# THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| WFC HOLDINGS CORPORATION | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 07-CV-3320 JRT/FLN |
| | ) |
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Defendant. | ) |
| | ) |

## PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTION IN LIMINE TO EXCLUDE THE EXPERT REPORTS AND TESTIMONY OF DOUGLAS J. SKINNER, OLIVER D. HART AND WALTER N. TOROUS

WFC Holdings Corp. ("Plaintiff") submits this memorandum in support of its motion in limine to exclude the expert reports and proposed testimony of two of Defendant's experts, Professor Douglas J. Skinner and Professor Oliver D. Hart, and one of its rebuttal experts, Professor Walter N. Torous.  Regarding Professors Skinner and Hart, neither witness is qualified to testify as to the issues in controversy; and regarding all three witnesses, the reports and proposed testimony of each witness are limited to opinions that are not relevant and/or not reliable, and are therefore not helpful to understanding the evidence or determining a fact in issue.  Accordingly, each expert fails to satisfy the threshold standards of Rule 702[1] of the Federal Rules of Evidence ("FRE") for the admission of expert testimony.

---

[1] For the convenience of the Court, all citations in blue typeface are hyperlinked to the cited source document in an e-brief on CD-ROM to be provided to chambers.  A courtesy copy of Plaintiff's e-brief will simultaneously be sent to Defendant's counsel.

## INTRODUCTION

On July 13, 2007, Plaintiff brought this suit for a refund of Federal income taxes erroneously assessed and collected for the taxable year ended December 31, 1996 (the "1996 Taxable Year").  The claimed refund arises from a $423,849,534 capital loss (the "Capital Loss") sustained by Plaintiff in the taxable year ending December 31, 1999 (the "1999 Taxable Year") upon its sale of stock in a wholly-owned subsidiary known as Charter Holdings, Inc. ("Charter") to an unrelated purchaser, Lehman Brothers, Inc. Plaintiff carried back $235,181,044 of the 1999 capital loss to its 1996 Taxable Year resulting in a claimed refund of $82,313,366.  The Internal Revenue Service ("IRS") disallowed Plaintiff's refund claim, after which Plaintiff filed the instant suit for refund.

The sole substantive issue to be resolved in this action is Plaintiff's entitlement to the Capital Loss.  To establish its entitlement to the Capital Loss, Plaintiff must prove that its tax treatment of the transaction giving rise to the loss was proper, based on the applicable statutes and case law.

Two federal appellate courts have considered transactions that are similar to the one at issue in this case.  *Black & Decker v. United States*, 436 F.3d 431 (4th Cir. 2006); *Coltec Indus., Inc. v. United States*, 454 F.3d 1340 (Fed. Cir. 2006).  Both courts affirmed that (i) the taxpayers' transactions satisfied the statutory requirements of the Internal Revenue Code (the "Code"),[2] and (ii) taxpayers are entitled to the statutory tax benefits if, based on the facts of their specific cases, they can demonstrate that the transaction served a business

_____

[2] All references to the "Code" are to the Internal Revenue Code of 1986, as amended.

function apart from obtaining tax benefits.  *See*, *e.g.*, *Black & Decker*, 436 F.3d at 441 (noting that whether a transaction should be respected for federal tax purposes "is an issue of fact.").[3]  Likewise, the Internal Revenue Service's own pronouncements have recognized that the treatment of such transactions "[d]epend[s] on the facts of the particular case…."  Notice 2001-17, 2001-1 C.B. 730.  This fact-specific analysis has come to be known as the "sham transaction" doctrine and focuses on the reasons for, and effects of, transactions that comply with the literal terms of the tax code, ensuring that the transactions also possess "economic reality."  *Coltec*, 454 F.3d at 1352.

A.      Background Regarding The Statutory Provisions

A detailed discussion of the statutory provisions governing this case is beyond the scope of this motion as they do not implicate the qualifications, relevance or reliability of Defendant's expert witnesses.  By way of background, however, the transaction at issue, involving the transfer of assets to a subsidiary in exchange for stock of the subsidiary and the subsidiary's assumption of associated contingent liabilities, is treated as a non-recognition (*i.e.*, non-taxable) transaction under Code Section 351.  As a result, the stock received by the transferors had a tax basis equal to the basis of the assets they transferred. Code Section 358(d)(2).  When Plaintiff sold a portion of the stock received by the

---

[3] In *Coltec*, the Federal Circuit concluded that the taxpayer failed to establish that it had any business purpose apart from creating tax benefits.  In *Black & Decker*, a case appealed after the trial court granted summary judgment in favor of the taxpayer, the Fourth Circuit concluded that issues of fact remained as to whether the transaction had a profit motive or other non-tax business purpose.  The case was thereafter settled on remand.

transferors to a third party, Plaintiff recognized the Capital Loss at issue in this litigation.

Code Section 1001.

   B.      Background Regarding The Sham Transaction Doctrine

   In the seminal case interpreting the sham transaction doctrine, *Frank Lyon Co. v. United States*, 435 U.S. 561 (1978), the Supreme Court held that:

> where . . . there is a genuine multiple-party transaction with economic substance which is compelled or encouraged by business or regulatory realities, is imbued with tax-independent considerations, and is not shaped solely by tax avoidance features that have meaningless labels attached, the Government should honor the allocation of rights and duties effectuated by the parties.

*Id*. at 583-84.  Subsequent court decisions interpreted this analysis as consisting of two components: (i) whether the transaction was motivated by any business purpose other than tax considerations (commonly known as the "business purpose" test), and (ii) whether there was any reasonable possibility to profit from the transaction (commonly known as the "economic substance" test).  *See Rice's Toyota World, Inc. v. Comm'r*, 752 F.2d 89 (4th Cir. 1985).  *See also Shriver v. Comm'r*, 899 F.2d 724, 725-26 (8th Cir. 1990); *IES Industries, Inc. v. United States*, 253 F.3d 350, 355 (8th Cir. 2001).

   The first prong of this analysis, business purpose, is considered to be a subjective test,[4] which examines the taxpayer's motives.  The second prong, economic substance, is considered to be an objective test – *i.e*., it looks at "the objective realities of the transaction."  *Shell Petroleum Inc. v. United States*, 2008 WL 2714252, *32 (S.D. Tex.

---

[4] Some courts have also referred to the business purpose test as "subjective economic substance."  *See, e.g.*, *IES*, 253 F.3d at 355.

2008).[5]  The Fourth Circuit, in *Rice's Toyota*, indicated that if a taxpayer can satisfy either the subjective business purpose test *or* the objective economic substance test, its tax treatment of the transaction should be respected.  *See Rice's Toyota*, 752 F.2d at 91-92.

The Eighth Circuit has declined to endorse or reject the Fourth Circuit's two-part test; however, it also has not excluded the possibility that satisfaction of either test is sufficient to uphold the transaction.  *See Shriver*, 899 F.2d at 727; *IES*, 253 F.3d at 353-54.[6]  Rather, the two-part test is an acceptable (but not exclusive) means to get at the ultimate question of whether the transaction was shaped solely by tax avoidance considerations.  *See Shriver,* 899 F.2d at 727.  Thus, the courts in this Circuit apply a flexible analysis that defines the "essential inquiry" as "whether the transaction had any practical economic effects other than the creation of income tax losses."  *Id.* at 727 (citing *Sochin v. Comm'r.*, 843 F.2d 351, 354 (9th Cir. 1988); *Rose v. Comm'r.*, 868 F.2d 851, 854 (6th Cir. 1989)).

C.     Relevance Of The Objective Economic Substance And Subjective Business Purpose Analyses

Historically speaking, courts examining a transaction's "objective economic substance" have focused on whether the transaction created a "reasonable possibility of profit… apart from tax benefits."  *IES*, 253 F.3d at 354 (citations omitted).  For purely financial transactions that have no natural nexus to an individual's or corporation's

---

[5] For this reason, the objective prong has also been referred to as "objective economic substance."  *See IES*, 253 F.3d at 354.

[6] Indeed, in *IES,* the court did not need to decide whether a two-part analysis was required because it determined that the transaction had both business purpose and economic substance.

ordinary business operations, *e.g.*, *id.* at 351-52 (purchase and sale of American Depository Receipts), courts have had little choice but to look solely to that criterion.  For such transactions, it is all but impossible to discern any non-tax benefit other than the profit that would be generated directly by the transaction.

Where there were no conceivable circumstances under which such a transaction could produce benefits greater than the transaction costs, courts have held that the transaction lacked economic substance because the only objective benefit from entering into the transaction was the tax savings it generated.  *See, e.g.*, *ACM P'ship v. Comm'r*, 157 F.3d 231, 251 (3d Cir. 1998) (examining the use of contingent installment notes to generate a capital loss); *Kirchman v. Comm'r*, 862 F.2d 1486, 1492 (11th Cir. 1989). However, where the taxpayer objectively demonstrates good reasons to believe that profit or cost savings are likely to exceed the costs of the transaction (*e.g.*, a prior favorable experience involving a similar situation, or actual post-transaction benefits that validate the substance of the transaction), the standard for objective economic substance is considered satisfied.  *See Jacobson v. Comm'r*, 915 F.2d 832, 838 (2nd Cir. 1990) (citing the "standing and experience" of the principals of a transaction as examples of "objective facts" that justified their profit motives); *IES*, 253 F.3d at 354 (concluding that the transaction actually "resulted in a profit, an economic benefit to IES").[7]

---

[7] To establish objective economic substance, a taxpayer's expectation of making a profit (or saving money) need not necessarily come to fruition if the belief was reasonable at the time of the transaction.  *See Jacobson.*, 915 F.2d at 839 (taxpayer had a bona fide profit motive for a losing investment that was not an obvious loser *ex ante*).

As a practical matter, a taxpayer who satisfies the objective economic substance test also plainly satisfies the business purpose test because making or saving money, even from unrelated activities, is undeniably a legitimate reason for undertaking a transaction so long as the events giving rise to the benefit were reasonably foreseeable.[8]

On the other hand, while the potential for profit from a purely financial transaction indicates both objective economic substance and a subjective business purpose, that rigid analysis is not applicable in all circumstances.  For example, where a company restructures part of its business operations in a way that is reasonably expected to provide a benefit at some future point, but perhaps not in a way that is readily quantifiable in the near term, the restructuring should also satisfy the requirements defined by the Eighth Circuit and other courts.  Cf. *United Parcel Service, Inc. v. Comm'r*, 254 F.3d 1014, 1019 (11th Cir. 2001) ("a transaction has a 'business purpose,' when we are talking about a going concern…, as long as it figures in a bona fide, profit-seeking business.").  Although a taxpayer's inability to quantify precisely the benefits of such transactions may make them more amenable to a "business purpose," or "subjective economic substance" test, the benefits that they create should nonetheless satisfy the standard for respecting a transaction.

This explains why the Eighth Circuit has said that whether a transaction should be respected for tax purposes does not depend on whether one applies "'a generic tax shelter' test or a two-prong subjective/objective analysis."  *Shriver*, 899 F. 2d at 727

---

[8] Thus, for example, a taxpayer who, by virtue of an unforeseen event such as an unanticipated change in the law, actually ends up making or saving money on a transaction entered into solely for tax purposes, would not satisfy the objective *or* subjective economic substance tests.

(quoting *Rose v. Comm'r.*, 868 F.2d at 854).  All that matters under the Supreme Court's

sham transaction analysis, as articulated in *Frank Lyon*,[9] and similarly under the flexible

analysis adopted in the Eighth Circuit, "is whether the transaction 'had any practicable

economic effect other than the creation of economic tax losses.'" *Id*.

> D.     Economic Substance And Business Purpose In This Case

As discussed in detail in Plaintiff's Statement of Facts, the transaction at issue

involved the transfer of assets (government securities and leasehold interests) by two of

Plaintiff's subsidiary banks, to a non-bank subsidiary, Charter, in exchange for stock and

Charter's assumption of the banks' obligations under the leases.  The transferred leases

were considered to be "underwater" because the rental obligations the banks owed as

master lessees exceeded the rental income they were able to generate from subleasing

space they no longer required for bank operations.

Multiple business reasons motivated the transfer of the leases from the Banks to

Charter.  Among the most prominent, the transaction enabled Plaintiff to remove the

leases from the regulatory jurisdiction of the Office of the Comptroller of the Currency

(the "OCC") and place them under the jurisdiction of the Federal Reserve Board (the

"Fed").  By transferring the leases, Plaintiff removed the encumbrances of the OCC's

regulations, which were not replicated by the Fed.  This flexibility allowed Plaintiff to

minimize its losses and, in some instances, earn positive returns, by avoiding early

---

[9] Apropos to the instant case, in *Frank Lyon*, the Supreme Court cited regulatory barriers
imposed upon a bank that could be overcome by the transaction as one of the reasons
why the transaction had economic substance.

dispositions that might have been required by the OCC rules, or by exercising lease extension options which would have been prohibited by the OCC rules.

Further, the transfer enabled Plaintiff to mitigate the pressure for preferential treatment from good bank customers who were either (i) lessors of properties leased by Plaintiff (*e.g.*, waiving a right to terminate a lease obligation), or (ii) actual or prospective subtenants of vacated premises (*e.g.*, offering rent concessions). As discussed in more detail below, the transfer provided the separate entity the flexibility to fend off these requests without impairing the customer relationship.

E.   <u>Relationship Of Statutory Rules And Judicial Doctrines To Plaintiff's Motion In Limine</u>

The three expert witnesses who are the subject of this motion were each retained by Defendant ostensibly to support its position that Plaintiff lacked a business purpose for undertaking the transaction and that the transaction lacked objective economic substance.[10] However, none of the three can offer testimony that satisfies the threshold standards for admissibility of expert testimony as established by FRE 702. As explained below, none of the experts are qualified to speak to the issue of whether Plaintiff was capable of making or saving money by entering into its restructuring transaction, *or* to the issue of whether Plaintiff had a non-tax business reason for proceeding with the transaction.

---

[10] Although Defendant may also have intended to offer one or more of the experts to challenge Plaintiff's claim that it satisfies the statutory requirements of the Internal Revenue Code, none of the three is qualified as an expert as to such matters nor do they purport to offer any opinions controverting that particular claim.

To preview the discussion below, the three experts who are the subject of this motion can offer the Court nothing in terms of competent, relevant or reliable testimony that will assist the Court in understanding the evidence or in determining a fact in issue. Although two of the three, Professors Hart and Torous, arguably opine on matters relevant to the issues before the court, they nonetheless fail to satisfy the FRE 702 reliability requirement for admissibility of their reports and testimony.  Beyond his failure to meet this requirement, Professor Hart also fails the core competency requirement to testify about matters on which he is qualified as an expert.[11]  The third expert, Professor Skinner, may be qualified as an expert in the field of economics; however, his opinion, which is limited to defining the debt versus equity characteristics of the Preferred Stock from an economic viewpoint, is wholly irrelevant to any of the issues presented in this case.

## STATEMENT OF FACTS

Plaintiff is a diversified financial services company that provides banking, insurance, investment, mortgage, and consumer finance services for 70 million customers through 11,000 stores, 12,300 automated teller machines, and other distribution channels around the world.  Wells Fargo & Company 2008 Annual Report, at 1 (Feb. 27, 2009), available at https://wellsfargo.com/invest_relations/annual.  To conduct its operations, Plaintiff owns and leases a variety of premises in the geographic regions in which it

---

[11] Professor Torous' opinion is narrower in scope.  Although he arguably has the qualifications to render his opinions, the basis for his exclusion is the unreliability of his principles and methods in formulating these opinions.

operates.  (Compl. ¶ 16.)  The size, cost, and strategic importance of Plaintiff's corporate

real estate portfolio makes it a central component in the success of Plaintiff's business.

Prior to Plaintiff's acquisition by Norwest Corporation in 1998, this real estate portfolio

was the financial responsibility of Plaintiff's Corporate Properties Group ("CPG"), a unit

of Wells Fargo Bank, N.A. that, at all time relevant to this case, has been overseen by

Donald Dana.  (Deposition of Donald E. Dana ("Dana Dep."), 14:12-23, Oct. 28, 2008.)

Plaintiff has grown its banking business, in part, through strategic acquisitions, the

most recent of which was the well-publicized acquisition of Wachovia Corp. on October

3, 2008.  *See* Press Release, Wells Fargo & Company, Wells Fargo and Wachovia

Merger Completed (Jan. 1, 2009), available at https://www.wellsfargo.com/press/2009/

20090101_Wachovia_Merger.  Given the size and importance of its real estate portfolio,

Plaintiff's ability to achieve the business objectives of these acquisitions depends

critically on its ability to integrate into its operations the real estate that it acquires.

(Transcript of Interview of Donald E. Dana ("Dana Int.") 44:19-22, Oct. 15, 2003.)

When Plaintiff acquired Wachovia, the companies operated in largely different

geographic footprints.  *See* Press Release, Wells Fargo & Company, *supra*.

Consequently, the strategic combination of the two businesses did not result in a

significant number of redundant properties (*e.g.*, retail branches and administrative

offices) that would need to be disposed of following the acquisition.

In contrast, when Plaintiff acquired First Interstate Bancorp in March 1996, the

companies' geographic footprints largely overlapped, particularly in Southern California

and Texas.  (Transcript of Deposition of Karen Bowen ("Bowen Dep.") 21:5-15. 22:13-

21, Sep. 25, 2008).  As Plaintiff integrated First Interstate's operations with its own, it vacated substantial amounts of redundant retail and administrative space that was no longer needed by the combined business.  (Compl. ¶ 19.)[12]  In light of the generally challenging real estate environment in early 1996, Plaintiff could not sell or sublease the vacant properties and/or space within those properties for the same prices and rates at which it had originally purchased or leased them.  (Compl. ¶¶ 20-21.)  *See*, *e.g.*, WFP-00249 at 00255, attached as Exhibit 3.

1.  Consequently, as of 1996, Plaintiff projected that the costs associated with the integration of the two companies' real estate portfolios would generate between $1 billion and $1.4 billion of losses to Wells Fargo.  *See*, *e.g.*, WFP-00132, attached as Exhibit 2.

In an effort to mitigate this looming business problem, CPG undertook aggressive efforts over the next two years to consolidate and dispose of its loss-producing real estate interests.  (Compl. ¶¶ 20, 23; Dana Int. 42:8-43:23.)  During this period, CPG experienced considerable success in disposing of vacant retail branches.  (Dana Int. 43:24-44:5.)  For example, in 1997 alone, CPG sold or subleased more than 360 such properties.  (*Id*. 44:6-12.)  On the other hand, CPG made much less progress in disposing of its loss-producing administrative properties.  (*Id*. 44:13-45:25.)

A combination of several factors impeded CPG's ability to dispose of the administrative properties, which generally consisted of large, multi-tenant office

---

[12] As background, "retail" space consists of bank branches, ATMs, and other locations that are used for customer service and transactions.  In contrast, "administrative" space consists of back-office functions (e.g., accounting and finance, check processing, general management) that typically do not involve interactions with customers.

buildings.  First, whereas a retail branch could be disposed of by selling or subleasing the property to a single buyer or tenant, an office building of 100,000 square feet or more required complex negotiations with multiple parties, each of which had unique needs in terms of space, parking, lease term and other factors.  (Dana Int. 61:4-64:18.)  Second, many of the administrative properties were leased from landlords or subleased to tenants who also had significant banking relationships with Plaintiff's banking subsidiaries.  *See Exhibit 3 at WFP-00296*.  Plaintiff's reluctance to compromise these relationships limited CPG's ability to aggressively negotiate buyouts or restructurings of the bank customers' lease and sublease interests.

Finally, because the leased properties were held by two of Plaintiff's subsidiary banks, Wells Fargo Bank, N.A. and Wells Fargo Bank (Texas), N.A. (together, the "Banks"), Plaintiff's management of a number of these properties was constrained by Federal banking laws and regulations.[13]  (Compl. ¶ 22.)  In particular, the Banks were generally required to dispose of properties not used for banking purposes within a fixed period of time.  12 U.S.C. § 29.  Further, rulings and regulations issued by the OCC limited Plaintiff's ability to exercise options to extend (or negotiate extensions of) leases of former bank premises.  12 C.F.R. § 34.83.  Consequently, Plaintiff generally could not offer extension options to prospective subtenants when marketing the vacant space.

---

[13]  Thus far, Defendant has made much of its belief that only a portion of the properties would have been subject to the OCC's statutory and regulatory restrictions.  However, Defendant fails to account for the possibility that certain properties, which were not affected by these restrictions at the time of the transaction, could have become so afterwards, especially in light of the continuing consolidation of the banking industry generally and Plaintiff's operations specifically.

These statutory and regulatory limitations affected Plaintiff in multiple ways. First, Plaintiff's inability to offer extension options to prospective subtenants beyond the end of its master lease reduced the attractiveness of the property.  (Deposition of Mark Ingram ("Ingram Dep.") 43:25-44:17, October 23, 2008.)  Indeed, when the remaining term of its master lease was relatively short (*e.g.*, less than four years), Plaintiff often could not attract any new subtenants for the duration of the lease.  (Ingram Dep. 70:3-11.)  Moreover, because of the statutorily mandated disposition period, the Banks could have been forced to dispose of properties before the expiration of their lease terms, further increasing Plaintiff's losses from these properties.  (Dana Int. 92:24-93:7.)

Due to this confluence of factors, Plaintiff entered 1998 facing a substantial economic burden from these administrative properties.  (Dana Int. 44:23-45:25.)  As one of CPG's executives wrote in a January 1998 memorandum, "The disposition of large administrative space is a key agenda item for Wells in 1998.  There will not be a more important project undertaken by CPG."  *See* WFP-00734, attached as Exhibit 4.  In light of this continuing business problem, CPG investigated different mechanisms for reducing its exposure to these projected losses.  (Dana Int. 46:1-47:4.)

Initially, CPG formed an "Administrative Space Disposition Team," which was intended to bring additional focus to the problem presented by these loss-producing properties.  (Dana Dep. 57:13-58:4; Ingram Dep. 38:12-15.)  *See also* Exhibit 3.  During the first half of 1998, however, it became clear to CPG's managers that this Disposition Team was not having any greater success in disposing of the properties than CPG's prior efforts.  (Ingram Dep. 38:12-15.)  The problem was highlighted when a large proposed

sublease with Bank of America at one of the administrative properties fell through in the middle of 1998. (Dana Int. 94:23-95:5.)

During the same time that Plaintiff was experimenting with the Disposition Team, Donald Dana was also exploring other means for solving this seemingly intractable business problem. First, Mr. Dana had realized that a comprehensive solution needed to involve a non-bank subsidiary that would be regulated by the Fed, rather than the OCC. (Dana Int. 112:4-9; Bowen Dep. 22:6-23:8.) Because the Fed does not impose the same restrictions on leased properties, this transfer would give Plaintiff greater flexibility in deciding how to most profitably dispose of a significant portion of the transferred properties. (Dana Int. 96:21-25; Bowen Dep. 22:22-24.)

Mr. Dana further believed that Plaintiff's efforts could benefit from a structure that he had used approximately ten years earlier when faced with the similar problem of marketing office space during a challenging real estate environment. (Dana Dep. 60:14-18.) That structure involved transferring the properties to an entity that had (i) a name that was distinguishable from Plaintiff's brand name (*i.e.*, "Charter Holdings") and (ii) an outside investor in its capital structure to whom the entity would owe fiduciary obligations. (Dana Dep. 60:22-61:2.) Based on his earlier experience, Mr. Dana believed that the distinguishable name and presence of an outside investor would enable the properties' lease negotiators to negotiate more aggressively with Plaintiff's bank customers and other stakeholders without comprising the Banks' relationships. (Dana Int. 80:11-86:12.)

Finally, Mr. Dana concluded that the troublesome administrative properties could be more efficiently and effectively managed if financial responsibility for the properties

remained with a centralized business unit, like Charter, rather than being assigned to one or more of Plaintiff's other business lines. As part of Norwest's acquisition of Plaintiff, financial responsibility for Plaintiff's corporate properties was shifted from CPG to the combined company's regional business managers. (Dana Int. 60:10-61:10.) As a result, Mr. Dana was required to allocate to the business managers properties that had previously been the financial responsibility of CPG. (*Id*.)

Due to Plaintiff's particular compensation structure, the business managers to whom these properties would otherwise have been assigned often were reluctant to invest in tenant improvements necessary to attract subtenants or buy out a lease interest. (Dana Int. 64:19-67:9.) Charter, however, had no such limitations, and its managers could make investment decisions without risking reductions in their compensation.

At approximately the same time that Plaintiff's property managers were examining possible solutions for their business dilemma, Plaintiff's tax department was also exploring how these properties could be restructured in a tax-efficient manner. (Transcript of Interview of Richard Hayes ("Hayes Int.") 11:9-12:1, Jan. 22, 2004.) Mr. Dana ultimately met with Plaintiff's in-house tax advisors and the outside firm of KPMG in April and May of 1998, more than two years after Plaintiff had originally begun addressing the problem of these loss-producing properties. (Dana Dep. 97:1-99:2.) Mr. Dana agreed that he might be willing to implement his proposed restructuring in a tax-efficient manner so long as the tax aspects were consistent with his business objectives. (Dana Dep. 119:15-24.)

Between August and October of 1998, Mr. Dana identified 20 administrative properties and one retail property that he felt were the best candidates for inclusion in the lease restructuring transaction (the "LRT").  Plaintiff's property managers determined that these 21 properties were most likely to benefit from the various advantages offered by the new structure.  (Dana Dep. 138:3-20.)  Although Plaintiff could have transferred many other underwater properties to Charter, along with their hundreds of millions of dollars of additional liabilities, Mr. Dana determined that these properties were not likely to benefit from any of the advantages afforded by the LRT.  (Dana Dep. 137:24-139:9.) Moreover, because these other loss-generating properties consisted almost exclusively of small retail branches, with commensurately small losses, Mr. Dana recognized that these properties did not provide the same large-scale opportunities as the Selected Leases to reduce costs and earn profits.  (Dana Dep. 137:24-139:9.)

On December 17, 1998, Plaintiff directed the Banks to transfer the selected properties (the "Selected Leases") to Charter along with government securities that would finance the payment of the net projected liabilities associated with the Selected Leases. In return, Charter issued preferred stock (the "Preferred Stock") to the Banks as well as assuming the lease payment obligations for the Selected Leases.  Defendant's Responses to Plaintiff's First Set of Requests for Admissions ("Admissions") #4.  To comply with Federal banking law, the Banks immediately sold to Plaintiff the Preferred Stock they had received in the exchange.  Admissions #13 (regarding the sale of stock by the Banks to Plaintiff)

The Banks' transfer of assets to Charter in exchange for the Preferred Stock and

Charter's assumption of the Banks' obligations under the Selected Leases was treated as

a non-taxable exchange of property for stock under Code Section 351.  Further,

Defendant itself concedes that the Preferred Stock received by the Banks is stock for

Federal tax purposes.  Defendant's Objections and Responses to Plaintiff's First Set of

Interrogatories ("Interrogatory Response") #1.

As part of Mr. Dana's business objective of bringing an unrelated investor into

Charter's capital structure, Plaintiff discussed the possibility of selling the Preferred

Stock with several different prospective investors.  *See* WFP2-04716, WFP2-04717 and

WFP2-04718, attached as Exhibits 4, 5, and 6.  On February 26, 1999, Plaintiff sold

4,000 shares of the Preferred Stock to Lehman Brothers, Inc. for $3,750,022.22 in a non-

prearranged arm's-length transaction.  Admissions #14, 17; Interrogatory Response #13,

as amended by Letter from Thomas P. Cole to Philip Karter (Jan. 16, 2009).

Since the time that Plaintiff undertook the LRT, Charter has consummated a

number of cost-saving transactions that are directly attributable to the restructuring.  As

of December 31, 2006, the losses attributable to the transferred properties had been

reduced by more than $65 million (approximately $100 million in undiscounted terms)

under Charter's direction.  Of this reduction, no less than $25 million is directly

attributable to actions taken by Charter that would have been impossible, or at least

significantly more difficult, without the LRT.

Moreover, because Charter's lease management activity involves an ongoing

business, Charter (and, by extension, Plaintiff) is likely to earn tens of millions of dollars

in additional profits through the aggressive management of Charter's remaining portfolio. For example, Charter has extended its master lease at one of the 21 properties transferred, the Garland Center Building in Los Angeles, as Charter's senior managers expected that it might at the time of the LRT.  According to the latest projections prepared by the commercial real estate firm CB Richard Ellis on October 6, 2009, Charter stands to earn more than $25 million (approximately $46 million in undiscounted terms) of additional profits during the next ten years.  WFP13-19257, attached as Exhibit 8.[14]  Due to the regulatory restrictions that would have been imposed on the Banks' management of the Garland building, none of this additional profitability would have been possible had Plaintiff not undertaken the LRT.

## LAW AND ARGUMENT

I.   **The Court Must Scrutinize The Qualifications Of Defendant's Experts, As Well As The Reliability And Relevance Of Their Proposed Testimony.**

The admission of expert testimony is governed by FRE 702, which prescribes that the proposed expert testimony must meet three prerequisites in order to be admitted. First, it must be offered by an expert who is qualified to opine about the subject matter by knowledge, skill, experience, training, or education.  Second, the expert's opinions must be relevant; *i.e.*, it must be useful to the finder of fact in deciding the ultimate issue of

---

[14] Furthermore, Steven Grenadier, a professor of financial economics at the Stanford University Graduate School of Business, whom Plaintiff has engaged as an expert, has calculated that Charter's option to extend the Garland lease had an aggregate value of $221 million as of the beginning of 2009.  Revised Report of Steven R. Grenadier (Feb. 4, 2009).  Defendant has not presented any evidence or testimony to rebut Professor Grenadier's opinion of the current value of the Garland extension option.

fact.  Third, the expert's testimony "must be reliable or trustworthy in an evidentiary sense, so that, if the finder of fact accepts it as true, it provides the assistance the finder of fact requires . . . ."  *Polski v. Quigley Corp.*, 538 F.3d 836, 839 (8th Cir. 2008) (internal quotation and citation omitted).  *See also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999) (all expert testimony, whether based on "scientific" or "other specialized knowledge," is subject to the relevance and reliability screening of FRE 702).  As the proponent of the three experts, Defendant has the burden of demonstrating that the expert reports and testimony of Professors Hart, Skinner, and Torous satisfy these requirements, or their testimony must be excluded.  *See Daubert v. Merrell Dow Pharmaceuticals, Inc.* 509 U.S. 579, 592 (1993).

A.    The Relevancy Requirement

To be useful to the finder of fact in deciding the ultimate issues of fact, an expert's testimony must relate to an issue in the case.  *Daubert*, 509 U.S. at 591 (quoting 3 JACK B. WEINSTEIN & MARGARET A. BERGER, WEINSTEIN'S EVIDENCE ¶ 702[2] (1988) ("Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful").  *See also United States v. Wintermute*, 443 F.3d 993, 1001 (8th Cir. 2006) (expert testimony that misrepresented the legal question at issue was properly excluded as irrelevant).  Here, the sole factual issue is whether Plaintiff can establish that the LRT had economic substance or that Plaintiff had a non-tax business purpose for undertaking the transaction.  Because Plaintiff's entitlement to the 1999 Capital Loss hinges on that determination, expert testimony not bearing on this issue of fact must be excluded as irrelevant.

B.     The Reliability Requirement

In addition to meeting the relevancy standard, FRE 702 requires that the proponent

demonstrate that the testimony is "the product of *reliable* principles and methods."  *North*

*Star Mutual Insurance Co. v. Zurich Insurance Co.*, 269 F.Supp.2d 1140, 1148 (D. Minn.

2003) (emphasis added).  This screening for reliability permits the court to "separate…

expert opinion evidence based on 'good grounds' from subjective speculation that

masquerades as scientific knowledge."  *Glastetter v. Novartis Pharm. Corp.*, 252 F.3d

986, 989 (8th Cir. 2001); *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1057

(8th Cir. 2000) ("Expert testimony that is speculative is not competent proof and

contributes nothing to a 'legally sufficient evidentiary basis.'");  *Daubert*, 509 U.S. at 594

("knowledge," as used in FRE 702, connotes more than subjective belief or unsupported

speculation).  *See also* FRE 702 advisory committee's note (2000 amends.) ("The trial

judge in all cases of proffered expert testimony must find that it is properly grounded, well-

reasoned, and not speculative before it can be admitted.").

If any step in an expert's analysis is unreliable, the expert's opinion is also

unreliable and must be excluded.  *See In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 745

(3rd Cir. 1994) ("any step that renders the analysis unreliable…renders the expert's

testimony inadmissible.  This is true whether the step merely changes a methodology or

merely misapplies that methodology.");  *Knight v. Kirby Inland Marine Inc.*, 482 F.3d

347, 354-55 (5th Cir. 2007) (expert's testimony must be reliable at each and every step or

else it is inadmissible).  To satisfy the reliability standard of FRE 702, therefore,

Defendant must demonstrate that its experts employed reliable methods and principles in

each step of their analysis; only then may the Court determine that the expert's opinion is

"based upon sound, reliable theory" as opposed to "rank speculation." *North Star Mutual*

*Insurance Co.,* 269 F.Supp.2d at 1147.

## II.   **Professor Skinner's Report And Testimony Are Irrelevant To The Legal And Factual Issues In This Case.**

     A.    <u>Professor Skinner Has Admitted The Irrelevance Of His Testimony.</u>

Professor Douglas Skinner is one of three initial experts engaged by Defendant in

this case.[15]  Professor Skinner describes the scope of his engagement as follows:

> I have been engaged . . . to study the transaction . . . and reach an opinion as
> to the economic nature of certain preferred stock issued by Charter
> Holdings, Inc. ("Charter"), one of Wells Fargo's subsidiaries, and
> subsequently sold to Lehman Brothers, Inc. ("Lehman"). More specifically,
> I have been asked to reach an opinion as to whether these securities are
> most appropriately characterized as debt or equity.

Report of Douglas J. Skinner, dated December 1, 2008 ("Skinner Rpt.") at ¶ 6.  Professor

Skinner's report concludes that, "from an economic perspective," the Preferred Stock

"has characteristics and features that make it much more similar to debt than

equity." *Id.* at ¶ 42.  Curiously, Professor Skinner never actually opines about whether

the Preferred Stock is debt or equity, even from an "economic perspective."  He merely

suggests that it is closer to one end of the debt - equity continuum than the other.

Professor Skinner did not evaluate the Preferred Stock for other purposes either,

such as tax, corporate, accounting, financial reporting, or securities law.  (Skinner Expert

---

[15] The other two initial experts engaged by Defendant are Oliver D. Hart and Ronald
Hendricks.  Professor Hart is also a subject of this motion in limine, along with one of
Defendant's rebuttal experts, Walter Torous.

Deposition ("Skinner Dep.") 206:10-207:22, March 20, 2009.)  He also acknowledges that he lacks qualifications to testify as an expert on matters involving tax, corporate, bankruptcy, debtor-creditor, securities and real estate law.  (Skinner Dep. 54:6-56:2.)

Professor Skinner concedes that his opinion does not relate to whether or not the transaction had a non-tax business purpose.  (Skinner Dep. 70:4-7 ("that was not specifically something that I was asked to opine on."), 73:12-17.)  Similarly, he offers no opinion in his report or deposition testimony about the Plaintiff's expectations of making a profit or saving money.  Indeed, Professor Skinner concedes that he has no practical experience that relates to the issues in this case.  (Skinner Dep. 60:19-22.)[16]

B.   Professor Skinner's Testimony Will Not Help The Court Determine A Fact In Issue.

The relevancy of Professor Skinner's testimony hinges on whether it will "assist the trier of fact to understand the evidence or to determine a fact in issue."  FRE 702. Here, the limited scope of Professor Skinner's opinion (i.e., that the Preferred Stock is more "debt-like" from an economic perspective) fails this test on two accounts.

First, Professor Skinner's "economic perspective" will not assist the Court in determining whether the Preferred Stock is properly treated as equity under the Code. Although the Code recognizes that a debt-equity spectrum exists for preferred stock, the

_____

[16] Professor Skinner may well be qualified to opine about the debt versus equity characteristics of the Preferred Stock from an "economic perspective," but such opinions are wholly irrelevant to this case.  In contrast, as to relevant matters, such as whether Plaintiff had a business purpose for entering into the transaction, or whether it had a reasonable expectation that it could save or make money as a result, these are beyond the scope of Skinner's opinions.

attributes that the Code considers for this purpose are distinct from those considered by Professor Skinner for purposes of his economic analysis.  *See*, *e.g.*, Code Section 351(g). Also, the courts have recognized that all preferred stock has characteristics of debt that do not change its classification for tax purposes.  *See TIFD III-E Inc. v. United States*, --- F.Supp.2d ---, 2009 WL 3208650, *13 (D.Conn. Oct. 7, 2009) ("the Second Circuit has long and consistently held that, although preferred stock is debt-like in nature, it should be treated as equity for tax purposes.").  In addition, Defendant has already conceded the characterization of the Preferred Stock as "stock" for purposes of Code section 351.  Interrogatory Response #1. In sum, Professor Skinner's opinion adds no additional insight into this issue.

Professor Skinner's testimony is also not relevant to the decisive factual issues in this case – *i.e.*, Plaintiff's business purpose and the transaction's economic substance. Whether, from an "economic perspective," the Preferred Stock is more akin to debt than equity has no bearing on either analysis.  As noted above, the rationale behind the business purpose and economic substance analyses is to determine whether a transaction was "shaped *solely* by tax avoidance features." *Frank Lyon*, 435 U.S. at 583-84 (emphasis added).  Professor Skinner's testimony does not assist in this determination. First, the testimony bears no relationship to the possibility that the transaction would produce a profit or cost savings for Plaintiff.  Moreover, by his own admission, Professor Skinner's opinions are equally irrelevant to Plaintiff's subjective business purpose, which does not hinge on the economic characteristics of the Preferred Stock.  Accordingly, Professor Skinner's expert report and proffered testimony must be excluded in their entirety on the basis of their irrelevance.

**III.**   **Professor Hart Is Not Qualified To Render His Opinions And, In Any Case,**
**The Opinions Are Based On Unreliable Speculation.**

     A.   Professor Hart's Report And Testimony Implicate Several Areas of
Expertise For Which He Has No Qualifications.

Professor Hart states in his expert report that he was "retained by the United

States . . . to provide expert analysis of certain economic issues and to testify regarding

[his] findings, if necessary." Report of Oliver D. Hart (Dec. 1, 2008) ("Hart Rpt.") at ¶ 1.

For this purpose, he professes to be "an expert in corporate governance, corporate

finance, the theory of the firm, and contract theory." Hart Rpt. at ¶ 6.

The essence of Professor Hart's initial report is that it was unnecessary for

Plaintiff to transfer the underwater leases to a separate legal entity to obtain the benefits

of the transaction.  In Professor Hart's opinion, whatever non-tax benefits Plaintiff

derived from the LRT arguably could have been replicated by utilizing what he believes

would have been a less expensive contractual approach.  (Hart Rebuttal Expert

Deposition ("Hart Reb. Dep.") 14:11-20, July 16, 2009.)

Arriving at this opinion necessarily implicates several areas of expertise in which

the witness must be qualified to testify before he is permitted to do so:

- Expertise regarding the application of banking laws and regulations to the
  LRT, including the qualifications to determine whether they would apply in
  a comparable manner if Professor Hart's contractual theory were utilized in
  lieu of the LRT in an effort to achieve the claimed business objectives.

- Expertise regarding the substitution of contract law principles for corporate
  law principles (including fiduciary duty) to opine that they provide
  comparable benefits and protections; and

- Expertise in comparing the relative cost of Professor Hart's so-called
  contract alternative to the chosen form of the transaction, assuming

*arguendo* that they are comparable in all other respects in terms of achieving the claimed business objectives.

In addition to his engagement by Defendant as one of its initial experts, Professor Hart has also been identified by Defendant as a rebuttal expert. According to the Rebuttal Report of Oliver D. Hart (May 15, 2009) ("Hart Rebuttal Rpt."), he has also been asked to evaluate the expert opinions of Gregory G. Gotthardt, Hart Rebuttal Rpt. at ¶ 2, an expert engaged by Plaintiff whose expertise is in real estate valuation, restructuring, financial and market analysis, and due diligence.[17]

B.   Professor Hart Lacks The Qualifications That Are Needed To Form His Principal And Rebuttal Opinions.

Opinions rendered by experts that fall outside of their area of expertise are inadmissible. The Eighth Circuit has repeatedly limited or excluded the testimony of witnesses "who, although considered experts in certain areas, were not well-versed in the particular discipline relevant to their testimony." *Smith v. Rasmussen*, 249 F.3d 755, 758-59 (8th Cir. 2001) (excluding doctor's testimony regarding treatment options because it was "based neither on his personal experience nor on his knowledge of the relevant discipline"); *see also Watkins v. Schriver*, 52 F.3d 769, 771 (8th Cir. 1995) (affirming exclusion of neurologist's testimony "that the [plaintiff's neck] injury was more consistent with being thrown into a wall than with a stumble into the corner"); *Mid-State Fertilizer Co. v. Exchange Nat'l Bank*, 877 F.2d 1333, 1339-40 (7th Cir. 1989) (rejecting

---

[17] For many of the same reasons discussed below, Professor Hart is no more qualified to opine about the subject matter of his rebuttal report than he is to opine about the subject matter of his initial report, and his rebuttal opinions are similarly unreliable and speculative.

expert economist's opinion that defendant's conduct "was contrary to good faith and fair dealing" because it was "a legal rather than an economic opinion").  As to the threshold qualifications that are needed to render an opinion about the business purposes for the LRT, Professor Hart fails on multiple counts.

    1.    <u>Professor Hart Lacks The Qualifications To Be An Expert On The Regulatory Restrictions Of The OCC.</u>

First, as to a fundamental business rationale for entering into the LRT, avoiding the regulatory restrictions of the OCC, Professor Hart simply excludes that from consideration altogether.  *See*, *e.g.*, Hart Rpt. at ¶ 3 ("I am not an expert on these regulatory issues.  Thus, for the purposes of this report, I will analyze the organizational structure of Charter as if regulatory considerations were absent.").  Hart's failure to consider the regulatory reasons for entering into the transaction makes his opinion that it could have been replicated in some contractual fashion invalid *ab initio*.  Indeed, during his initial deposition, Professor Hart admitted that, if the regulatory advantages created by the LRT resulted in a positive economic effect (*e.g.* profits or cost savings), this would reflect that Plaintiff's non-tax business objectives were genuine.  Hart Dep. 163:11-21.

    2.    <u>Professor Hart Lacks The Expertise To Compare The Benefits Of Contract Law With The Benefits Of Corporate Law.</u>

Second, despite his professed expertise in "contract theory," Professor Hart has no actual expertise in the study or practice of contract or corporate law.  Consequently, Professor Hart is not qualified to compare the two in order to render an opinion that the benefits of the LRT could have been replicated by contract.  *See* Hart Rpt. at ¶ 4 ("Any substantive changes resulting from the Charter formation could have been achieved

contractually by modifying the incentive arrangements between Wells Fargo and its employees.").  A discussion of his lack of qualifications as to each area of expertise follows.

(a)     Contract Law

Professor Hart is an economist; he is not a lawyer and not an expert in drafting contracts.  He admits that he has never seen nor drafted a contract like the one he proposes should have been used by Plaintiff in lieu of a separate legal entity.  (Hart Reb. Dep. 316:20 - 317:1.)  His practical experience with contracts is, in fact, limited to a few isolated instances, such as the lease of an apartment, (Hart Expert Deposition ("Hart Dep.") 59:6-15, March 13, 2009.), an employment contract for a caretaker (Hart Reb. Dep. 68:18-20), and what he describes as a $10,000 contract with a software company to allow an organization he belongs to accept credit cards on the Internet.  (Hart Dep. 59:20 - 61:24.)  Although Hart envisions the hypothetical contract alternative for Plaintiff to be "simple," (Hart Dep. 136:1-21), he described his own contractual experiences, such as the one involving an apartment lease, as "horribly complex."  (Hart Dep. 59:13-15; 135:15-16.)

(b)     Corporate Law

Professor Hart dismisses the importance of using a separate entity (Charter) to accomplish Plaintiff's business objectives and asserts that a contract would have provided benefits and protections comparable to corporate law.  This opinion, however, is predicated on a misunderstanding of the fiduciary duty a corporation owes to its shareholders and the fiduciary duty corporate executives owe to the corporation and its shareholders.

In his initial report, Professor Hart disputes Plaintiff's assertion that the ownership structure of Charter, particularly the presence of Lehman as a third-party shareholder, enabled Charter to aggressively negotiate with good bank customers, both on the landlord and subtenant side.  Hart Rpt. at ¶ 4.  On the basis of this belief, he opines that the fiduciary duty owed to Lehman has no "economic significance" in this case.  *Id*.[18] Professor Hart, however, is not qualified to opine on issues relating to the law of fiduciary duty, which is the basis for his "economic significance" opinion.  Indeed, there is nothing in Professor Hart's education or experience, academic or otherwise, that qualifies him to testify as an expert on fiduciary duty.  The following exchange is illustrative:

> Q.  You're certainly not qualified in the law of fiduciary duty, are you?
>
> A.  I'm not, but I suppose, as I was hoping that the law would be such, that --
>
> Q.  So your opinion is based on a hope.  I see.
>
> A.  Well, am I wrong?

(Hart Reb. Dep. 47:5-11; *see also* 58:20-59:3.)  Professor Hart has conceded that his opinion is based on his "assumption" concerning the *legal* requirements of fiduciary duty, rather than on any specific knowledge of the applicable law.  (Hart Reb. Dep. 57:14-20.)

Lacking expertise in both contract and corporate law, Professor Hart is ill-equipped to offer an opinion that his suggested alternative provides the same benefits as

---

[18] Hart derives this opinion on the belief that "[f]iduciary duty matters when one party's actions affect another party, but Wells Fargo's day-to-day business decisions did not have any practical effect on Lehman's investment."  *Id*.

were projected – and actually provided – by Charter, even assuming the lifting of OCC

regulatory restrictions is disregarded.

        3.       <u>Professor Hart Is Unqualified To Opine Regarding The Relative</u>
<u>Costs Of The Two Alternatives, Even Assuming The Alternatives</u>
<u>Are Otherwise Comparable.</u>

Professor Hart's lack of qualifications is further highlighted by his inability to

quantify the relative cost of his so-called contract alternative to the chosen form of the

transaction.  Professor Hart never contends that the transaction did not accomplish

Plaintiff's stated business objectives.  (Hart Dep. 70:20 – 71:2.)  Indeed, he concedes that

it very well may have.  (Hart Reb. Dep. 19:19-23.)[19]  Instead, he opines simply that there

was a *less expensive* alternative available that would have conferred the same benefits.

(Hart Reb. Dep. 19:24 - 20:7.)  The problem with such a statement is that it requires a

cost comparison that Professor Hart is unqualified to make.

Professor Hart admits that he has not calculated the costs to implement either his

contract alternative or the LRT as executed by Plaintiff.  (Hart Reb. Dep. 70:20-24.)

With respect to his contract alternative, Professor Hart concedes that he does not even

know what the cost of drafting such a contract would be.  (Hart Reb. Dep. 67:14-23.)

Professor Hart's knowledge of, or qualifications to determine, the implementation costs

attributable to the LRT is similarly lacking.  In fact, at various points in his depositions,

---

[19] On this point, Professor Hart tries to straddle the fence, on one hand conceding that the transaction may have provided benefits, but on the other hand, opining that "[f]rom an organizational efficiency perspective, the Wells Fargo-Charter transaction served no purpose."  Hart Rpt. at ¶ 5.

he speculates that the LRT costs might have been $600,000 (Hart Dep. 110:10-111:8; 123:4-8.), or as little as nothing.  (Hart Reb. Dep. 78:3-16.)

Professor Hart's confusion over the LRT costs (which he claims could have been avoided if his contract alternative were used) is compounded by an erroneous assumption that they were attributable, in part, to setting up Charter as a new corporate entity. (Hart Dep. 110:10-111:8.)  In fact, no such costs were incurred in the LRT because Charter was a pre-existing entity.  Before being made aware of this fact, Professor Hart agreed that if the transferee entity had been pre-existing, "[he] would say in that case there is no incremental cost."  (Hart Reb. Dep. 78:15-16.)

As the foregoing discussion illustrates, nothing in Professor Hart's background or experience indicates that he is qualified to make a cost comparison between the approach that was employed (the LRT) or his suggested alternative (a contract), even though such a comparison is the centerpiece of his opinion.  His deposition testimony only serves to further establish his complete lack of qualifications to offer "expert" testimony on the subject.

C.    Professor Hart's Opinion That His Contractual Approach Would Be Less Expensive To Implement Than The LRT Is Based On Speculation, Rendering His Testimony Unreliable and Inadmissible.

Inherent in Professor Hart's lack of qualifications to compare (i) the costs of executing the LRT and (ii) his proposed contractual alternative, is the undeniable truth that his opinion rests on nothing more than speculation lacking any quantitative or analytical foundation.  (*See e.g.*, Hart Reb. Dep. 92:18-93:6.)  Expert opinions of that nature are unreliable and, accordingly, inadmissible under FRE 702.

As evidenced by his deposition testimony, it is clear that Professor Hart has no understanding of what the actual costs unique to the transaction were, nor does he offer any methodology to estimate what the costs of his contractual alternative would be. Thus, any comparison by Professor Hart of the relative costs and benefits of the LRT with his contractual alternative to render an opinion that his suggested alternative is the better one, is not the product of reliable principles and methods and must be excluded. *See North Star Mutual Insurance*, 269 F.Supp.2d at 1148. It is, instead, the epitome of "subjective speculation that masquerades as scientific knowledge." *Glastetter*, 252 F.3d at 989.

IV.   **By Misapplying His Stated Methodology, Professor Torous' Opinions Are Not The Product Of Reliable Principles And Methods And Must Therefore Be Excluded.**

A.   Background Regarding Professor Torous' Expert Report And Testimony.

Of the 21 leasehold interests transferred by Plaintiff to Charter, the largest in terms of projected lease liabilities is a building known as the Garland Center. The lease for the entire building, which houses a mixture of office and data center facilities, was acquired in Plaintiff's merger with First Interstate. Shortly following the acquisition, Plaintiff vacated its space in the building.

Garland presented a particularly difficult problem to Plaintiff because of bank regulatory restrictions preventing lease extensions. By the same token, the terms of the lease itself presented Plaintiff with a tremendous opportunity. The lease gave the master tenant (Plaintiff), a series of six five-year extension options at a fixed rate, starting in 2009. *See* WFP-02232 at 02238, 02298-99, attached as Exhibit 9. Moreover, the annual rent due under the lease was scheduled to be reduced starting on February 1, 2009, from

- 32 -

more than $40 per square foot to less than $19 per square foot.  *Id*. at WFP-02298.  Given

the opportunity to extend the Garland lease up to 30 years at a fixed rate that called for a

significant future rent reduction at the time of the first extension, Donald Dana and Mark

Ingram were well aware of the value inherent in the extension options, assuming they

could exercise them.  (Dana Int. 94:23-95:11.)[20]

To corroborate its belief regarding the potential value of Charter's options for the

Garland building, Plaintiff engaged Professor Steven Grenadier to value the options as of

the beginning of 1999 and the beginning of 2009.  Professor Grenadier calculated that the

extension and purchase options were worth approximately $19.7 million and $17.1

million respectively as of the beginning of 1999; as of 2009, he calculated their value as

approximately $280 million and $128 million respectively.  Revised Report of Steven R.

Grenadier at ¶¶ 8-9 (Mar. 16, 2009).[21]

In response to Professor Grenadier's report and deposition, Defendant engaged

Professor Walter Torous as a rebuttal expert to investigate Professor Grenadier's

methodology and to produce an alternate valuation of the options as of the beginning of

1999.  Expert Report of Walter Torous ("Torous Rpt.") at ¶ 5 (May 15, 2009).  In

producing his valuations, Professor Torous employed the same mathematical formula as

---

[20]  In fact, as noted earlier, Charter has exercised the first Garland lease extension and is
projecting profits of more than $25 million ($46 million in undiscounted terms) during
the first ten years of the extension period.  *See* Exhibit 8.

[21]  Had Plaintiff been required to relinquish its lease in the building because of the OCC's
requirements, it would have been forced to forgo both the purchase and extension options,
which consequently would have had no value to Plaintiff.  By transferring the lease to
Charter, Plaintiff was able to retain the flexibility of exercising either of these options, if it
determined that the exercise would be a profitable undertaking.

Professor Grenadier, but produced values for the options that were substantially lower than those calculated by Professor Grenadier. Torous Rpt. at ¶ 72. As revealed in his deposition, however, Professor Torous made a critical error with respect to the methodology underlying his opinion. Because his opinions are only as reliable as his chosen methodology, his deposition testimony demonstrates that his report is unreliable and therefore, along with his testimony, inadmissible under the Federal Rules of Evidence and applicable case law.

B.      Professor Torous' Revised Report Did Not Comply With The Court's Amended Scheduling Order And Must Therefore Be Excluded From Evidence.

As an initial matter, Professor Torous' testimony should be limited to the opinions expressed in his report dated May 15, 2009. Following his deposition on July 21, 2009, Defendant's counsel revealed certain errors in Professor Torous' initial report that were inconsistent with his deposition testimony. *See* attached Declaration of Philip Karter ("Karter Decl."). Ten days later, Professor Torous issued a revised report in which he (i) disclosed new opinions intended to be consistent with his testimony and (ii) attempted to distance himself from his original opinions, which were inconsistent with his testimony. *See* Revised Report of Walter Torous (Jul. 31, 2009).

Magistrate Judge Noel's scheduling order established May 15, 2009 as the deadline for disclosure of rebuttal expert testimony. Amended Pretrial Schedule at 2.b.2. (Aug. 26, 2008). The order further states, without ambiguity, "Any expert testimony which has not been fully disclosed in accordance with this schedule *shall be excluded from evidence at trial*." *Id*. at 2.d. (emphasis added). Professor Torous did not disclose

his revised testimony until July 31, 2009, two-and-one-half months after the deadline established by Magistrate Judge Noel.  In accordance with the Court's order, Professor Torous' revised report should be excluded from this case.[22]

As explained below, however, even if Professor Torous' revised report would otherwise be permitted into this case, it also must be excluded on the grounds that it is unreliable.

C.    Professor Torous' Failure To Follow His Own Methodology Undermines The Reliability Of His Opinions.

The options-pricing model employed by both Professor Torous and Professor Grenadier relies on a number of inputs, the most important of which is the volatility of the price of the underlying asset.  (Torous Dep. 120:4-11.)  As the volatility of the price of the underlying asset increases, so does the value of an option relating to that asset.  *See* Torous Rpt. at ¶ 20, Fig. 3.  In this case, the underlying asset used by both Professor Torous and Professor Grenadier to value the Garland options was the present value of a 10-year stream of sublease rental income.  (Torous Dep. 62:4-6.)

To calculate the value of the Garland options as described above, Professor Torous needed to estimate the volatility of the 10-year stream of income at the Garland building. (Torous Dep. 122:12-13.)  In his deposition, Professor Torous claimed to have estimated

---

[22]  Plaintiff acknowledges that Professor Grenadier also issued two revised reports after the deadline for disclosure of initial expert reports.  However, Professor Grenadier's changes (i) were disclosed before his deposition and (ii) were limited to minor corrections to his inputs that did not materially change his opinions.  In contrast, and as discussed below, Professor Torous' changes involved a wholesale revision of the most important variable underlying his analysis, issued only after he discovered a fundamental error in his methodology.

the volatility of this income using data of sublease rents for Class A office space in the greater downtown submarket of Los Angeles County.[23]  (Torous Dep. 155:16-20.)  In Professor Torous' opinion, this data set would produce a more reliable estimate for the volatility of rents at the Garland building than data derived from other submarkets in Los Angeles.  (Torous Dep. 55:12-56:3.)  As Professor Torous himself explained, "the geographical location matters."  (Torous Dep. 55:6-11.)  As a result, Professor Torous continued, he intended to rely on data from what he considered to be the most relevant submarket – downtown Los Angeles – rather than data from other submarkets in Los Angeles County.  (*Id*. at 55:6-56:3.)

Professor Torous likewise insisted upon his certainty of having relied on data from the downtown Los Angeles submarket, stating, for example:

> Q.  And sitting here today, you don't know that in producing [the data on which you relied] that you only specified Class A office space in downtown Los Angeles?
>
> A.  No, I'm sure that I did.

(Torous Dep. 155:16-20.)  On several occasions during his deposition, Professor Torous reaffirmed this point.  (*See, e.g.,* Torous Dep. 142:2-12, 142:24-143:1.)  In sum, Professor Torous left no doubt of his opinion and belief that he should have used, and did use, data that was limited to properties in the greater downtown submarket of Los Angeles.

In spite of his professed certainty, Professor Torous' deposition revealed that he was unfamiliar with, and unable to recreate, the data set on which he claimed to have

---

[23] Professor Torous obtained his data from a real estate data service provider known as The CoStar Group, Inc. ("CoStar").

relied.  (Torous Dep. 188:2-7, 188:22-189:4.)  Following this revelation, Defendant's

counsel informed Plaintiff the next day that, contrary to his deposition testimony,

Professor Torous had relied on data that was derived from the entire Los Angeles market,

rather than from the downtown submarket.  Karter Decl. at ¶ 3.  Thus, although Professor

Torous testified that he should have used, and did use, data limited to the downtown Los

Angeles submarket, he subsequently conceded that his opinions were actually based on a

different set of data.  As his deposition testimony indicated, it would have been

inappropriate to rely on data from disparate submarkets in Los Angeles; yet, by relying

on data from the entire Los Angeles market, Professor Torous did just that.

       As noted above, before the opinion testimony of an otherwise qualified expert

witness may be admitted into evidence at trial, the party offering the testimony must

demonstrate that it is both relevant and reliable.  *See Wintermute*, 443 F.3d at 1000.  The

ultimate purpose behind these inquiries is to ensure that the opinion will assist the trier of

fact in arriving at an intelligent and sound verdict.

       An expert's opinion is only as reliable as the methodology on which it is based.

As a result, every step of the expert's analysis must be examined for reliability.  *Knight v.*

*Kirby Inland Marine Inc.*, 482 F.3d at 354-55; *In re Paoli RR Yard PCB Litigation*, 35

F.3d at 745.  In this case, Professor Torous' ultimate opinion cannot assist the Court in

valuing the Garland options because, in reaching his ultimate opinion, he relied on data

that his own testimony indicated was improper.  As the Eleventh Circuit has stated,

"Opinions derived from erroneous data are appropriately excluded." *United States v. City*

*of Miami*, 115 F.3d 870, 873 (11th Cir. 1997) (citation omitted) (expert in employment discrimination case relied on wrong census data to determine the relevant labor market).

In *City of Miami*, the court had previously identified the proper data set on which the expert's opinion should have been based.  When the expert failed to use that data set, the court concluded that his opinion was inadmissible.  In this case, Professor Torous himself has identified the data set on which he believed his opinion should have been based and then failed to rely on that data.  In short, Professor Torous did not do what, by his own words, he should have done.  Therefore, even if Professor Torous' professed methodology can be considered to be reliable, it is clear from his and Defendant's own admissions that he did not reliably apply that methodology in arriving at his opinions.

      D.    <u>Professor Torous' Revised Report Does Not Supply the Reliability That Is Missing From His Initial Report.</u>

As noted above, following his deposition, Professor Torous prepared and disclosed a revised report in which he attempted to distance himself from his initial opinions.  In the revised report, Professor Torous attempted to rationalize why his admittedly erroneous application should nevertheless be considered reliable, describing certain supposed statistical flaws in the downtown Los Angeles data and asserting that those flaws did not exist in the data for the greater Los Angeles market.  Revised Report of Walter Torous ("Revised Report") at ¶ 70 (July 31, 2009).  Yet, the Revised Report casts further doubt on the reliability of both Professor Torous' initial and revised opinions.  Consequently, even if the Revised Report had been disclosed in accordance with the

Court's scheduling order, it also lacks a reliable foundation to assist the court in understanding the factual issues of this case.

First, the Revised Report attempted to rationalize his inadvertent reliance on the wrong data. According to the Revised Report, the changing composition of the downtown data set caused it "to bias the volatility calculation upwards." *Id.* Data derived from the greater Los Angeles market would, according to Professor Torous, "overcome[] the shortcomings associated with the limited number of downtown observations…." *Id.*

Professor Torous' *post-hoc* rationalization sharply contrasts with the six hours of sworn testimony, during which he affirmed on several occasions the propriety of using data from the downtown submarket. But it also raises the question of why, if the number of observations from the downtown market were so limited, Professor Torous intended to rely on that data set in the first place. Thus, beyond Professor Torous' own failure to follow his stated methodology, the Revised Report further suggests reasons why he should not have relied on that methodology in the first place.

Moreover, the Revised Report also undermines the reliability of his revised opinions. As noted above, Professor Torous criticized his prior choice of data on the theory that the "small and changing number of observations… tend to bias the volatility calculation upwards." *Id.* Yet, as Appendix B of the Revised Report shows, the "Greater Los Angeles" portfolio exhibits even greater variation than the "Downtown Los Angeles" data set. Combined with Professor Torous' prior assertions about the propriety of relying on the downtown Los Angeles submarket, it is difficult to see how Professor Torous, in

an effort to rehabilitate his methodology, can now claim that the data from the greater Los Angeles market produces a reliable result.

## **CONCLUSION**

The three experts who are the subject of this motion should be precluded from testifying for failing to meet the requirements of FRE 702.  To summarize:

1.      Professor Douglas Skinner fails to satisfy the relevancy requirement.

2.      Professor Oliver Hart lacks the necessary qualifications to support his opinions, and he fails to satisfy the reliability requirement.

3.      Professor Walter Torous fails to satisfy the reliability requirement.

Accordingly, Plaintiff requests that the Court grant the within motion.


Dated: October 16, 2009.

Respectfully submitted

*/s/ Philip Karter*
PHILIP KARTER
JONATHAN PROKUP
HERBERT ODELL
Chamberlain, Hrdlicka, White, Williams &Martin
300 Conshohocken State Road, Suite 570
West Conshohocken, PA 19428
610/772-2300 Telephone
610/772-2305 Facsimile
*Attorneys for Plaintiff*

4042.doc/4046.pdf

**THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MINNESOTA**

|  |  |
|---|---|
| WFC HOLDINGS CORPORATION | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 07-CV-3320 JRT/FLN |
| | ) |
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Defendant. | ) |
| | ) |

**L.R. 7.1(d) CERTIFICATE OF COMPLIANCE**

I, Philip Karter, certify that PLAINTIFF'S MEMORANDUM OF LAW IN

SUPPORT OF MOTION IN LIMINE TO EXCLUDE THE EXPERT REPORT AND

TESTIMONY OF DOUGLAS J. SKINNER, OLIVER D. HART AND WALTER N.

TOROUS complies with Local Rule 7.1(d).

In conformity therewith, I certify that in the preparation of the above-referenced

memorandum, I used Microsoft Word 2003 and that the program's word-count feature

has been applied specifically to include all text, including headings, footnotes and

quotations, resulting in a word count of 10,985 words.

I also certify that that the foregoing memorandum of law was prepared using 13-

point typeface and therefore complies with the type size limitation of Local Rule 7.1(f).

Dated: October 16, 2009.

Respectfully submitted

*/s/ Philip Karter*
JONATHAN PROKUP
PHILIP KARTER
HERBERT ODELL
Chamberlain, Hrdlicka, White, Williams
&Martin
300 Conshohocken State Road, Suite 570
West Conshohocken, PA 19428
610/772-2300 Telephone
610/772-2305 Facsimile
*Attorneys for Plaintiff*