# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| WFC HOLDINGS CORPORATION, | Civil No. 07-3320 (JRT/FLN) |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION AND ORDER DENYING MOTIONS TO EXCLUDE EXPERT REPORTS AND TESTIMONY** |
| UNITED STATES OF AMERICA, | |
| Defendant. | |

Philip Karter, Jonathan Prokup, and Herbert Odell, **CHAMBERLAIN, HRDLICKA, WHITE, WILLIAMS & MARTIN**, 300 Conshoshocken State Road, Suite 570, West Conshoshocken, PA 19428; and Jeffrey A. Sloan and Mark A. Hager, **WELLS FARGO BANK, NA CORPORATE TAX DEPARTMENT**, MAC N9305-164, 90 South Seventh Street, Minneapolis, MN 55479, for plaintiff.

Gregory E. Van Hoey and Jacqueline C. Brown, **UNITED STATES DEPARTMENT OF JUSTICE, TAX DIVISION**, P.O. Box 7238, Ben Franklin Station, Washington D.C., 20044; and Thomas P. Cole, **UNITED STATES DEPARTMENT OF JUSTICE, TAX DIVISION**, P.O. Box 55, Ben Franklin Station, Washington D.C., 20044, for defendant.

This case is before the Court on the motions *in limine* of plaintiff WFC Holdings Corporation ("WFC") and defendant United States to exclude expert testimony from being presented at a bench trial before this Court. Upon consideration of the briefs and supporting materials accompanying those motions, the Court denies both parties' motions.

## BACKGROUND

### I. THE DISPUTED TRANSACTION

On July 13, 2007, WFC brought this action against the United States seeking a refund of Federal income taxes "erroneously assessed and collected for the taxable year ending December 31, 1996." (Compl. ¶ 1, Docket No. 1.) The claimed refund arises from a $423,949,534 capital loss (the "Capital Loss") sustained by WFC during the taxable year ending December 31, 1999. WFC suffered the Capital Loss in connection with the sale of preferred stock in a wholly owned subsidiary known as Charter Holdings, Inc. ("Charter") to an unrelated purchaser, Lehman Brothers, Inc. (*Id.* ¶¶ 5, 36.) WFC did not use the Capital Loss in its 1999 Taxable Year and instead carried back $235,181,044 of the Capital Loss to its 1996 Taxable Year. *See* I.R.C. § 1212(a)(1)(A); Treas. Reg. § 1.1502-22(b). According to WFC the carry-back reduced WFC's federal income tax liability for the 1996 Taxable Year and entitles WFC to a refund of $82,313,366. (*Id.* ¶¶ 8, 38, Pl.'s Mem. in Supp. at 2, Docket No. 89.) The Internal Revenue Service ("IRS") disallowed WFC's refund claim for the 1996 Taxable Year. WFC brought this suit in accordance with Internal Revenue Code § 6532(a)(1), alleging that the IRS's disallowance is erroneous and contrary to law.

The Court does not here endeavor to meticulously describe the WFC transaction at issue in the present dispute. It is the substance and parameters of that transaction, however, that form the basis for the expert opinions at issue in the parties' *Daubert*

motions. Thus, the Court offers a brief description of the transaction – as alleged by WFC – here.[1]

On March 31, 1996, WFC acquired a financial services company, First Interstate Bancorp ("First Interstate"). In connection with that acquisition, WFC integrated First Interstate's operations with its own operations and assumed control over First Interstate's retail and administrative real estate. As a consequence of the overlap of WFC's and First Interstate's territories, WFC closed several retail bank branches and combined overlapping departments. As a result of those actions to consolidate, WFC remained in control of a number of surplus real estate properties. WFC attempted to sell or lease the surplus real estate that it owned, and attempted to sublease or negotiate early terminations for surplus real estate that it leased. According to WFC, for a variety of reasons, it was unable to effectively dispose of a substantial quantity of those properties.

WFC alleges that a primary reason for its inability to offload leased space was that over 180 of its leases were "underwater"; that is, WFC's "contractual obligation under each of [the] leases was greater than the rental income that [WFC] could earn by subleasing vacant space at then-market rates." (Compl. ¶ 21, Docket No. 1.) Two of WFC's subsidiary banks – Wells Fargo Bank (Texas), N.A. and Wells Fargo Bank, N.A. ("the Banks") – held the interests of many of the underwater leases. On December 19, 1998, WFC directed the Banks to transfer a group of the underwater leases to Charter,

---

[1] The Court acknowledges that the parties dispute many of the facts pertaining to the details of the transaction. The Court provides a recitation of the alleged facts only to the extent necessary to shed light on the role of the parties' respective experts in the context of these motions.

together with government securities that would finance the payment of the net projected liabilities associated with those leases. In return, Charter assumed the lease payment obligations for the underwater leases and issued preferred stock to the Banks. To comply with Federal banking laws, the Banks immediately sold the Charter preferred stock to WFC. On February 26, 1999, WFC sold 4,000 shares of the Charter preferred stock to Lehman Brothers for $3,750,022.22. The sale of preferred stock resulted in a $424,099,512 Capital Loss to WFC, of which only $423,849,534 was deducted as a capital loss in WFC's 1999 Federal income tax return and carried back to the 1996 Taxable Year.

The United States contends that the underwater-lease transaction was, in fact, an abusive corporate tax shelter sold to WFC by its auditor and tax consultant. The IRS disallowed WFC's refund claim after determining that the transaction giving rise to the Capital Loss – and thus the carry-back to 1996 and consequent refund demand – was a "sham transaction." (Def.'s Mem. in Opp'n at 2-3, Docket No. 103 ("[T]he underwater-lease transaction was a sham for tax purposes because [WFC] lacked (1) any realistic potential to profit from the deal (aside from tax benefits) and (2) a legitimate business purpose for engaging in the transaction (aside from tax benefits).").)

## II. LAW RELATING TO "SHAM" TRANSACTIONS

In evaluating whether a transaction is a "sham," the Supreme Court held in *Frank Lyon Co. v. United States*:

> [W]here . . . there is a genuine multiple-party transaction with economic substance which is compelled or encouraged by business or regulatory

> realities, is imbued with tax-independent considerations, and is not shaped solely by tax-avoidance features that have meaningless labels attached, the Government should honor the allocation of rights and duties effectuated by the parties.

435 U.S. 561, 583-84 (1978)

A subsequent Fourth Circuit case, *Rice's Toyota World, Inc. v. Comm'r*, 752 F.2d 89 (4th Cir. 1985), interpreted the Supreme Court's holding as having two parts: First, the Court considers whether the transaction was motivated by any business purpose other than tax considerations. *Id.* at 91. That component, termed the "business purpose" test, involves a subjective analysis of the taxpayer's motives. Second, the Court considers whether "the transaction has no economic substance because no reasonable possibility of a profit exists." *Id.* The second component, referred to as the "economic substance" test, examines "the **objective** realities of the transaction." *Shell Petroleum Inc. v. United States*, No. H-05-2016, 2008 WL 2714252, at *32 (S.D. Tex. July 3, 2008) (emphasis added; internal quotation marks omitted); *see also Rice's Toyota World*, 752 F.2d at 94.

The Eighth Circuit noted that the "essential inquiry" in the analysis is "whether the transaction had any practical economic effects other than the creation of income tax losses." *Shriver v. Comm'r*, 899 F.2d 724, 727 (8th Cir. 1990). "In determining whether a transaction is a sham for tax purposes, the Eighth Circuit has applied a two-part test set forth in *Rice's Toyota World*," but it has not concluded that *Frank Lyon* "mandates a two-part analysis." *IES Indus., Inc. v. United States*, 253 F.3d 350, 54 (8th Cir. 2001) (quoting *Shriver*, 899 F.2d at 727). That is, the Eighth Circuit has not concluded that Fourth Circuit's two-part test is the exclusive means by which to satisfy the question of "whether

the transaction had any practical economic effects other than the creation of income tax losses." *Sochin v. Comm'r*, 843 F.2d 351, 354 (9th Cir. 1988); *see also Shriver*, 899 F.2d at 727 (quoting *Sochin*).

### III. THE PARTIES' MOTIONS *IN LIMINE*

Each party retained experts in support of their positions in the litigation, and the experts' reports and trial testimony are the focus of the parties' instant motions.

WFC filed a motion to exclude the expert reports and testimony of two of the United States' experts, Professor Douglas J. Skinner and Professor Oliver D. Hart, and one of the United States' rebuttal experts, Professor Walter N. Torous. (Docket No. 87.) WFC contends that the United States' experts' reports and testimony should be excluded because Professor Skinner's opinion is irrelevant to the issues in this case; Professor Hart – aside from not being qualified to offer opinions on regulatory restrictions or on contract law – offers opinions that are based on speculation and unreliable methodology; and Professor Torous's opinions are the product of unreliable methods and principles. (Pl.'s Mem. in Supp., Docket No. 89.) The United States filed a motion to strike the expert reports of WFC's experts Robert Clarke, Neal Petersen, and Ellen Schulhofer, and to preclude those experts from testifying at trial. (Docket No. 93.) The United States primarily argues that that those experts' reports and testimony should be excluded because they impermissibly seek to offer legal opinions. (Def.'s Mem. in Supp. at 10-25, Docket No. 95.)

**DISCUSSION**

**I.      STANDARD OF REVIEW**

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony. Under Rule 702, proposed expert testimony must satisfy three prerequisites to be admitted. *See Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 686 (8th Cir. 2001). First, evidence based on scientific, technical, or specialized knowledge must be useful to the finder of fact in deciding the ultimate issue of fact. *Id.* Second, the proposed witness must be qualified. *Id.* "Third, the proposed evidence must be reliable or trustworthy in an evidentiary sense, so that, if the finder of fact accepts it as true, it provides the assistance the finder of fact requires. *Id.* (internal quotation marks omitted). The district court has a "gatekeeping" obligation to make certain that all testimony admitted under Rule 702 satisfies these prerequisites. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597-98 (1993). But an expert's opinion should be excluded as unreliable under the third prong only if that "opinion is so fundamentally unsupported that it can offer no assistance to the jury." *Bonner v. ISP Techs., Inc.*, 259 F.3d 924, 929-30 (8th Cir. 2001) (internal quotation marks omitted).

**II.      THE COURT DENIES BOTH PARTIES' MOTIONS *IN LIMINE***

The parties will try this case in a bench trial and, in that context, "the court's gatekeeping role is necessarily different." *In re Salem*, 465 F.3d 767, 777 (7th Cir. 2006). In *In re Salem*, the Seventh Circuit distinguished the Court's role as a gatekeeper in a jury trial from its role in a bench trial. The Seventh Circuit considered an appellants'

argument that a bankruptcy judge erred by allowing certain expert testimony and evidence to be presented at a bench trial. *Id.* At trial, the bankruptcy judge stated that the *Daubert* principles applied

> "with less force in the context of a bench trial" and reasoned, "I can accept the evidence. And if I find that it's not well grounded by experience and expertise in the witness, I can ignore that. The gatekeeping function that *Daubert* talks about is most pointedly at issue in a jury trial where a jury might be misled by an expert who doesn't have sufficient qualifications."

*Id.*

On appeal, the appellants challenged the statement, arguing that the bankruptcy judge "erred as a matter of law by failing to hold the expert to the standards codified" in Rule 702. *Id.* The Seventh Circuit found no error, stating:

> [The appellants'] argument misses the bankruptcy court's point. It is not that evidence may be less reliable during a bench trial; it is that the court's gatekeeping role is necessarily different. Where the gatekeeper and the factfinder are one and the same – that is, the judge – the need to make such decisions prior to hearing the testimony is lessened. That is not to say that the scientific reliability requirement is lessened in such situations; the point is only that the court can hear the evidence and make its reliability determination during, rather than in advance of, trial. Thus, where the factfinder and the gatekeeper are the same, the court does not err in admitting the evidence subject to the ability later to exclude it or disregard it if it turns out not to meet the standard of reliability established by Rule 702.

*Id.* (citation omitted); *cf. Franklin v. Local 2 of the Sheet Metal Workers Int'l Ass'n*, 565 F.3d 508, 517 n.1 (8th Cir. 2009) ("Moreover, this was a non-jury trial, the district court permitted Dr. Gutman to testify, and our review of the district court's opinion makes clear the district court carefully considered the methodology and conclusions in Dr. Gutman's report.").

Although the Court's role as a gatekeeper is not diminished in the context of a bench trial, the Court's gatekeeper role is distinguishable from its role in a jury trial. Here, the Court may review the substance of the experts' opinions during trial and may disregard, in accordance with the principles outlined in *Daubert* and the Federal Rules of Evidence, any expert evidence that it deems to be not credible; that is not supported by reliable methods; that is too speculative; or that is not offered by an individual qualified to provide such expert testimony.

The Court further acknowledges that expert opinions on the law are generally inadmissible. *S. Pine Helicopters, Inc. v. Phoenix Aviation Managers, Inc.*, 320 F.3d 838, 841 (8th Cir. 2003); *see also In re Initial Pub. Offering Sec. Litig.*, 174 F. Supp. 2d 61, 64 (S.D.N.Y. 2001) ("The rule prohibiting experts from providing their legal opinions or conclusions is so well-established that it is often deemed a basic premise or assumption of evidence law – a kind of axiomatic principle." (internal quotation marks omitted)). In a bench trial, however, the Court is well-prepared to identify expert evidence that operates to inform the Court of the circumstances of the complex transaction at issue in this case, and distinguish that evidence from expert opinions that invade the province of the Court or offer interpretations of the law that go to the heart of the legal issues in this case. *See United States v. Van Dyke*, 14 F.3d 415, 422 (8th Cir. 1994) (holding that a district court abused its discretion in excluding an expert witness who offered an opinion interpreting bank regulations and concluding, "[W]e are convinced that elaboration by [the expert] would clearly have assisted the jury in

understanding the regulation and defendant's reasons for asserting that he had not violated its provisions").

Given the complex facts underlying WFC's transaction with Charter and Lehman Brothers, and the Court's dual role as gatekeeper and factfinder in this case, wholesale exclusion of the reports or testimony of either party's experts is unwarranted. Accordingly, the Court denies WFC's and the United States' motions to exclude or strike expert reports and testimony.

**ORDER**

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. WFC's Motion *in Limine* to Exclude the Expert Reports and Testimony of Douglas J. Skinner, Oliver D. Hart and Walter N. Torous [Docket No. 87] is **DENIED**.

2. The United States' Motion *in Limine* to Preclude Expert Testimony of Robert Clarke, Neal Petersen, and Ellen Schulhofer [Docket No. 93] is **DENIED**.

DATED: March 17, 2010  
at Minneapolis, Minnesota.

                                        ____s/ John R. Tunheim____  
                                            JOHN R. TUNHEIM  
                                         United States District Judge