## UNITED STATES DISTRICT COURT

## DISTRICT OF MINNESOTA

| | |
|---|---|
| WFC HOLDINGS CORPORATION, | Civil No. 07-3320 (JRT/FLN) |
| Plaintiff, | |
| v. | **FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER FOR JUDGMENT** |
| UNITED STATES OF AMERICA, | |
| Defendant. | |

Philip Karter, Jonathan Prokup, and Herbert Odell, **CHAMBERLAIN, HRDLICKA, WHITE, WILLIAMS & MARTIN**, 300 Conshohocken State Road, Suite 570, West Conshohocken, PA 19428; Jeffrey A. Sloan and Mark A. Hager, **WELLS FARGO & COMPANY**, 90 South Seventh Street, MAC N9305-164, Minneapolis, MN 55479, for plaintiff.

Thomas P. Cole, Gregory E. Van Hoey, and Jacqueline C. Brown, **UNITED STATES DEPARTMENT OF JUSTICE, TAX DIVISION**, P.O. Box 7328, Ben Franklin Station, Washington, DC 20044, for defendant.

Plaintiff WFC Holdings Corporation ("WFC" or "Wells Fargo"[1]) brought this action against the United States seeking a refund of federal income taxes in the amount of at least $82,313,366 for the tax year ending December 31, 1996. (Compl. ¶ 1, Docket No. 1.) According to the government, WFC's refund demand is based on capital losses accruing from a sham transaction intended to operate as a tax shelter. A trial on the

---

[1] Unless further specificity is required, the Court will refer to WFC or "Wells Fargo" interchangeably as the entire family of Wells Fargo corporations including both Wells Fargo & Co. and plaintiff WFC Holdings Corporation. The differences between these two entities are not relevant for the disposition of this case. "The bank" or "Wells Fargo Bank" will refer to WFC's banking operations, including but not limited to one of the transferring banks discussed below.

merits was conducted by the Court without a jury on October 4, 5, 7, 8, 12, 13, 14, 20, 22, 25, and November 3, 2010.  The parties presented closing arguments on February 18, 2011.  Having considered each party's evidence, exhibits, and arguments of counsel, the Court enters its Findings of Fact, Conclusions of Law, and Order for Judgment, pursuant to Rule 52(a)(1) of the Federal Rules of Civil Procedure.

## FINDINGS OF FACT

**1.**      All of the Findings of Fact set forth herein are undisputed or have been proven by a preponderance of the evidence.

**2.**      To the extent that the Court's Conclusions of Law include what may be considered Findings of Fact, they are incorporated herein by reference.

## I.      CORPORATE STRUCTURE

**3.**      Wells Fargo & Company, formerly known as Norwest Corporation ("Norwest"), is a diversified financial services company that, together with its subsidiaries, provides banking, insurance, investment, mortgage, and consumer finance services.  (Joint Stip. ¶ 1, Docket No. 157.)

**4.**      WFC Holdings is the successor-in-interest to the corporation previously known as Wells Fargo & Company ("Old Wells Fargo," or simply "Wells Fargo" when the distinction is irrelevant), which was acquired by Norwest on November 2, 1998, through the merger of Old Wells Fargo into WFC Holdings.  (*Id.* ¶ 2.)

**5.**      Following the 1998 Norwest merger and at all times relevant to this lawsuit, WFC Holdings was the parent corporation of an affiliated group of corporations,

including Wells Fargo Bank, N.A. and Wells Fargo Bank (Texas), N.A. ("the transferring banks" or, individually and/or with other Wells Fargo banking operations "the bank"). (*Id.* ¶¶ 2-3.)

6.     Following the 1998 Norwest merger and at all times relevant to this lawsuit, Wells Fargo & Company owned and continues to own all of the outstanding stock of WFC Holdings.  (*Id.* ¶ 8.)

7.     Following the 1998 Norwest merger and at all times relevant to this lawsuit, WFC has been the common parent corporation of Charter Holdings, Inc. ("Charter").  (*Id.* ¶ 10.)

8.     Charter was known as AMFED Financial, Inc. ("AMFED") prior to December 10, 1998.  (*Id.* ¶ 15.)

9.     At all relevant times, each of the transferring banks was and continues to be a national banking association subject to the regulatory oversight of the Office of the Comptroller of the Currency ("OCC") of the United States Department of the Treasury. (*Id.* ¶ 13.)

10.     At all relevant times, Charter was and continues to be a holding company subject to the regulatory oversight of the Federal Reserve Board ("the Fed"). (*Id.* ¶ 16.)

11.     The transferring banks, their parent corporation WFC Holdings, and Charter were at all relevant times and continue to be domestic corporations.  (*Id.* ¶¶ 4, 9, 14.)

**12.** As the parent corporation of an affiliated group of corporations including WFC Holdings and Charter, WFC files consolidated income tax returns for such entities. (*Id.*)

## II. LEASE RESTRUCTURING TRANSACTION AND REFUND CLAIM: SUMMARY

**13.** The transaction at issue in this case – known as the "underwater lease transaction" or "lease restructuring transaction" ("LRT") – consisted of three steps, summarized briefly here and elaborated upon below.

**14.** **First**, on December 17, 1998, pursuant to an exchange agreement among the transferring banks, WFC, and Charter, the banks transferred government securities with an aggregate fair market value of $429,899,099 and a tax basis of $427,849,534, and leasehold interests in twenty-one commercial properties (comprised of twenty-two master leases, collectively "the selected leases") to Charter in exchange for 4,000 shares of Series A Preferred Stock ("Preferred Stock") in Charter and Charter's assumption of the lease obligations. By transferring the leases to Charter, the transferring banks transferred to Charter both assets (i.e. the leasehold interests) and their associated liabilities (i.e. the rent payable under such leases). (*Id.* ¶¶ 20, 25, 41.)

**15.** The accounting firm KPMG LLP ("KMPG") estimated the present value of the future cash flows associated with the transferred leases to be negative $425,899,099. (*Id.* ¶ 25.)

**16.** **Second**, on December 17, 1998, the transferring banks sold their 4,000 shares of Charter Preferred Stock to WFC for $4,000,000 in cash. (*Id.* ¶ 26.)

**17.**     **Third**, on February 26, 1999, WFC sold 4,000 shares of the Preferred Stock to Lehman Brothers, Inc. ("Lehman") for $3,750,022.22.  (*Id.* ¶ 27.)

**18.**     WFC timely filed with the Internal Revenue Service ("IRS" or "government") a federal corporate income tax return for the tax year ending December 31, 1999 which included a deduction for a capital loss in the amount of $423,849,534 ("1999 Capital Loss"), but WFC did not utilize any portion of the 1999 Capital Loss in its 1999 tax return.  (Joint Stip. ¶ 29.)

**19.**     On March 25, 2003, WFC filed a refund claim, Form 1120X, with the IRS, claiming a refund of federal income taxes previously paid by Old Wells Fargo on the 1996 tax return.  (*Id.* ¶ 31.)

**20.**     In its refund claim, WFC claimed a net capital loss carryback from its 1999 tax return which was in part attributable to the 1999 Capital Loss.  (*Id.* ¶ 32.)

**21.**     On April 6, 2007, the IRS disallowed the refund claim with respect to the carryback at issue in this suit.  (*Id.* ¶ 34.)

## III.   ACQUISITION OF FIRST INTERSTATE/UNDERWATER LEASES

**22.**     The LRT at issue began with WFC's acquisition of a large quantity of real estate.

**23.**     On January 23, 1996, Old Wells Fargo reached an agreement to acquire First Interstate Bancorp ("First Interstate"), another financial services company.  The acquisition was completed on April 1, 1996.  (*Id.* ¶¶ 36-37.)

24.    At the time of the First Interstate acquisition, Old Wells Fargo was a publicly traded bank holding company with business operations concentrated in California.  (*Id.* ¶ 35.)

25.    First Interstate was also based in the Western United States, with particular concentrations in California and Texas.  (*Id.* ¶ 36.)

26.    Generally, when WFC is considering acquiring another company, its Corporate Properties Group ("CPG") values the target's real estate portfolio, the value of which is integrated in WFC's offer price.  (Tr. 68.)

27.    From 1985 to the present, through dozens of acquisitions and mergers, Donald Dana has run CPG; he is the company's top real estate executive.  (Tr. 64, 67.)

28.    CPG oversees all owned and leased real property held by every entity under the Wells Fargo umbrella, with the exception of real properties acquired by foreclosure. (Tr. 66.)

29.    WFC's real estate portfolio consists of over 110 million square feet of space with a present market value of approximately $10 billion.  Real estate expenses account for either the second or third largest category of expenses in WFC's organization. (Tr. 65-66, 81.)

30.    CPG's responsibilities include negotiating the acquisition (i.e. purchase or lease) and disposition (i.e. sale or sublease) of properties, and managing existing properties.  CPG's portfolio includes retail properties such as bank branches and administrative properties such as accounting offices.  (Tr. 66, 72.)

**31.** WFC does not always use or occupy all of the space under each master lease it holds for the entirety of the lease term. WFC mitigates the losses associated with rental payments for unused space through three methods: assignment of the lease, sublease of the space, or termination of the lease. (Tr. 68-69, 77.)

**32.** Because Old Wells Fargo acquired First Interstate through a hostile takeover, information regarding First Interstate's real estate portfolio was generally unavailable to CPG prior to the acquisition. CPG was therefore unable to accurately value the assets and liabilities in First Interstate's real estate portfolio prior to WFC making an offer price. (Tr. 80-81.)

**33.** Because the First Interstate acquisition joined two companies with significantly overlapping geographic footprints, Old Wells Fargo was left with a large quantity of excess leased space that it no longer needed for its business operations, but on which it remained obligated to pay rent. (Tr. 106-07.)

**34.** After the acquisition, Old Wells Fargo discovered that it had vastly underestimated the costs of integrating the companies' real estate portfolios. (Tr. 105-06.)

**35.** Old Wells Fargo maintained loss reserves on its books for properties it deemed "underwater," meaning Old Wells Fargo's contractual rent and related obligations exceeded the market rent that it projected it could obtain from the properties (as through a sublease) over the remainder of the leases. (Tr. 335.)

**36.** By March 1996, Old Wells Fargo calculated that the losses from the underwater leases acquired from First Interstate exceeded $310 million, while losses from

Old Wells Fargo branches rendered redundant by the merger were approximately $185 million.  By July 1996, Old Wells Fargo calculated that the total costs associated with combining the companies' real estate portfolios could exceed $1 billion, instead of its pre-acquisition estimate of approximately $360 million in losses associated with obtaining First Interstate's real estate portfolio.  (Px. 7; Tr. 94-95, 105-06.)

37.    CPG took efforts to dispose of the excess property, selling or subleasing more than 362 such properties in 1997.  It nonetheless still had a large number of administrative properties as well as some retail properties.  (Tr. 106-07.)

## IV.    THE ECONOMIC LIABILITY TRANSACTION: DESIGN, MARKETING, AND SALE TO WFC

38.    Joel Resnick, formerly a partner at KPMG, WFC's accounting firm, offered testimony regarding a "tax product" KPMG marketed to clients called an "economic liability transaction."  (Resnick Dep. 26-28.)

39.    An economic liability transaction involves a corporate entity with a significant contingent economic liability, such as the prospect of liability in a series of pending asbestos-related lawsuits, post-retirement employee medical benefits, underwater lease obligations, or other "unmature" obligations.  The parent corporate entity transfers assets and the contingent liability to a subsidiary in exchange for stock in the subsidiary; the fair market value of the stock equals the value of the assets minus the contingent liability.  The parent entity receiving the stock then sells it to an unrelated third party, generating a deductible capital loss of approximately the same amount as the projected amount of the transferred contingent liability.  In deducting this capital loss against its

unrelated capital gains, the parent entity reduces its federal income tax liability, or as KMPG described it, the entity engages in "capital gain sheltering." The subsidiary corporation that assumed the contingent liability, however, also deducts its payments of the contingent liabilities as they accrue. The parent entity and subsidiary file a consolidated federal income tax return. (Resnick Dep. 28-29, Walker Dep. 17-18; Dx. 49, 64, 298.)

40.     KPMG employees developing the economic liability transaction product knew that a company needed a non-tax business purpose to justify the transaction. Ascertaining a non-tax business purposes was "the first question" KPMG asked of clients considering the transaction. (Walker Dep. 37-40; Dx. 53.)

41.     An internal KPMG memorandum dated May 19, 1997 lists "various theories that might be asserted by the Internal Revenue Service to challenge the validity of the Economic Liability transaction[,]" and suggests that the IRS might prevail in its challenge to a deduction generated by an economic liability transaction. Nonetheless, in May 1997, KPMG approved the marketing of the economic liability transaction to "appropriate clients." KMPG charged clients a fixed fee, generally based on the size of the anticipated capital loss generated, for its work in facilitating the transaction. (Dx. 57; Walker Dep. 53.)

42.     On February 18, 1998, KPMG representatives met with representatives from Old Wells Fargo, including its tax director Richard "Dick" Hayes and senior tax attorney Karen Bowen. Through a presentation, KPMG representatives explained the economic liability transaction in the context of CPG's underwater leases. KPMG

represented to WFC that WFC would not need to recognize an **accounting** loss upon its sale of the stock to a third party, but could claim as a tax deduction the entire amount of the transferred contingent liabilities, the underwater leases.   KMPG also clarified that WFC would need to represent to KPMG that the restructuring was "motivated in part by significant non-tax reasons[,]" namely reducing its anticipated losses from the lease obligations.  (Dx. 71 at WFC-11-0330; Dx. 68, 69; Bowen Dep. 55-56.)

43.     In a letter sent by KPMG to Hayes on March 6, 1998, KMPG proposed that Wells Fargo engage KMPG to assess the feasibility of, design, and implement "coordinated loss strategies related to losses inherent in the assets managed by the Corporate Properties Group (CPG)."  KMPG copied Ross Kari, then Wells Fargo's Chief Financial Officer, on the letter along with other WFC officials.  (Dx. 73; Kari Dep. 11-13.)

44.     On June 3, 1998, as KPMG commenced developing WFC's economic liability transaction, it sent Hayes and Dana sample documents "illustrative of documentation necessary to complete the proposed restructuring transaction."   The documentation included memoranda summarizing representations for a sample tax opinion letter, a certificate of amendment of certificate of incorporation, a support agreement, an exchange agreement, and a stock purchase agreement, among numerous other documents.  (Dx. 87.)

45.     Following the announcement of the proposed merger between Old Wells Fargo and Norwest on June 8, 1998, KPMG characterized the economic liability transaction as a "quick hit" tax-planning strategy to be accomplished before the merger.

KPMG estimated that the transactions involving the underwater leases could generate tax savings of $80 million.  KPMG represented that it had already begun to identify assets to be used in the transaction by working with Dana and others from CPG.  (Dx. 100 at WFP2-08096, WFP2-09098-99.)

**46.**    WFC agreed to pay KPMG a commission of $3 million for its work on the LRT, the economic liability transaction involving the underwater leases.  KPMG employee Todd Voss managed the project, which involved coordinating the actions of approximately two dozen people including KPMG personnel, WFC employees, and outside lawyers.  (Dx. 123, 437.)

**47.**    On August 18, 1998, Bowen sent an internal e-mail message in which she stated, "We are working with CPG on a project to move underwater leases to a special purpose entity **to trigger unrealized tax losses**."  (Dx. 120 (emphasis added).)

**48.**    An engagement letter from KPMG dated August 18, 1998, refers to KPMG's $3 million fee for designing and implementing the LRT for projected tax savings.  (Dx. 123.)  A subsequent, more detailed engagement letter sets forth agreed upon procedures for KPMG's work in ascertaining the bank's leasehold equity position in twenty-one selected leases.  This letter, dated September 1, 1998, does not refer to any prospective tax benefits.  (Dx. 147.)  Although the date September 1, 1998 appears below Dana's signature on that letter, it was backdated.  The parties signed and faxed the letter in January 1999.  (Dx. 435, 706 at 254-59.)

## V.   DEVELOPING THE LRT: BUSINESS PURPOSE

**49.**   An initial step of developing the LRT was "document[ing] [a] valid nontax business purpose for transferring the lease obligations."   KPMG initially assigned this task to Hayes and Bowen in WFC's tax department.   Bowen, however, responded that "far more effective documentation would originate with the business drivers, prepared in nontax-oriented style (with our review and input as needed)."   (Dx. 110.)   Accordingly, Don Dana was tasked with identifying a non-tax business purpose for the LRT.   (Dx. 195.)

**50.**   In an August 31, 1998 draft by Dana to document the business purpose of the LRT, Dana wrote, in response to the question "Why a separate subsidiary?":

> It has been over 2-1/2 years since our merger with [First Interstate].   We have done all we can with these underwater leases using traditional methods, we are about to enter into a new merger with Norwest, and **I am concerned that focus and attention necessary to effectively manage these assets will be diluted**.   A separate subsidiary, similar to the one I set up years ago when we built and leased the 500,000 square foot Wells Tower in Sacramento, will **preserve focus and attention by segregating the most hard core liabilities and directly incenting key managers for performance in excess of market expectations.**

(Dx. 142 (emphasis added).)   Dana proposed incenting property managers to share in the equity of the subsidiary to the extent that their disposition of property exceeded the market expectations formed by an "independent real estate review . . . ."   (*Id.*)

**51.**   On or around September 10, 1998, Voss – the KPMG employee managing the LRT – sent Dana a sample business purpose document used by another KPMG client.   (Dx. 156.)   The business purposes articulated in the sample document likewise primarily

relate to efficiencies obtained through centralization.  (*Id.*)  It reflected a similar sample document sent to WFC in February 1998.  (Dx. 71 at KPMG-Box02-0294 to 0295.)

**52.**   On September 19, 1998, Dana emailed to Wells Fargo and KPMG personnel involved in the LRT an updated and slightly lengthened draft of his business purpose document.  (Dx. 188.)  The business purpose as articulated by Dana remained focused on the benefits of focusing management and incentivizing disposition of the underwater leases.  (*Id.*)  Dana also, however, included a new justification relating to valuable customers of WFC ("good bank customers") which sought to leverage their banking relationship to obtain favorable lease terms:

> We can be tougher on greedy landlords.  While it may sound cosmetic, operating in a separate subsidiary with a different name limits the ability of our "good customer" landlords to leverage their lending or deposit relationship in sublease approval negotiations.  In short, it changes the expectations of landlord and brokers, allowing us to act more like a real estate company and less like a financial institution.

(Dx. 188.)

**53.**   As late as September 30, 1998, an internal KPMG email reflected the company's understanding that WFC's business purpose in conducting the LRT was "to provide a capital gain stock incentive to certain key employees to incent them to drive down the amount of [the] 'underwater' lease liabilit[ies] . . . . [Wells Fargo's] real estate person . . . feels quite comfortable in defending this business purpose so long as the incentive plan is consistent with his views."  (Dx. 204.)

**54.**   The business purpose document, however, was dramatically revised following a change in management of WFC's tax department after the Norwest merger.

- 13 -

55.     Prior to the merger, Dick Hayes was WFC's Vice President of Tax while Dan Vandermark was the Vice President of Tax for Norwest.   (Bowen Dep. 38.) Ultimately, Vandermark became the Vice President of Tax for the merged bank.  (Dx. 154.)

56.     On September 29, 1998, Karen Bowen advised Dana that Vandermark had learned about the LRT and had expressed concerns with the transaction, in particular with the asserted business purpose.  Bowen advised that there were several suggestions of how to "bolster the business purpose . . . ."  With regard to the new concerns, Dana responded that

> [i]t's important that we get a green light or red light on this deal as soon as possible.  This continues to be a huge burden on me and my people despite the best efforts of KPMG to shoulder much of the work, and I personally will have a lot to say if this turns out to have been a huge waste of time.

(Dx. 201.)

57.     Vandermark, who according to Bowen was attempting to exercise control during the leadership transition and ensure that he received some credit for concluding the transaction, asserted that the LRT was at risk of being challenged by the government. (Bowen Dep. 121-22.)   In particular, Vandermark believed that the asserted business purpose of incentivizing managers through the issuance of equity was "bullshit" because there were numerous other ways to incentivize managers with a similar economic return. (*Id.* at 123.)  According to Bowen, "[i]t was [Vandermark's] expressed belief at that time . . . that the existence and desire to offer the incentive plan in the way we had crafted it did not contribute to the business purpose."  (*Id.* at 124.)

58.     Vandermark expressed his concerns directly to Dana, instructing him to revise the business case with the expectation that the IRS would one day review it.  By Dana's account, Vandermark wanted a business purpose document that could withstand IRS scrutiny, rather than Dana's draft which he testified was aimed at a narrower audience of executives and officers of WFC who needed to approve the transaction. (Tr. 234.)

59.     Dana testified that Vandermark was his colleague, not his superior, and that Vandermark did not have authority to "pull the plug" on the LRT.  (Tr. 235; *see also* Tr. 324 (testimony from WFC's Chief Executive Officer ("CEO") that Dana's position was more senior than Vandermark's).)  According to a contemporaneous email message from KPMG's Voss, however, "Don [Dana] said that Vandermark is controlling the strategy [on the LRT] . . . [and Dana] reiterat[ed] that **Vandermark has veto power**" over the **LRT transaction**.  (Dx. 271 (emphasis added).)  Dana testified that Vandermark had veto power only over whether the LRT was to be structured and used for a tax benefit, not whether it would occur.  (Tr. 299.)

60.     Vandermark testified that, in his opinion, WFC "wouldn't get through an audit lottery" with such a large transaction.  Accordingly, "we knew we were going to be going to court on this, and so we wanted to be prepared for it from the get-go.  So I told them that we would need to document – fully document every aspect of the – business purpose of this transaction."  (Vandermark Dep. 36.)

61.     Dana testified that the concerns expressed by Vandermark were unrelated to his reasons for pursuing the LRT, and that he was committed to proceeding with the

transaction regardless of whether Vandermark approved of it from a tax perspective. (Tr. 150-51.)  Bowen similarly testified that "early on," prior to meetings with KPMG about the transaction, "Don Dana said he would do this transaction whether we got tax benefits or not." (Bowen Dep. 136.)  Vandermark also recalled Dana's assertion that he intended to transfer some leases into a non-banking subsidiary regardless of the tax benefits.  (Vandermark Dep. 67-69.)

**62.**    An internal KPMG email from October 6, 1998 indicates that Vandermark gave the LRT a "99.9% chance of losing" a tax audit unless, among other issues, its business purpose was bolstered and quantified.  KPMG understood that Vandermark received authority from WFC's CEO to "pull the plug" on the transaction if his concerns were not adequately addressed.  (Dx. 213.)

**63.**    On October 7, 1998, WFC regulatory attorney Julius Loeser explained by email that transferring underwater leases into a non-banking subsidiary would seem to confer a tremendous regulatory benefit to WFC.  Specifically, Loeser explained that pursuant to OCC regulations, WFC had a limited time period in which to dispose (i.e. through assignment or termination) of leased space that was no longer actively used in banking operations and had not been coterminously subleased.  By contrast, the Fed, with regulatory oversight over the non-bank subsidiary expected to receive the underwater leases, imposed no such mandatory disposition regulations for leased premises. Transferring underwater leases into a non-banking subsidiary would therefore allow WFC more flexibility in managing the leases.  Loeser had gathered this information in

the course of speaking with Ken Kinoshita of the Federal Reserve Bank of San Francisco. (Dx. 216.)

64.     A memorandum dated October 13, 1998, to Dana from another CPG regulatory attorney references Loeser's conversation with Kinoshita and affirms the information he obtained and his analysis. The memorandum purports to "respond[] to your question regarding possible regulatory advantages of transferring, by assignment," bank premises into a non-banking subsidiary. (Px. 38 at 26.)

65.     On October 13, 1998, Dana circulated an expanded, fourteen-page version of his business purpose document. The cover sheet for the document included the statement, "The business case stands on its own, but if you can figure out how to get some tax breaks in the process – GREAT!" For the first time, Dana articulated in writing another business purpose of the LRT: regulatory concerns. According to Dana, CPG's ability to execute lease extension options on behalf of prospective subtenants was impeded by the OCC's time-sensitive mandatory disposition rules. By transferring such leases to the non-banking subsidiary, thus causing the leases to fall under the Fed's regulatory oversight, WFC could avoid such restrictions and capitalize on existing lease "tails." (Dx. 225 at WFC-37-0248, WFC-37-0254.)

66.     As an example, Dana cited the Garland operations building on the fringe of downtown Los Angeles. The Garland building, acquired from First Interstate in 1996, is a 700,000 square foot space rendered superfluous after the merger. The bottom floors have no windows and are essentially designed as a vault. WFC was liable to pay rent on a lease on the Garland building through 2009, with multiple purchase and lease extension

options.  Bank of America, WFC's competitor, was interested in leasing 130,000 square feet of the Garland building, including the cash vault, but required more than a ten-year term.  According to Dana, OCC regulations prohibited him from offering such a sublease beyond the mandatory disposition period.  Accordingly, Bank of America walked away from the deal.  (*Id.* at WFC-37-0254.)

67.    In his October 13 business purpose document, Dana also elaborated on his explanation of the "good bank customer" purpose, comparing the LRT to his efforts with the Wells Tower in Sacramento ("the Sacramento project").  (*Id.* at WFC-37-0255-WFC-37-0259.)

68.    Dana's "speak-now-or-forever-hold-your-peace[] draft" of the business purpose document and subsequent final draft, dated November 17, 1998, were substantially similar, retaining and further expanding upon the regulatory benefit and "good bank customer" purposes, as well as the purpose of centralization/incentivizing managers.  (Px. 37, 44, Tr. 251.)

69.    WFC ultimately proffered three non-tax business purposes to justify the LRT: (1) avoiding regulatory restrictions, (2) avoiding unfavorable deals with "good bank customers," and (3) creating management efficiencies.

## VI.    DEVELOPING THE LRT: BASE CASE AND "WHAT IF" SCENARIOS

70.    Another initial step of developing the LRT was determining which properties to utilize in the LRT.  In assembling the portfolio of properties with underwater leases, Dana aimed for liabilities with a present value of approximately

negative $400 million.  He placed twenty-three leases under consideration.  (Tr. 170; Dx. 149 at WFC-17-1007.)

**71.**     Dana testified that in choosing the selected leases for the LRT, he sought to assemble a portfolio that was large enough to provide him with the economies of scale sufficient to justify the time and expenses required of the transaction, yet small enough so that the employees managing the portfolio would retain focus on a select number of problematic properties.  According to Dana, he excluded several properties with large potential losses, even though they would have ultimately increased the size of WFC's tax loss, because they might complicate Charter's mission.  (Tr. 169-71.)  Specifically, one of the largest underwater leases obtained by Wells Fargo through the First Interstate merger, 707 Wilshire, was excluded from the transaction because "[w]e were in a partnership on the particular property, and [Dana] thought it just added one more conflict of interest, and [he] just didn't want to have Charter Holdings that complicated."  (Tr. 169.)

**72.**     KPMG had previously confirmed that approximately $483 million in WFC's capital gains could be offset by capital losses.  (Dx. 112.)

**73.**     Two properties – Hayward Main and Stockton – originally included in the portfolio were dropped from it in early October, as part of what a KPMG employee characterized as "instructions . . . to get our numbers to the $390 million range." (Dx. 217, 680.)

**74.**     In September 1998, KPMG began to calculate a "base case scenario," or the current value of the liabilities for the twenty-three underwater leases preliminarily selected for consideration in the LRT.  To accomplish this task, KPMG considered

information including Wells Fargo's expected revenue from current subtenants, market rates, and Wells Fargo's rent payments and operating expenses to master landlords. At Wells Fargo's direction, KPMG made certain global assumptions in formulating the base case scenario. These assumptions included the duration of each new sublease expected to be signed (generally five years, but ten years if Wells Fargo's master lease exceeded ten years), the down time between an expiring lease and the re-leasing of that space (nine months), and whether Wells Fargo could re-lease the "lease tail," or space becoming available within forty-eight months of the maturity of the master lease (the assumption was it could not). KPMG also applied information supplied by a real estate broker from Cushman Realty. KPMG's base case scenario purported to reflect the net present value of the selected leases, assuming the LRT was not executed. (Dx. 349.)

75.    By September 25, 1998, KMPG's estimate reflected a total negative value of $410,338,482, although the number was still subject to change. (Dx. 195.) WFC ultimately dropped two of the twenty-three leases from the portfolio, settling on a portfolio of twenty-one properties. KPMG ultimately valued the selected leases at negative $425,899,099. (Joint Stip. ¶¶ 20, 25.)

76.    Around October 1998, Dana instructed KPMG to determine the LRT's effect on the total portfolio value by changing certain assumptions provided by WFC. These alternative calculations became known as the "what if" scenarios. They purported to reflect the savings that WFC could expect to achieve by entering into the LRT. Dana sought to have the calculation of the liabilities change by an amount of at least $10 to $15 million. (Dx. 223, Tr. 533.)

77.     Under one "what if" scenario, the occupancy level in each property was adjusted from 90% to 95%, based on the expectation that conducting the LRT would enable WFC to achieve a better occupancy rate in the properties.  (Px. 44 at 13 (estimating that 5% of the success of the Sacramento project in beating market expectations was attributable to the structure of transferring responsibility to a non-banking subsidiary).)   KPMG determined that achieving a 95% occupancy figure decreased the negative equity in the underwater leases by over $8 million, which was still, according to KPMG, "below the range [Dana] sought."  (Dx. 223.)

78.     Under another "what if" scenario, KPMG took those properties with empty space at the tail end of the master lease (sub-tenancies expiring within forty-eight months of the end of the master lease) and "filled in" the lease tails with subtenancies that were coterminous with the master lease.  This "what if" scenario was predicated on WFC's ability to market the lease tails by using Charter to remove itself from OCC regulatory restrictions, at an estimated $14.1 million reduction in the leases' negative equity. (Px. 44 at 13; Tr. 278-79.)

79.     Under the third "what if" scenario, KPMG took properties that had existing subtenants paying below-market rent, and adjusted the rate to market value.   WFC assumed that the LRT, by enabling CPG to avoid unfavorable real estate deals with "good back customers," would facilitate a savings of approximately $1.5 million. (Px. 44. at 14.)

80.     Ronald Hendricks, an expert witness for the government, offered credible testimony criticizing the base case scenario for overstating the negative equity associated with the selected leases.  (Dx. 671.)

81.     KPMG's estimation was not an independent market value appraisal because it relied exclusively on information provided by WFC and unchecked by KPMG or any other third party.   (Dx. 671 at 8-10.)   As even WFC's real estate expert, Gregory Gotthardt, acknowledged, KPMG's valuation was an "investment valuation," not a market valuation, because it included assumptions obtained from WFC and was not the result of KPMG's independent market analysis.  (Tr. 1043-44.)

82.     While WFC considered hiring a third party to conduct a market appraisal, it ultimately had the Cushman broker sign a letter stating that he had reviewed the final KPMG work and believed it to be reliable.  (Dx. 257 (internal WFC email discussing the prudence of a third-party market valuation given the likelihood of governmental scrutiny of a transaction between a bank and a non-banking affiliate), 263 (noting request from Vandermark for valuation study by independent third party), 352 (letter from broker).)

83.     At the instruction of Wells Fargo representatives including Dana, KPMG changed certain assumptions in the base case scenario and otherwise manipulated the data to achieve Dana's target of approximately $400 million in negative equity.  For example, Dana instructed KPMG to adjust the leaseback rate – the rent rate that the bank would pay the WFC subsidiary for space it currently occupied and would sublet from the subsidiary after the LRT – from the midpoint of the broker's market estimate range to the top.  (Dx. 190.)  Another example involved a KPMG estimate from September 22, 1998

of $383 million which identified two of the twenty-three leases as being "in the money," meaning that they were not underwater but generating positive cash flows. (*Id.*) Further changes to the assumptions resulted in these two properties being re-characterized as underwater. (Dx. 195.)

84.     The base case included space **already occupied by Wells Fargo as part of its banking operations**. (Dx. 671 at 11-12.) This space was ultimately leased back to the bank by Charter. (*See, e.g.*, 369.)

85.     For example, one selected lease, the Louisiana Street property, was almost completely occupied by Wells Fargo Bank-Texas as of fall 1998. (Dx. 155.) Nonetheless, Dana selected Louisiana Street for inclusion in the LRT. WFC maintained a loss reserve of at least $11 million on Louisiana Street, based on the difference between WFC's obligations to its landlord under the master lease and the rent it could expect to generate through subleases. (Dx. 111.)

86.     In addition, the base case assumes that the bank (and Charter) would not exercise early-termination options available with respect to several properties even though they were "underwater" and thus ostensibly undesirable. (Dx. 671 at 13.)

87.     As Hendricks documented, the base case's assumptions that new subleases would be for five-year periods and that it could not obtain any new sublease for the lease tail when a sublease expired within forty-eight months of the end of the master lease are contrary to WFC's actual subleasing practices with regard to the selected leases. In practice, prior to the LRT, WFC and its predecessor-in-interest obtained subleases for a

variety of terms, frequently coterminous with the duration of the master lease.  (*Id.* at 15-16.)

88.     The base case also assumes a flat rental rate for each new sublease, but in practice both the bank and Charter utilized an escalating rental rate structure for some properties.  (*Id.* at 16.)

89.     While existing subtenants often renewed their subleases in the selected properties, the base case assumed zero retention of subtenants and a nine month period at the end of the sublease before a new subtenant would occupy the space.  (*Id.* at 18-19.)

90.     As an example of how the base case overstates the negative equity of the selected leases, the government cites the Seattle Tower property in Seattle, Washington. By fall 1998, Wells Fargo Bank was using approximately 90,000 of 177,527 leased square feet (approximately 50%) in Seattle Tower for banking operations.  (Dx. 371 at A-1, B-1.)  The remainder of the useable space had been subleased to four subtenants. (Dx. 50, 52, 66, 402.)   After the LRT, the bank subleased back from Charter approximately 90,000 square feet in Seattle Tower.  (Dx. 371.)  In calculating the base case, however, KPMG assumed that one subtenant occupied approximately 20,000 more square feet than it did, using the amount stated in its original sublease rather than the sublease as amended.  KPMG assumed that WFC occupied and would continue to occupy all non-subleased space, but because of the miscalculation, the base case understates WFC's occupancy in Seattle Tower by approximately 20,000 square feet.  Instead of stating that WFC occupied approximately 90,000 feet, the base case states that WFC occupied approximately 70,000 square feet.  (Dx. 402.)  However, in determining the

base case negative value for Seattle Tower, KPMG assumed that WFC would only lease back 51,820 square feet.  Although Seattle Tower was fully occupied, this number was selected to create a 90% occupancy rate for the building, to comport with KPMG's global assumption of 90% occupancy.  (Tr. 1430-31.)  From this figure, KMPG simply changed the occupancy rate from 90% to 95% to quantify anticipated lease improvement from the LRT.

## VII.   IMPLEMENTING THE LRT: STEPS 1-2

**91.**   On November 17, 1998, Dana circulated the final version of his business purpose document to, among others, WFC's CEO and President Richard Kovacevich and Vice Chairman Rodney Jacobs.   (Px. 44 at 1, 16.)   He met with, among others, Kovacevich that day to obtain conceptual approval for the LRT.  (Tr. 251.)

**92.**   The LRT was approved, with a few changes, including the decision to use AMFED, an existing non-banking subsidiary from Norwest which Dana subsequently renamed Charter, as the entity that would receive the underwater leases.   (Tr. 322; Dx. 285, 318.)   Earlier versions of the business purpose document had presumed the creation of a new non-banking subsidiary.  (Dx. 142.)

**93.**   WFC executives approved changes to the articles of incorporation of AMFED, changing its name to Charter and designating 20,000 shares of preferred stock as Series A Preferred Stock.   AMFED's directors appointed Dana and Mark Ingram, Senior Vice President of CPG, as officers of Charter.  (Dx. 327, Tr. 658.)

94.     AMFED's Board also approved an Executive Officer Bonus Plan, applicable to Dana and Ingram, setting forth their eligibility for performance-based bonuses based on future calculations of leasing performance in the twenty-one properties. Dana was to receive 6% of the calculated improvements and Ingram 4%. (Dx. 327 at 5-6.)  Dana participated in the development and structure of the bonus plan. (*See, e.g.*, Dx. 192.)

95.     AMFED filed its Amended and Restated Articles of Incorporation, reflecting the changes, with the Secretary of State for the State of Nevada on December 10, 1998. (Dx. 335.)

96.     Of the 20,000 shares of Series A Preferred Stock, Charter sold 16,000 to WFC on December 17, 1998 in exchange for $16,000,000 in government securities. WFC also transferred to Charter government securities with a fair market value of $83,000,000 as a contribution to common capital. (Joint Stip. ¶ 21.)

97.     Also on December 17, 1998, pursuant to an exchange agreement among the transferring banks, WFC, and Charter, the transferring banks transferred government securities with an aggregate fair market value of $429,899,099 and a tax basis of $427,849,534, and leasehold interests in the selected leases to Charter in exchange for 4,000 shares of Preferred Stock and Charter's assumption of the lease obligations. (*Id.* ¶¶ 20, 25.)

98.     At the time the transaction was executed, KPMG estimated the present value of the future cash flows associated with the transferred leases to be negative $425,899,099. (*Id.* ¶ 25.)

**99.** KPMG, and subsequently a spin off separate entity known as BearingPoint, Inc. ("BearingPoint"), determined the lease improvement calculation – a quantification of the degree to which CPG's performance exceeded that anticipated by the base case scenario – for every year from 1999 to 2006. (*See, e.g.*, Px. 63.)

**100.** Following the transfer of real estate assets and government securities to Charter by the transferring banks and WFC in exchange for Preferred Stock, the transferring banks and WFC collectively owned stock possessing at least 80 percent of the total combined voting power of all classes of Charter stock entitled to vote and at least 80 percent of the total number of shares of all other classes of Charter stock. (*Id.* ¶ 23.)

**101.** By transferring the leases to Charter, the banks transferred to Charter both assets (i.e. the leasehold interests) and their associated liabilities (i.e. the rent payable under such leases). (*Id.* ¶ 41; Dx. 355.)

**102.** By transferring the selected leases to Charter, the transferring banks transferred to Charter the trade or business of managing the selected leases. (Joint Stip. ¶ 42.)

**103.** Pursuant to a December 17, 1998 service agreement between WFC and Charter, however, WFC (as "Wells Fargo Bank, National Association") agreed to provide real estate marketing and management services to Charter in connection with its business of leasing and subleasing the selected leases. (*Id.* ¶ 43.)

**104.** The managerial services Wells Fargo agreed to perform on behalf of Charter included: billing and collecting payments from subtenants; making payments to

master landlords under the master leases; negotiating or re-negotiating leases and subleases; maintaining the properties; purchasing and paying premiums for insurance; and managing security deposits. (Dx. 357.)

106. 105. The service agreement also enabled Wells Fargo to market vacant space in the leases and to exercise its judgment in obtaining new tenants or subtenants. Any new subleases, however, were to be executed in the name of Charter and subject to approval from Charter's board of directors. (*Id.*)

106. Pursuant to the service agreement, Charter agreed to pay Wells Fargo a fee of 3% of the gross revenue received from the leases it managed. (*Id.*)

107. The same CPG lease negotiators who managed the selected leases for the bank prior to the LRT generally continued to manage the properties after Charter's assumption of the leases. (*Id.*; Tr. 372-75, 382-83.)

108. Dana testified that the service agreement with Charter was not unique; CPG provides real estate services for hundreds of subsidiaries that exist under the WFC umbrella through similar service agreements. (Tr. 70-71, 1110.)

109. For fourteen of the twenty-one properties involved in the LRT, Dana (on behalf of Charter) and Dana and Ingram (on behalf of the bank) signed subleases pursuant to which Charter immediately leased back to WFC the space it had previously occupied; each such sublease bears an effective date of December 17, 1998. (*See* Dx. 362-76.)

**110.** To implement the second step of the LRT, on December 17, 1998, the transferring banks sold their 4,000 shares of Charter Preferred Stock to WFC for $4,000,000 in cash. (Joint Stip. ¶ 26.)

## VIII. IMPLEMENTING THE LRT: STEP 3

**111.** The third step of the LRT occurred on February 26, 1999, when WFC sold 4,000 shares of Charter Preferred Stock to Lehman for $3,750,022.22. (*Id.* ¶ 27.)

**112.** WFC retained 16,000 shares of Preferred Stock and continues to hold those shares, while 20,000 additional shares of Preferred Stock are outstanding. (Dx. 669 at 6-8.) Accordingly, Lehman owned 20% of the shares and Wells Fargo 80%.

**113.** Prior to that transaction, and contemporaneous with the first two steps of the LRT, executives of Charter and WFC signed a support agreement. Pursuant to that agreement, WFC agreed to provide sufficient funds to Charter to enable it to pay declared dividends on its Series A Preferred Stock and to ensure that Charter maintained solvency. The agreement also obliged WFC to retain majority ownership of the outstanding common stock of Charter. The agreement was signed by Dana, as executive vice president of Charter, and by Dana's boss Rod Jacobs, on behalf of WFC. (Dx. 356.)

**114.** WFC represented to KPMG that it had not commenced negotiations with Lehman prior to the execution of the first two steps of the LRT on December 17, 1998. (Dx. 517.) However, WFC had commenced discussions with Lehman regarding the sale of the Preferred Stock much earlier, as evidenced by an October 22, 1998 letter from

WFC asking Lehman whether its available documentation was sufficient for a future sale of the Preferred Stock.  (Dx. 232.)

115.    An internal KPMG email suggest that Vandermark had no plan to sell the Preferred Stock "any time soon" after the LRT was conducted.  (Dx. 431.)  He decided to sell the Preferred Stock "as quickly as possible[,]" however, one week after the United States Treasury Secretary announced a proposal to limit taxpayers' ability to structure deals with high-basis, low-value securities.  The new rule would not apply retroactively.  (Dx. 458; *see also* Dx. 253, 450 at IRS-056, 452 at IRS-062.)

116.    The parties agree that WFC's negotiations with Lehman for the sale of the Preferred Stock were conducted on an arm's length basis, and Lehman paid fair market value to acquire the Preferred Stock.  (Joint Stip. ¶¶ 44, 46.)

117.    However, the record reflects that Lehman's risk of loss on the Preferred Stock and its financial interest in Charter's success were negligible.  Government expert Dr. Douglas Skinner, an accounting professor at the University of Chicago, testified that Lehman's stock in Charter functioned more like a debt instrument than like equity.  (Tr. 1351; *see generally* Dx. 670.)

118.    Common stockholders are generally entitled to what Skinner described as a residual claim on the assets of the entity, or a portion of what remains after the entity has satisfied its debts and obligations.  Debt holders, by contrast, have a "fixed claim" in that they are entitled to a specified, period return, usually in the form of an interest payment.  (Tr. 1353-55.)  As Skinner explained in his testimony and report, Lehman's Preferred Stock in Charter was more like a debt security, as it had a fixed liquidation value of

$1,000 per share regardless of Charter's performance.  Lehman was paid fixed, specified dividends on a quarterly basis based on a specified rate of 6.625% premised on the fixed, specified $1,000/share liquidation value of the stock.  (*Id.*)

119.    The support agreement between WFC and Charter ensures that WFC would provide Charter sufficient funds to pay dividends on its Preferred Stock.  It also requires WFC to continue to own a majority of Charter's outstanding common stock, and to contribute capital to Charter if Charter's net worth falls below one dollar.  The support agreement can be terminated only if (a) WFC, Charter, and the holders of 90% of the outstanding Preferred Stock agreed, (b) all shares of the Preferred Stock ceased to be outstanding, or (c) WFC notified Charter that the two main credit ratings agencies advised WFC that the Preferred Stock would be rated at specified rates.  (Dx. 356.)

120.    Charter has paid a fixed amount dividend on its Preferred Stock in each calendar quarter from February 16, 1999 through the present.  (Dx. 669.)

## IX.    ASSERTED BUSINESS PURPOSE 1: REGULATORY BENEFITS

121.    The first non-tax business purpose for the LRT proffered by WFC is the regulatory benefits of moving the selected leases from the regulatory ambit of the OCC, which imposes time sensitive mandatory disposition requirements on certain bank property, to the Fed, which does not.

122.    According to Dana, the regulatory issue was "one of the largest moving factors" supporting the LRT.  (Tr. 172.)

123.   The National Bank Act permits a bank to hold real property only for limited purposes, including for use in the bank's business.  12 U.S.C. § 29.  A property held by a bank but not used for the bank's business is considered "Other Real Estate Owned," or OREO.  12 C.F.R. § 34.81(3).

124.   Pursuant to OCC regulations, "[a] national bank shall dispose of OREO at the earliest time that prudent judgment dictates, but not later than the end of the holding period (or an extension thereof) permitted by 12 U.S.C. [§] 29."  12 C.F.R. § 34.82(a).  Section 29 provides for a five-year disposition period, subject to an additional five-year extension if "(1) the [banking] association has made a good faith attempt to dispose of the real estate within the five-year period, or (2) disposal within the five-year period would be detrimental to the [banking] association."

125.   The OCC five/ten-year disposition regulation extends to **leases** on former banking premises.  (Tr. 796.)  Technically, this property is Other Real Estate Leased, or OREL, but it is sometimes referred to as OREO, or simply ORE.[2]  (Tr. 791-92; 73-74.)

126.   In the 1980s and 1990s, Dana – sometimes in conjunction with other competitor banks –  periodically lobbied the OCC to change its regulations and conform the rules applicable to leased former bank premises to those of the Fed.  (Tr. 118-22; Px. 3, 4, 5, 169.)

127.   As Neal Petersen, WFC's banking regulation and supervisory practice expert, explained, the Fed does not treat operating leases as assets subject to the ORE

---

[2] The Court will refer to leased former banking premises and owned former banking premises as ORE.

mandatory disposition rules as does the OCC.  The only guideline prescribed by the Fed is that the property be administered in an economically sensible manner.  (Tr. 867-69; *see also* Dx. 216.)

128.    Among the methods of disposing of leased property permitted by the OCC regulations, a bank may assign or sublease the property, through a sublease coterminous with the master lease.  12 C.F.R. § 34.83(a)(3)(i).  According to Dana and Jordan Cohen, CPG's chief regulatory attorney, the regulations do not distinguish between an assignment to a related party such as Charter or a third party; both are equally permissible.  (Tr. 238-39; 798-99.)

129.    Many of WFC's properties are partially occupied by bank functions.  There is no clear, bright-line rule promulgated by the OCC to determine when a partially vacated former bank premises constitutes ORE.  According to Cohen, different OCC examiners may characterize partially vacated property differently and use varying factors to determine whether a property is ORE.  (Tr. 809-10, 818.)

130.    Dana testified that in the 1980s, a local OCC examiner informed him that properties with 50% or less bank occupancy were subject to scrutiny as potential ORE. (Tr. 348.)  Wachovia Bank, which WFC acquired in 2008, considered only property with 70% bank occupancy as safely constituting bank premises are therefore not ORE. (Tr. 812.)   According to Cohen, WFC generally considers property with 60% bank occupancy as not ORE.   (Tr. 812-13.)   Below 60 or 50% occupancy, WFC would consider various facts and circumstances – such as whether the building contained prominent Wells Fargo signage – to decide whether or not it could be characterized as

ORE.  (Tr. 815-16.)  Mark Ingram, however, testified that as of the late 1990s Wells Fargo only needed to occupy **15%** of a given space to remove it from the ambit of the ORE disposition rules.  (Tr. 700-01.)

**131.**   Cohen, who began work at CPG in 2002, testified that he and several employees are responsible for analyzing whether a WFC property is ORE.  This type of work comprises a good portion of Cohen's work responsibilities.  (Tr. 800, 809.)

**132.**   The OCC has never disagreed with Cohen's characterization of property, but "[i]f it's a really close call[,]" he will directly ask WFC's OCC regulator for guidance.  (Tr. 814-15.)  The risk of calling the OCC, according to Cohen, is that "[i]f we call them up and they say, no, it's ORE, all similar situations in the future are also ORE." (Tr. 815.)

**133.**   In 1996, the OCC amended 12 C.F.R. § 34.83(a)(3)(i) to toll the statutory ORE disposition period for subleases not coterminous with the master lease held by the bank.  It also permits the bank to extend the master lease in certain circumstances.  The regulation states:

> If a national bank enters into a sublease that is not coterminous, the period during which the master lease must be divested will be suspended for the duration of the sublease, and will begin running again upon termination of the sublease.  A national bank holding a lease as OREO may enter into an extension of the lease that would exceed the holding period referred to in § 34.82 if the extension meets the following criteria:
>
> (A) The extension is necessary in order to sublease the master lease;
>
> (B) The national bank, prior to entering into the extension, has a firm commitment from a prospective subtenant to sublease the property; and

(C) The term of the extension is reasonable and does not materially exceed the term of the sublease . . . .

12 C.F.R. § 34.83(a)(3)(i).

134.    The amended regulation refers to "a sublease" and "the sublease" in the singular. *Id.* Dana and Cohen testified that they believe the amended regulations permit the extension of leases only for small, single-tenant branches, not large, multi-tenant office buildings such as many of those transferred to Charter.  (Tr. 275-76; 815-16.)

135.    Violating OCC regulations can result in serious consequences, including public and private reprimands, monetary fines, moratoriums or delays by the OCC in approving new mergers and acquisitions, as well as reputational harm.  (Tr. 77-78; 817-18.)

136.    Dana testified about how the OCC's regulatory constraints hindered CPG's subleasing capabilities.  Specifically, according to Dana, CPG could not offer extension options to prospective subtenants that extended beyond the termination of the master lease when marketing vacant space in properties treated as ORE, because doing so would violate the OCC's mandatory disposition period.  (Dx. 225 at 6.)  Dana testified that when the lease tail was less than forty-eight months long, the bank often could not attract any new subtenant for the duration of the lease.  (Tr. 232-33.)

137.    For some of the selected leases, such as that applicable to the Garland building, the ORE disposition period was set to end before the master lease.  According to Dana, had the Garland lease stayed with the bank and not been transferred to Charter,

CPG would have been obligated to pay $90 million in future rent on the master lease without being able to collect any loss-mitigating sublease rent.  (Tr. 268-74.)

**138.**   Dana testified that he had long contemplated moving underwater properties from the First Interstate merger into a non-banking subsidiary for regulatory purposes, but that the idea began to crystallize in the spring of 1998.  (Tr. 118.)

**139.**   Dana testified that he considered the underwater leases at risk of being characterized as ORE as ticking "time bomb[s]" because every day that passed was one day closer to the mandatory disposition period, after which the company would be in violation of law if it had not properly disposed of the properties.  (Tr. 185.)

**140.**   However, WFC produced **no** contemporaneous documentation from 1998 indicating which of the leased properties it considered ORE or at risk of being categorized as ORE by an OCC regulator, and no evidence of any communication with the OCC from 1998 on the issue of whether certain of the selected leases were ORE.

**141.**   In the course of discovery in this case, WFC asserted that in 1999 it changed the data system in which it tracked which of its properties were considered ORE, and that it had deleted its previous data files and did not have any software system that could produce a list of the properties it considered ORE as of December 17, 1998.  (Dx. 674.)

**142.**   At trial, Dana testified that at least seven of the twenty-one selected leases had zero to 10% bank occupancy, meaning that they would almost certainly have been treated as ORE by the OCC: Garland, 830 Nash, First Interstate House, First Interstate

World Center ("FIWC"), Telesis Tower, Laguna Niguel, and Heitman Centre.  (Tr. 173, 179, 181-83, 188, 357, 348.)

**143.**   In his deposition, Dana identified **at least ten** of the twenty-one selected leases that he believed WFC did **not** consider ORE prior to their transfer to Charter: 2120 Park, National City, Seattle Tower, 401-B-San Diego, Koll–Main, Koll–Birch, Las Vegas Tower, Boise Main, 801 Travis, and Louisiana Street.  (Dx. 706 at 263-65; *see also* Tr. 188 (explaining that he confused Telesis Tower with Louisiana Street in his deposition), 355 (same), 188-89 (explaining that his deposition testimony that the Post Oak property was not ORE was in error, as Post Oak was approximately 40% bank occupied and thus at high risk of being categorized as ORE in his view).)

**144.**   At trial, however, Dana testified that, although he compiled the list of twenty-one selected leases, and although ORE status was the primary factor he used in developing the list, he did not consult any kind of list that WFC might have maintained regarding ORE classifications in 1998.  (Tr. 342; 354.)

**145.**   At trial, approximately two years after his deposition, Dana re-characterized many of the properties he had previously identified as not considered ORE by WFC in 1998.  With regard to 2120 Park, for example, Dana testified in his deposition, "I believe that 2120 Park was not ORE."  (Dx. 706 at 264.)  He was responding to the question, "[D]o you know if, prior to December of 1998, Wells Fargo had categorized all of these 21 properties as being ORE? . . . Do you know which ones were not?"  (*Id.* at 263.)  At trial, Dana testified, "I do not know whether that was on ORE list in 1998.  If you were to ask me today was that a property that would have been a risk, I would have said yes, that

is an ORE risk." (Tr. 346.)  Dana could not identify a point at which he would consider a

property at "risk" of ORE categorization.  (Tr. 347.)  The bank occupied approximately

27% of 2120 Park.  (Dx. 373 at A-1, B-1.)

**146.**   With regard to National City, Dana testified in his deposition, "National

City, that was not ORE" in 1998.  (Dx. 706 at 264.)  At trial, however, Dana stated that

he did not know whether the bank would have characterized National City as not ORE in

1998, but that he believed the property was at risk of being so categorized by the OCC.

Dana testified that he could have reasonably argued that National City was not ORE

because, although the bank occupied a small percentage of the building, its occupancy

was an important use (a cash vault).  Dana testified that ultimately, the designation would

be left to the OCC examiner's discretion.  (Tr. 349-50.)

**147.**   With regard to Seattle Tower, Dana testified in his deposition, "First

Interstate Tower, in Seattle, that was not ORE."  (Dx. 706 at 264.)  At trial, the following

exchange occurred:

> Q. . . .  But isn't it true that you believe that Seattle Tower was classified by
> Wells Fargo as not ORE in 1998?
>
> A. . . .   I don't have a list.  I can't tell you what was on the list in 1998 for
> all these properties.  I don't know what the list was in 1998.  **I never
> looked at the list in 1998**.
>
> Q.  You gave me testimony under oath where you said it was not ORE in
> 1998, is that correct, Mr. Dana?
>
> A.  I think I used the word "believe," and I think that was upheld.

(Tr. 354-55 (emphasis added).)  The bank occupied approximately 50% of Seattle Tower.

(Dx. 371 at A-1, B-1.)

**148.**   WFC did produce a list from mid-1999, which reflects at least dozens of properties WFC classified as ORE that were not included in the LRT.  (Dx. 669 at 18; Dx. 674 at 6; Dx. 676; Dx. 680.)

**149.**   Several of the selected leases that were included related to properties in which the bank occupied well over 50% of the space, and sometimes nearly all of the space.  (Dx. 671 at 11-12; Ex. 2.)

**150.**   An internal email between two WFC employees in CPG dated December 11, 2000 suggests that **only three** of the selected leases transferred to Charter were considered ORE.  (Dx. 539.)

**151.**   Several of the selected leases were subject to master leases that expired before the ten-year OCC disposition period.  (Dx. 671, Ex. 1.)

**X.     ASSERTED BUSINESS PURPOSE 2: "GOOD BANK CUSTOMERS"**

**152.**   WFC's second asserted non-tax business purpose for the LRT is that transferring the selected leases to Charter enabled CPG "to act more like a real estate company and less like a financial institution."  (Dx. 188.)  By operating under the auspices of Charter, which was beholden to its own stockholders including outside parties, WFC argues that CPG lease negotiators were able to avoid less favorable real estate deals obtained by entities leveraging their banking relationship with WFC.

**153.**   Dana explained the "good bank customers" purpose by comparing the LRT to his work on the Sacramento project.  (Tr. 125-26.)  With the Sacramento project, under Dana's direction, CPG found a co-joint venturer – a firm named William Wilson &

Associates ("Wilson") – to invest in the construction of a new building; CPG then leased out the building to tenants in the financial district in the area.  (Tr. 550.)  Dana testified that by operating as a joint venture with outside investors under the name Crocker Properties ("Crocker"), CPG was able to avoid offering disadvantageous lease terms based on tenants' banking relationship with WFC:

> When they [prospective tenants] came to us and said they wanted special deals, we were able to say, you know, we really can't.  This is held under a separate entity.  It has a separate name, and it has separate investors, so we can't give you a special deal because it would be a conflict of interest. . . . It worked beautifully . . . .

(Tr. 126.)

**154.**   For example, under Dana's supervision, Old Wells Fargo employee Robert Paratte established a selection process for obtaining the most qualified and financially stable general contractor for the Sacramento project, an approximately $100 million project.  (Tr. 551, 554.)  Several of Old Wells Fargo's good bank customers solicited the bank to hire them as the project's general contractor by pressuring their lending contacts, who then implored Paratte to give the customers preferential treatment in the selection process.  Paratte staved off the pressure by explaining that he was obliged to protect the interests of Crocker and Crocker's joint venturer Wilson.  (Tr. 552-55.)

**155.**   In another example of how he used Crocker to diffuse tension relating to the Sacramento project with good bank customers, Paratte testified about how a national union – a good bank customer – picketed and campaigned against the Sacramento project, accusing the bank of using a nonunion electrical subcontractor.  (Tr. 558-60; Px. 168.)  Paratte spoke with the local union head and "explained the nature of the

venture," that all transactions with vendors and subcontractors were conducted at an arm's length "and that other bank customers had also been turned away from doing work in the project, that they shouldn't feel picked upon, and certainly this wasn't something that Wells Fargo had done. This was something decided within Crocker Properties and William Wilson & Associates." (Tr. 561-62.) Within a day of the meeting, the union stopped picketing the building site. (Tr. 562.)

156.    In connection with the Sacramento project, Paratte used Crocker business cards, which identified him as a Vice President of Crocker rather than a bank employee. (Tr. 561, 578.)

157.    Wilson issued a capital contribution before the building was built. Both Crocker and Wilson were mentioned in the building's marketing materials, and Paratte knew of no examples of subleases relating to the project which mistakenly identified the bank, instead of Crocker, as the landlord. (Tr. 573-75.)

158.    As Paratte testified, Wilson invested significant capital into the venture, "so we were truly partners in that particular entity." Wilson also brought in other investors. (Tr. 550.) While Wilson and the other outside investors did not have "an active role in the development process[,]" Old Wells Fargo did consult with Wilson, for example, by providing him a list of prospective contractors. Wilson also attended meetings with Paratte regarding the project. (Tr. 550-51, 573; Px. 167.)

159.    WFC's CEO Kovacevich also testified regarding the value of distinguishing the name of an affiliate, particularly one owned partially by an outside investor, from WFC in other contexts. (Tr. 319-20.)

**160.**   Early consideration of transferring underwater leases into a non-banking subsidiary seem to reflect the possibility of the same advantages recognized by the Sacramento project's structure.  By May 1998, Dana had received information regarding the benefits and disadvantages of establishing a separate subsidiary to dispose of superfluous property.   The first listed benefit was "[m]arketing advantages by differentiating a subsidiary's business from traditional banking through the use off the a name [sic] distinct from Wells Fargo Bank or Wells Fargo & Company."  (Px. 14, 17; Tr. 139.)  The other "pros" included the ability to name a board of directors and officers different from those of the bank who have expertise in a specific business, possible state income tax benefits, containment of risks and losses arising from a subsidiary's operations within the subsidiary, and the "[a]bility to engage in activities that must be conducted in an [sic] unique subsidiary for regulatory reasons (e.g., securities underwriting)."  (Dx. 14.)

**161.**   Dana testified that he hoped to use Charter to the same advantage obtained through his use of Crocker with the Sacramento project.  (Tr. 139.)

**162.**   While regulatory concerns were allegedly the primary non-tax business purpose driving the LRT, Dana testified that not every one of the selected leases had to be subject to regulatory concerns to be included in the LRT; even if not at risk of being categorized as ORE, a property might still benefit from the Sacramento project's inoculation against pressure from good bank customers.  (Tr. 172-73, 412 (describing the use of Charter as "immunization in case the good bank customer issue c[ame] up").)

**163.**   Contemporaneous documentation from 1998 indicates that WFC considered that twelve of the selected leases, including some that WFC considered ORE, were leased from landlords or subleased to tenants who also had significant banking relationships with WFC: Garland, Koll–Main, Koll–Birch, 830 Nash, 2120 Park, FIWC, Seattle Tower, Telesis Tower, Esperson, Las Vegas Tower, Louisiana Street, and Laguna Niguel.  (Px. 38 at Ex. 11.)

**164.**   Dana sent an internal email to WFC employees on April 14, 1999 requesting that he and Ingram be elected officers of Charter so that they could sign Charter subleases.  (Dx. 471.)   Pursuant to the series of resolutions adopted by AMFED, however, Dana and Ingram became officers of AMFED (later Charter) in December 1998.  By the time Dana sent the April 14, 1999 email, numerous subleases for space in the selected leases had already been signed.

**165.**   Although the lease negotiators managing the selected leases were the same individuals before the LRT as after the transfer of the leases to Charter, and Ingram testified that staff was informed about Charter's legal structure in late 1998 and early 1999, the record contains no documentation of any written notice to the lease negotiators on the effect of the transfer until June 30, 1999.  (Tr. 372-75, 382-83, 697; Dx. 487.)

**166.**   That June 30, 1999 notice states that "[o]ther than Charter becoming the sublessor under the existing third-party subleases, the transaction has had no effect on those subleases.  Accordingly, **no notices of the transfer will be sent to subtenants**." The notice does not instruct the lease negotiators with regard to how to use the

assignment of the leases to Charter to advantage the negotiators in their negotiations with subtenants.  (Dx. 487 (emphasis added).)

167.   Even after the negotiators received the June 1999 notice, however, they still sometimes signed subleases and other documents relating to space in the selected leases – including those specifically identified as having "good bank customer" issues – that identified Wells Fargo Bank, not Charter, as the sublessor.  Many of these documents were signed by Wells Fargo vice presidents.  (*See, e.g.*, Dx. 494, 609; Tr. 489.)

168.   For example, in May 1999, CPG decided to reduce the space it leased in Seattle Tower from 177,527 to 89,637 square feet, the latter quantity being the amount occupied by the bank.  (Dx. 476.)  Both the internal memorandum discussing the transaction, as well as the two contracts effectuating it – a new lease for the desired amount of space and a space reduction amendment to the original lease eliminating obligations regarding the undesired space – identify the tenant as Wells Fargo Bank and exclude all reference to Charter.  (*Id.*; Dx. 473, 474.)  Numerous other documents relating to Seattle Tower and executed after the LRT, including a subsequent master lease amendment, a license agreement, and several subleases, similarly refer to Wells Fargo Bank as the tenant on the master lease.  (Dx. 531, 535, 536, 561.)

169.   Although Dana was told contemporaneously about the Seattle Tower master lease modification and although he received and cosigned a memorandum from a CPG employee seeking approval to execute the modification documents in the bank's name, there is no indication that Dana expressed concern that Charter held the leasehold.  (Dx. 476.)  Dana acknowledged that the (prior) ownership and management of Seattle

Tower were considered good bank customers.  (Px. 38 at Ex. 11; Tr. 450.)  Dana testified that he believes he nonetheless could have used Charter's fiduciary duty to the outside investor "in a reactive sense, . . . if this had come up in this transaction . . . ."  (Tr. 450.)

170.    Post-LRT documents relating to the Louisiana Street property, including a lease amendment from 2000 signed by Ingram expanding the amount of space covered by the master lease, also ignore the LRT's transference of the master lease to Charter.  (*See, e.g.*, Dx. 529, 562, 564.)  Only in 2005, after Dana knew that the IRS was reviewing the LRT, did the **eighth** Louisiana Street lease amendment properly identify Charter as the tenant on the master lease.  This amendment was signed by Dana himself.  (Dx. 610, 576 (email from Dana indicating his awareness of the IRS audit and noting that "if we win against the IRS, or even settle, it's a lot of money directly to the bottom line[;] [p]ersonally, I feel that the business case is strong, and I'm prepared to defend it vigorously in any administrative or judicial process.").)

171.    Upon receiving the Louisiana Street leasehold, Charter immediately subleased 97% of the space back to the bank, which was occupying the space and had no intention of leaving it.  (Dx. 368.)  The sublease expired on December 21, 2002, yet the bank continued to occupy the space in what was, pursuant to the sublease, a tenancy at sufferance.  (*Id.* at 5.)  In 2006, years after the expiration of the sublease, Ingram and Dana signed on behalf of Charter a "First Amendment to Sublease" providing for a new expiration date of December 21, 2012 and an effective date of January 1, 2003.  (Dx. 633.)  While Dana stated that the amendment was drafted by "very expensive and high profile counsel[,]" he did not know whether the bank paid Charter rent for the three-year

period during which it was a tenant at sufferance.  (Tr. 469-70.)  Ingram also did not

know whether Charter received rent from the bank during that period.  (Tr. 730.)

173.      In response to the question of whether the Louisiana Street property is held

today by the bank or by Charter, Dana, a Charter officer, testified:

> Well, it should be held by Wells Fargo Bank.  I'm sure you're going to tell
> me it's not, but I'm sure, you know, my understanding is it should be held
> by Wells Fargo Bank because I don't think Charter would have had an
> interest in holding onto the space, but these things are complicated.  I don't
> know what counsel would have drafted up.

(Tr. 466.)

173.      Even when subleases identified Charter as the sublessor, at times they

identified Charter as a "wholly owned subsidiary" of Wells Fargo Bank.  (*See, e.g.*,

Dx. 581 at 1, 692 at 15.)

174.      The bank did send some notices to master lease landlords informing them

of the assignment of the selected leases to Charter.  (*See, e.g.*, Px. 249-51.)

175.      Dana acknowledged the existence of post-LRT documents misidentifying

Wells Fargo Bank as the tenant in numerous selected leases.  He testified, however, that

these were relatively infrequent mistakes; Dana estimated that a few dozen out of

hundreds of documents contained such errors.  (Tr. 1127-30.)

176.      Ingram cited CPG's experience with a particular sublease at 830 Nash as an

example of how the LRT immunized CPG from having to agree to disadvantageous real

estate deals with good bank customers.   830 Nash was owned by Continental

Development Corporation ("CDC"), which is wholly owned by Richard Lundquist, a

developer in southern California.  WFC considered both CDC and Lundquist good bank customers.  (Tr. 660; Px. 38 at Ex. 11.)

**177.**  Towards the "start of the Charter period[,]" a start-up company called Globix Corporation ("Globix") approached the bank and Lundquist about subleasing space at 830 Nash.  The building had a large quantity of vacant space, and Lundquist wanted to fill it to "get some traction going in the area[,]" where he also owned several other buildings.  CPG's lease negotiators, however, did not believe that Globix was creditworthy.  Accordingly, they declined to sublease the space to Globix.  Ingram testified that CPG was able to use its fiduciary obligations to Charter's investors to prevent Lundquist from leveraging his banking relationship with WFC to compel CPG to sublease space to Globix.  Instead, CDC itself subleased space back from Charter, and then CDC sub-subleased the space to Globix.  Subsequently, when Globix defaulted on its sub-sublease with CDC and entered bankruptcy, CDC was nonetheless obliged to pay Charter over $6 million pursuant to its sublease with Charter.  (Tr. 661-66.)

**178.**  When asked if Ingram would have responded to Lundquist's request in the same way had the property not been in Charter, however, Ingram responded:

> **[P]robably I would have**, but what is very likely that would have happened there is that Mr. Lundquist, like many bank good customers, would have gone to his line of business within the bank, and they would have become a party to the discussion. . . .  That obviously didn't happen here.

(Tr. 665-66 (emphasis added).)

**179.**  As another example of how the LRT allegedly immunized CPG from pressure from good bank customers, Ingram testified about the Koll Center.  According

to Ingram, the master landlord of the Koll Center, Cornerstone Properties, was a good bank customer, although it was not listed as such on the "partial list" of good bank customers prepared in conjunction with the business purpose document in 1998. (Tr. 666; Px. 38 at Ex. 11.)  Following the LRT, CPG exercised its termination right with regard to part of the leased space.  Ingram testified that if not for Charter, CPG "would have had a lot of push back" from other divisions of WFC with whom Cornerstone had significant business.  (Tr. 667-68.)

**180.**   As an example undermining WFC's contention that the LRT financially benefited the company, the government cited Laguna Niguel, a property in a suburban shopping center anchored by a supermarket.  (Dx. 485.)  The master lease for Laguna Niguel prohibited the bank's leased space from being used for purposes other than financial services, and in particular prohibited its use for purposes that would compete with businesses that were already operating in the shopping center.  (Dx. 25 at Add. 1; Dx. 480 (referencing a "financial use only clause").)  WFC operated a bank branch in the Laguna Niguel property until April 1997, when it closed the branch.  (Tr. 426; Dx. 480.)

**181.**   The Laguna Niguel lease was transferred to Charter as part of the LRT.  As a result of the service agreement, the same CPG employees who managed the Laguna Niguel property before the LRT continued to manage it after the LRT.  (Dx. 672 at 35.)

**182.**   Around May 1999, Washington Mutual Bank ("Washington Mutual") proposed to sublease the entire leased space as a home mortgage center.  A CPG employee described Washington Mutual's proposal as "really a good one, basically full market value."  (Dx. 480.)   In evaluating whether to enter into a sublease with

Washington Mutual for the Laguna Niguel space, CPG employees consulted with members of the WFC's retail banking operations to ascertain any opposition.  The retail banking operations employees opposed subleasing former WFC space to a competitor, however, and the deal with Washington Mutual fell through.  (Dx. 480, 483, 485.)  Two other attempts to sublet the space in 1999 were unsuccessful.  (Dx. 489, 497.)

183.    Dana testified that he understood that there was an agreement between the bank and Charter to limit any subleases to office space, and that the Washington Mutual deal would have constituted a variance from that understanding.  (Tr. 428; Px. 78 (1998 letter from Cushman reflecting that CPG wanted an opinion of Laguna Niguel  that takes into account "general market conditions and all relevant factors that a general office tenant would normally be expected to consider in deciding what it would be willing to pay to sublease the space in question . . . .".)  WFC cited no written evidence of such an agreement between Charter and the bank, however, and the internal emails among CPG employees regarding the prospective transaction with Washington Mutual do not reference any reason to decline the offer other than Washington Mutual's status as a competitor.

184.    Ultimately, CPG exercised its right to terminate the master lease, effective March 1, 2001, for a fee.  (Dx. 534.)  Although Dana testified that Laguna Niguel was selected for transfer into Charter in part because of a good bank customer issue, the notice informing the master landlord of the termination, like a letter of intent which did not result in a sublease, misidentified the lessor as Wells Fargo Bank and did not mention Charter's interest in the master lease.  (*Id.*; Dx. 497; Tr. 1095.)  The termination option

could have been exercised even if the property had not been transferred to Charter. (Tr. 1095.)

185.  Internal emails among CPG employees indicate that they viewed a functioning Wells Fargo automatic teller machine ("ATM") at Laguna Niguel as high traffic.  When CPG decided to exercise the termination option, they struggled to find an adequate new location for the ATM; several employees even suggested reopening the Laguna Niguel location.  (*See, e.g.*, Dx. 480 ("I am not even sure it was a good decision to leave in the first place . . . ."), 483 ("[T]his leave behind location is a valuable site" because of the ATM), 511, 519, 526 ("Do you think we should consider reopening?").)  Wells Fargo Bank and the master landlord eventually signed an ATM License Agreement to allow for the continued use of the Laguna Niguel ATM following the early termination of the sublease in exchange for monthly rent of $2,000.  (Dx. 558.)  However, there is no record evidence of any comparable written contract between the bank and Charter for the use of the ATM between December 17, 1998, when it was transferred to Charter, and March 1, 2001, when the sublease ended.

## XI.  ASSERTED BUSINESS PURPOSE 3: CENTRALIZATION/ MANAGE-MENT EFFICIENCIES

186.  WFC's third asserted non-tax business purpose for conducting the LRT involves management efficiencies allegedly obtained through the transfer of the leases to Charter.

187.  Dana's earliest business purpose document discussed the benefit accorded by centralization of focus and attention on problematic leases, and incentivizing key

managers.  (Dx. 142.)  At trial, however, Dana discussed the LRT's benefit in facilitating a management efficiency emerging from the Norwest merger.

188.    After the Norwest merger was announced in June 1998 and it was determined that Kovacevich – formerly of Norwest – would head the merged companies, Dana was required to interview for his job.  He learned he would be retained as head of CPG around the end of July 1998.  (Tr. 142, 144.)

189.    In the course of Dana's interview with Kovacevich, he learned that Kovacevich expected the management of the company's real estate portfolio to change.  Specifically, as Dana testified:

> Wells Fargo, prior to the acquisition by Norwest, was a highly centralized company meaning that the decisions were made by a small number of officers at the very top.  The Norwest business model was highly decentralized and decisions were made in literally, you know, hundreds and hundreds of business units. . . . [W]hat it would mean [for CPG] is I would have to take the properties that were currently under the management of Wells Fargo under a centralized model and essentially send it out to these business units which means essentially they would have to approve any checks or any real big decisions made on those properties.

(Tr. 146-47.)

190.    As an example of how transferring the selected leases to Charter alleviated this internal bureaucratic entanglement, WFC highlighted a selected lease in Los Angeles, the FIWC.  According to Dana, FIWC was one of the most problematic underwater leases; following the First Interstate merger, thirteen business units that had previously occupied FIWC vacated the building.  (Tr. 182-83; Px. 10.)  Not only was the property "absolutely ORE[,]" it was also "replete with good bank customers."  (Tr. 183.)  By fall 1998, WFC's only operations in FIWC were the operation of three ATMs;

136,122 of the 162,828 square feet leased by the bank was leased to existing third-party subtenants.  (Dx. 395.)   In addition, Dana testified that although the business units no longer occupied the space, "[u]nder [Norwest's] decentralized plan, [he] would still have to get their sign-off before [he] could make a decision relating to this property if it affected their floors." (Tr. 197.)  Dana testified that he would not have been required to obtain a multitude of signatures prior to the Norwest merger. (Tr. 198.)  According to Dana, he could avoid the requirements of Norwest's decentralized system with regard to real estate disposition by transferring the lease to Charter.  (Tr. 195.)

191.   As with the ATM the bank operated at the Laguna Niguel property, the bank did not enter into a written lease with Charter despite continuing to use space in FIWC for three ATMs after the LRT.  Instead, Wells Fargo Bank entered into a Third Amendment to the master lease, dated July 12, 2000, pursuant to which the parties agreed to terms regarding space rental for the ATMs.  (Dx. 21 at 8.[3])  The amendment does not acknowledge Charter's interest in the master lease and misidentifies the bank as the tenant.

192.   Numerous other post-LRT documents generated by CPG relating to FIWC similarly misidentify the bank as the tenant on the master lease.  For example, an amendment to a sublease agreement with Steptoe & Johnson LLP ("Steptoe") dated March 8, 2005, lists Wells Fargo Bank as the tenant and excludes any mention of Charter. (Dx. 609.)  According to Dana, Steptoe was a good bank customer.  (Tr. 489.)

---

[3] This document is offered as Dx. 23 in the government's pdf exhibit submissions.

**193.**   A sublease dated May 7, 2003 with City National Bank for space in FIWC likewise identifies Wells Fargo Bank as the sublandlord and excludes reference to Charter.  (Dx. 588.)

**194.**   Dana testified that while he chose most of the selected leases on the bases of regulatory concerns and good bank customer concerns, there were a few properties that he included in the LRT but which did not raise either issue.  He included those properties "pretty much based upon my concerns about the approval process and centralizing the approval process."  (Tr. 185.)

**195.**   According to Dana, he is not sure if he would have proceeded with the LRT if the only non-tax business reason to execute it was the benefit of centralized management; rather, this third justification was a "pile on reason . . . ."  (Tr. 186.)

**196.**   As an example of how centralization facilitated cost savings, Ingram cited First Interstate House, a selected lease in London.  GE Capital had tentatively agreed to take over WFC's entire lease obligation on the property, with the condition that WFC pay it $1.3 million as a concession.  The master landlord also insisted that WFC remain a guarantor on GE Capital's obligation.  (Tr. 671.)

**197.**   When asked what about that arrangement he could attribute to the LRT, Ingram testified:

> Well, from my standpoint, one of the great benefits of Charter was to be able to simply make decisions on transactions, and I guess what I would say a little bit of a quick, centralized manner where we were able to simply go back to the bank lines of business that were affected and indicate that this was something that needed to be done.  It was such a valuable deal for Charter, whereas if Charter hadn't existed, let's put it this way, we would have gotten a significant amount of push back [from the lines of business

whose budgets would have been affected], just as Wells Fargo corporate properties, for the expenditure of the 1.3 million.

(Tr. 672-73.)

**198.** Dana's business purpose document also initially cited the benefit of incentivizing key managers to beat market expectations with regard to the underwater leases. Dr. Oliver Hart, a Harvard economics professor and government expert, testified that WFC could have implemented the executive bonus plan contract at a lower cost without the LRT structure. (Dx. 672 at ¶¶ 56-59; Tr. 1227-33.)

**199.** According to Hart, the managerial efficiencies typically associated with transferring certain business functions to a subsidiary involve managers obtaining more control over those functions and/or outside investors contributing valuable experience or specialized expertise. Early consideration of transference of underwater leases, and Dana's earliest business purpose documents comparing the LRT to the Sacramento project, reflected the potential of these advantages. (Px. 14 (identifying the "[a]bility to name a board of directors and officers who are experts in a specific business and who differ from the Bank's Board and officers" as a "pro" of using a separate subsidiary); Dx. 142.) In the case of Charter, however, control did not shift to Dana and Ingram (the incentivized executives), who already controlled the selected leases prior to the LRT. Moreover, Lehman (the outside investor) did not contribute any expertise to the enterprise. (Dx. 672 at ¶¶ 60-63.)

**200.** The lease improvement calculations provided by KPMG and later BearingPoint determined Dana and Ingram's bonuses. As of December 31, 2006, the

- 54 -

lease improvement calculations reflected that the present value of the losses related to the selected leases were reduced from the $425,899,099 anticipated in the base case to less than $360 million, an improvement of approximately $67.8 million.  (Px. 63 at 2.)

201.   According to WFC's expert Greg Gotthardt, at least $26 million of the reduction in the selected leases' liabilities is reasonably attributable to one or more of the benefits allegedly obtained through the LRT; in his view, the transaction generated at least as many benefits as the "what if" scenarios anticipated.  (Tr. 1002-04.)

202.   Pursuant to the bonus plan and based on KPMG and BearingPoint's quantification of how much better the selected leases fared through the transfer to Charter than they otherwise would have, Dana received a bonus of $3.4 million and Ingram a bonus of approximately $2.3 million.  (Tr. 262.)

## XII.   THE GARLAND BUILDING

203.   The Court will now focus – as did WFC at trial – on the changes and leasing activity in the largest selected lease, Garland, following the LRT.  Garland had previously served as an administrative and operations center for First Interstate.  (Px. 56; Tr. 173, 282, 676.)  Following Old Wells Fargo's acquisition of First Interstate and the consolidation of the companies' operations, Old Wells Fargo vacated the facility completely.  (Tr. 173.)

204.   Dana described Garland as "the key poster child for something that should go into Charter."  (Tr. 173.)  It was ORE, with zero bank occupancy, and two of its subtenants – Regulus and Prudential – were "good bank customers."  (Px. 38 at Ex. 11.)

**205.**　In some ways, Garland was a very difficult property to sublease.  In 1998, according to Dana, it was located in a crime-ridden part of downtown Los Angeles "on the wrong side of the tracks" surrounded by vacant lots.  Several hundred thousand feet of the property were underground, unsuitable for general office space.  (Tr. 282.)  On the other hand, Garland's uniqueness was also potentially lucrative.  It was designed as a "virtual fortress" with a helicopter pad and redundant power feeds, capable of sustaining itself for thirty days.  (Tr. 281.)  Garland's unusually robust electrical capabilities and other features make it particularly well-suited to address the burgeoning need for secure electronic data storage.  (Tr. 283-84.)

**206.**　From the master lease's commencement in 1984, annual rents on Garland escalated from approximately $5.8 million to approximately $29 million for the last year of the initial term ending in February 2009.  (Tr. 584.)  However, after the initial term, the annual master lease rent during each of six five-year lease extension periods was fixed at approximately $13.4 million through the year 2039.  (Tr. 584, 267.)  The rent drop, in Dana's view, presented "tremendous opportunity to turn that property from a money loser to a real gold mine . . . ."  (Tr. 267.)  The OCC's five-year disposition period for Garland ended in 2001, while an additional five year extension would have ended in 2006.  (Tr. 269-70.)  Dana testified that, had Garland stayed under the purview of the bank instead of Charter, CPG would have had to dispose of the property pursuant to OCC regulations and miss the opportunity to capitalize on the prospective rent reduction.  (Tr. 268.)

**207.**   As evidence of how the OCC mandatory disposition period hindered CPG's ability to market the Garland lease tail and extension options, Dana cited a potential $14 million sublease at Garland that Bank of America walked away from because it could not justify expending resources on necessary improvements to the cash vault without the possibility that it could remain in the space past the expiration of Wells Fargo's master lease and disposition period.  (Dx. 225 at WFC-37-0254; Tr. 110-11.)

**208.**   After the LRT, CPG recommenced negotiations with Bank of America on behalf of Charter and successfully executed a sublease.   That sublease, however, contained a provision in which **Charter explicitly disclaimed any obligation to exercise its extension option** beyond the master lease's expiration date in 2009.  (Px. 96 at 65.)  According to Dana, CPG did not need to include a sublease extension guarantee because at that point, one year after their initial negotiations, Bank of America was "desperate" for cash vault space and CPG had therefore gained substantial leverage in the negotiations.  Dana testified that he gave Bank of America "considerable comfort" that it would be able to extend the sublease through a verbal "gentlemen's agreement" with Bank of America's real estate head.  (Tr. 1118.)

**209.**   WFC also cited a sublease with the City of Los Angeles as an example of how Charter generated savings by executing subleases during the final forty-eight months of the master lease.   Such subleases, according to WFC, would not likely have been possible absent the flexibility to exercise the lease extension option provided by the LRT. (Tr. 232-33.)  The Garland sublease with the City of Los Angeles, however, commencing on October 1, 2007, had a term of only seventeen months; it expired before the master

lease.  (Px. 121.)  WFC cited no record evidence of any "gentlemen's agreement" with the City regarding the likelihood of an extension.

    **210.**   Ingram testified about using Charter to immunize CPG from pressure from good bank customers in relation to Garland.  As an example, Ingram cited Aetna, a good bank customer subleasing space in the building.  In 2001, Aetna attempted to exercise its right to contract, or reduce, its subleased space thirteen days after the deadline for asserting such a right expired under the terms of the sublease.  CPG denied Aetna's request, and Charter continued to receive approximately $360,000 in annual rent from the contraction space until 2007.  Ingram testified that but for the LRT, he likely would have considered Aetna's relationship with WFB and honored Aetna's contraction request; because of the LRT, he instead informed Aetna that Charter could not accept an untimely contraction because it owed a duty to maximize its third-party investor's interest.  (Px. 116; Tr. 676-80.)

    **211.**   The letter in which CPG rejected Aetna's request, however, is on Wells Fargo letterhead, and it does not reference Charter's fiduciary duty to any outside investor.  Moreover, Ingram testified that had the bank retained possession of the lease and not transferred it to Charter, "I would have started off with the same position which is that you, you know, you blew a deadline, and so we're not going to contract the space."  Anticipating pressure from other WFC business lines, Ingram testified that "it's not inconceivable to certainly think that an accommodation would have been made."  (Px. 116; Tr. 680.)

212.  According to Ingram, another good bank customer and Garland sublessee, SBC Verizon, challenged its payment of approximately $150,000 in back rent over a dispute relating to power usage.  SBC Verizon directly contacted an individual high in WFC's hierarchy seeking an accommodation.  Ingram testified that after he explained the limitations imposed by Charter's fiduciary duty to the WFC executive, she relayed that explanation to SBC Verizon, which subsequently paid the past due rent.  (Tr. 681-83.)

213.  The government, however, provided numerous examples of Garland subleases misidentifying Wells Fargo Bank as the tenant on the master lease and omitting any reference to Charter.  (*See, e.g.*, Dx. 466, 475, 479, 541.)

214.  WFC has exercised subsequent lease extension options at Garland, taking advantage of the master lease rent reduction and capitalizing on Garland's unique capabilities and increased interest in technical equipment storage.  (Tr. 283-84, 591.)  In 2007, WFC invested $34 million to upgrade Garland's electrical infrastructure.  (Tr. 603.)  Garland subleases have subsequently generated millions of dollars in profit.  (Tr. 587-88, 629-30.)

## CONCLUSIONS OF LAW

To determine whether WFC is entitled to the deduction it seeks, the Court must decide two legal questions: (1) whether the LRT, on its surface, complied with the requirements of the Internal Revenue Code, and (2) even if it technically comports with statutory requirements, whether the LRT was nonetheless a tax shelter devoid of non-tax

business purposes or economic substance under the common law "sham transaction" doctrine.

## I.     STATUTORY REQUIREMENTS

The government challenges WFC's deduction on two statutory grounds: 26 U.S.C. § 357(b), and 26 U.S.C. § 351.   Generally, the sale or exchange of property is a "recognition" event requiring a taxpayer to recognize any gain or loss on the property.   26 U.S.C. § 1001(c).   Section 351(a), however, provides that "no gain or loss shall be recognized if property is transferred to a corporation by one or more persons solely in exchange for stock in such corporation and immediately after the exchange such person or persons are in control . . . of the corporation."   The taxpayer's basis in the received stock is usually the same as its basis in the transferred property, such that the taxpayer will recognize any unrecognized gain or loss the taxpayer had in the transferred property prior to the transaction later, when it sells the stock.   If, in addition to receiving transferred property, the transferee corporation also assumes liabilities of the taxpayer, then the taxpayer's basis in the received stock is reduced by the amount of the liabilities assumed by the transferee pursuant to 26 U.S.C. § 358, which governs the basis calculation in a § 351 exchange.   26 U.S.C. §§ 358(d)(1); 358(a)(1)(A)(ii).   However, where the assumed liabilities would have given rise to a deduction by the taxpayer but for its assumption by the transferee corporation, the taxpayer's basis in the transferee's stock is not reduced by the amount of the liabilities.   *Id.* §§ 358(d)(2); 357(c)(3).

The government insists that § 357(b) precludes a refund in these circumstances. Section 357(b) provides that if the taxpayer's purpose for the assumption of the liabilities (i) was to avoid federal income tax on the exchange or (ii) was not a bona fide business purpose, then the assumption of liability shall, for purposes of § 351, be considered "money received" by the taxpayer on the exchange.   According to the government, § 357(b) means that the amount of the liabilities is subtracted from the taxpayer's **basis**. As discussed below, the Court concludes that WFC has not proven by a preponderance of the evidence that it executed the LRT for any reason other than avoidance of federal income tax.   If the Court applies § 357(b) to the LRT, then the total amount of the liabilities assumed by Charter ($425,899,099) would be subtracted from the transferring banks' basis in the government securities ($427,849,535) to arrive at the transferring banks' basis in the Charter Preferred Stock ($1,950,436).   Under this logic, when the transferring banks sold the Preferred Stock to Wells Fargo for $4,000,000 they realized a capital gain instead of a capital loss, which means that WFC is not entitled to a capital loss deduction or tax refund.

As the government has acknowledged, however, two appellate courts have squarely rejected its interpretation of § 357(b) and concluded that the section applies only to determine whether gain is recognized in a § 351 exchange, not to calculate the basis of stock received in such an exchange.   *See Coltec Indus., Inc. v. United States*, 454 F.3d 1340, 1348-52 (Fed. Cir. 2006); *Black & Decker Corp. v. United States*, 436 F.3d 431, 438-40 (4th Cir. 2006).   Specifically, both courts recognized "the absence of **any**

reference to § 358 [the basis calculation provision] on the face of § 357(b)." *Black &*

*Decker*, 436 F.3d at 438; *Coltec*, 454 F.3d at 1350-51.  As the Fourth Circuit explained:

> [Section] 357(b)(1) refers (as pertinent here) only to the "purposes" of
> § 351, which are the purposes of gain or loss recognition, as indicated by
> the opening words of § 351(a) ("No gain or loss shall be recognized . . .").
> Those purposes are distinct from the purposes of § 358, which concerns the
> computation of basis.  Section 351(h) certainly refers to § 358, but this
> reference has no substantive content; rather, it simply guides the reader of
> § 351 to the basis computation rule for exchanges that qualify for § 351's
> tax-free treatment.

*Black & Decker*, 436 F.3d at 438.  The Court agrees and concludes that § 357(b) does not

operate to reduce WFC's basis.

The government's second statutory challenge is that § 351 itself precludes a refund

because only part of the exchange qualifies under § 351.  The government divides the

transfer into two parts: (1) the transferring banks' transfer of $425,899,099 worth of

government securities to Charter in exchange for Charter's assumption of lease liabilities

with a projected value of negative $425,899,099, and (2) the transferring banks' transfer

of $4,000,000 worth of government securities to Charter in exchange for $4,000,000

worth of Preferred Stock.  Characterizing the transaction in this manner, only the second

transfer qualifies as a § 351 exchange, meaning that: the transferring banks' basis in the

Preferred Stock is less than $4,000,0000, they realized a capital **gain** upon selling the

stock to Wells Fargo, and Wells Fargo is therefore not entitled to a capital loss deduction

or tax refund.  According to the government, this characterization of the transaction is

appropriate because the assumption of the lease liabilities was unrelated to the

transferring banks' sale of the Preferred Stock.  To the contrary, the exchanges occurred

simultaneously pursuant to an integrated exchange agreement.   Courts often conflate separately structured transactions into a single, integrated transaction subject to § 251 when the parties act pursuant to a single predetermined plan.   *See, e.g.*, *D'Angela Assocs., Inc. v. C.I.R.*, 70 T.C. 121, 129-30 (1978).   The government provides no evidentiary support, nor caselaw, in support of its proposition that the transaction should be separated into components, and the Court declines to do so.

## II.   SHAM TRANSACTION DOCTRINE

Although the Court concludes that the government has not shown that WFC failed to comply with the technical requirements of the Internal Revenue Code, WFC is not entitled to a tax refund unless the LRT passes muster under the common law "sham transaction" or "economic substance" doctrine derived from three Supreme Court cases: *Gregory v. Helvering*, 293 U.S. 465 (1935); *Knetsch v. United States*, 364 U.S. 361 (1960); and *Frank Lyon Co. v. United States*, 435 U.S. 561 (1978).[4]   "Over the last seventy years, the economic substance doctrine has required disregarding, for tax purposes, transactions that comply with the literal terms of the tax code but lack economic reality."   *Coltec*, 454 F.3d at 1352; *see also Frank Lyon*, 435 U.S. at 573 ("[T]he Court has looked to the objective economic realities of a transaction rather than to the particular form the parties employed."); *In re CM Holdings, Inc.*, 301 F.3d 96, 102

---

[4] WFC asserts that since the LRT would continue to comply with the tax code even after amendments, enacted after the LRT, which prohibit certain economic liability transactions, it is entitled to the deduction it claims.   Literal compliance with the tax code as it existed during the relevant period or as it was subsequently amended, however, does not entitle a taxpayer to deduct a capital loss based on a sham transaction.

(3d Cir. 2002) ("[C]ourts should not elevate form over substance by rewarding taxpayers who have engaged in transactions that lack any purpose save that of tax savings.").  It is the burden of the taxpayer claiming a deduction to prove, by a preponderance of the evidence, that the transaction on which the deduction is based had economic substance. *See, e.g.*, *Coltec*, 454 F.3d at 1355; *Stobie Creek Invs. LLC v. United States*, 608 F.3d 1366, 1375 (Fed. Cir. 2010) ("Because deductions are a matter of legislative grace, the taxpayer has the burden of proving that a transaction had economic substance by a preponderance of evidence.").

"In determining whether a transaction is a sham for tax purposes, the Eighth Circuit has applied the test set forth in *Rice's Toyota World, Inc. v. C.I.R.*, 752 F.2d 89, 91-92 (4th Cir. 1985)." *IES Indus., Inc. v. United States*, 253 F.3d 350, 353 (8th Cir. 2001) (citing *Shriver v. C.I.R.*, 899 F.2d 724, 725-26 (8th Cir. 1990)).  The *Rice's Toyota World* test is a two-part inquiry, pursuant to which "a transaction will be characterized as a sham if it is not motivated by any economic purpose outside of tax considerations (the business purpose test), and if it is without economic substance because no real potential for profit exists (the economic substance test)." *IES*, 253 F.3d at 353 (internal quotation marks omitted).  Courts apply this test even where, as here, the challenged transaction has some nexus to a corporation's ordinary business operations. *See, e.g.*, *Coltec*, 454 F.3d at 1344 (transaction involved assignment of company's asbestos-related liabilities created through taxpayer's business operations); *Am. Elec. Power Co., Inc. v. United States*, 326 F.3d 737, 739-40 (6th Cir. 2003) (transaction involved life insurance purchased on taxpayer's employees purportedly to fund employee health benefits).  Some courts do not

view the two prongs of the *Rice's Toyota World* test as "discrete prongs of a rigid two-step analysis," but rather as factors to aid the Court in determining whether a transaction has practical economic effects. *ACM P'ship v. C.I.R.*, 157 F.3d 231, 247 (3d Cir. 1998) (internal quotation marks omitted). The Court recognizes that many issues and factors in this case inform both a business purpose and economic substance analysis, and are not neatly divided into one of two prongs, but will nonetheless consider the transaction separately under both the business purpose test and economic substance test.

The Eighth Circuit has previously suggested "that a failure to demonstrate either economic substance **or** business purpose – both not required – would result in the conclusion that the transaction in question was a sham for tax purposes." *IES*, 253 F.3d at 353 (citing *Shriver*, 899 F.2d at 727). Because the Court concludes that the LRT does not pass muster under either prong, and more generally finds that the transaction was a sham tax shelter, it need not consider the consequence of failing to prove only one of the two *Rice's Toyota World* analytical prongs.[5]

The transaction the Court must analyze is the one that produced the claimed tax deductions at issue. *Sala v. United States*, 613 F.3d 1249, 1252 (10th Cir. 2010); *Coltec*, 454 F.3d at 1356. The relevant transaction in this case is the LRT. "'[T]he transaction[] must be viewed as a whole, and **each step**, from the commencement of negotiations to

---

[5] The Court notes, however, that Congress has recently mandated the application of the two-prong test, which will require taxpayers to prove that "the transaction changes in a meaningful way (apart from Federal income tax effects) the taxpayer's economic position, **and** . . . the taxpayer has a substantial purpose (apart from Federal income tax effects) for entering into such transaction." Health Care Educational Reconciliation Act of 2010, P.L. 111-152, § 1409(a) (to be codified at 26 U.S.C. § 7701(o)(1)) (emphasis added).

the consummation of the sale, **is relevant**.'" *IES*, 253 F.3d at 256 (emphasis added) (quoting *C.I.R. v. Court Holding Co.*, 324 U.S. 331, 334 (1945)); *see also Kirchman v. C.I.R.*, 862 F.2d 1486, 1493-94 (11th Cir. 1989); *Long Term Capital Holdings v. United States*, 330 F. Supp. 2d 122, 191 (D. Conn. 2004) (applying the "step transaction doctrine" pursuant to which "a series of separate transactions[,] . . . prearranged parts of what was a single transaction, cast from the outset to achieve the ultimate result[,]" are analyzed as a single transaction (internal quotation marks omitted)).   WFC does not appear to dispute that the three steps of the LRT were planned and executed as parts of one transaction, the LRT, nor would the factual record permit it to successfully mount this dispute.   Accordingly, the Court must consider all three steps of the LRT, to determine whether the LRT, viewed as a whole, was a sham transaction.

### A.    Business Purpose

"Asking whether a transaction has a bona fide business purpose is another way to differentiate between real transactions, structured in a particular way to obtain a tax benefit (legitimate), and transactions created to generate a tax benefit (illegitimate)." *Stobie Creek*, 608 F.3d at 1379.   "[T]he business purpose test is a subjective economic substance test" under which the Court considers a "subjective analysis of the taxpayer's intent and . . . such factors as the depth and accuracy of the taxpayer's investigation into the investment." *IES*, 253 F.3d at 355 (internal quotation marks omitted).   Although "a taxpayer's subjective intent to avoid taxes . . . will not by itself determine whether there was a business purpose to a transaction[,]" it is a relevant factor. *Id.*   The ultimate

inquiry is "whether the taxpayer was induced to commit capital for reasons only relating to tax considerations or whether a non-tax motive, or legitimate profit motive, was involved." *Shriver*, 899 F.2d at 726. The Court will assess several aspects of the development and implementation of the LRT before examining the specific non-tax business purposes WFC asserts motivated the transaction.

### i. Development and Implementation of the LRT

A review of the evolution and development of the LRT strongly suggests that it was designed and understood as a tax shelter. First, the LRT was designed, packaged and sold to Wells Fargo by KPMG, which received a fee of approximately $3 million, as a mechanism for sheltering WFC's taxable gain. *See Stobie Creek*, 608 F.3d at 1379 (fact that challenged transactions "were part of a prepackaged strategy marketed to shelter taxable gain" evinced lack of business purpose); *CM Holdings*, 301 F.3d at 107 (considering fact that "the plan was **marketed** as a tax-driven investment") (emphasis original). WFC argues that it is WFC's motivation for entering into the transaction, not KPMG's, that is relevant. The Court agrees. Scrutinizing WFC's motivation for the transaction, however, undermines its case.

In particular, WFC has experienced dozens of mergers and acquisitions (it merged with First Interstate in 1996) and Dana had long lobbied the OCC to conform the rules applicable to leased ORE to those of the Fed. CPG has presumably always navigated the dynamics of negotiating with good bank customers. However, there is no contemporaneous written evidence that WFC began to consider transferring underwater

leases into a non-banking subsidiary – let alone engage in the LRT in its entirety, including the stock sale – for these two primary non-tax benefits it now propones until its auditor KPMG approached it with the idea of an economic liability transaction. Dana's early version of the business purpose document in fact states that the purpose of the transaction is to focus attention on problematic properties through segregation and to incentivize key managers (one of two of whom turned out to be Dana himself). The memorandum received by Dana in May 1998 setting forth pros and cons of using a separate subsidiary to dispose of the underwater property likewise discusses benefits of the transference entirely different from those on which WFC now relies. The regulatory issues, that according to WFC were paramount to Dana's desire to transfer underwater properties into a non-banking subsidiary, did not appear in Dana's business purpose document until Vandermark derided the business case as inadequate and unlikely to survive a tax audit.

Internal emails among KPMG employees make clear that, whatever Dana's general position in WFC's hierarchy relative to Vandermark, it was Vandermark, as head of the tax department, who guided and held ultimate authority over the transaction. The non-tax benefits of the transaction were not quantified until Vandermark required it. These internal dynamics strongly suggest that the LRT was a tax-driven transaction, designed and sold by an accounting firm and developed by WFC's tax department in conjunction with CPG, and that WFC took steps to make it appear that tax advantages did not drive the LRT. The Court notes the presence of a compelling reason Dana would advocate for the LRT despite the presence of any non-tax business purpose: the

opportunity to obtain a bonus of over $3 million based on property disposition improvements calculated by reference to a base case Dana himself helped formulate.[6] *Cf. Shell Petroleum Inc. v. United States*, No. H–05–2016, 2008 WL 2714252, at *34 (S.D. Tex. July 3, 2008) (considering the genesis of the challenged transaction in ascertaining the presence of a legitimate business purpose).

In *IES*, the Eighth Circuit found it "important to note" in finding a valid non-tax business purpose to certain challenged transactions "that these were not transactions conducted by alter-egos of IES or straw entities created by IES simply for the purpose of conducting [the transactions]." 253 F.3d at 355. All of the entities involved were "separate and apart from IES, doing legitimate business before IES started [engaging in the challenged transactions] . . . ." *Id.*; *see also Frank Lyon*, 435 U.S. at 580 (noting that "[the entity which participated in a challenged leaseback transaction] is not a corporation with no purpose other than to hold title to the bank building. It was not created by [the company which leased back the space] or even financed to any degree by [that company].").

Here, by contrast, Charter did not exist in its current form until it was altered – through changes including its name, WFC's capital contribution, and the addition of

---

[6] WFC points to the testimony of its CEO, Kovacevich, who stated that he approved the LRT based on Dana's presentation of the non-tax business purposes for the transaction, and that his decision excluded any consideration of tax advantages. Any CEO presented with KPMG's estimate of the prospective millions of dollars in savings associated with the transaction would likely have no reason to disapprove of it. Yet, as explained below, both KPMG's base case and calculation of lease improvements are dubious and the proffered non-tax justifications for the transaction appear pretextual upon closer inspection. Kovacevich's approval, based on faulty and misleading information, does not disrupt the Court's conclusion that, as a whole, the LRT had neither a non-tax business purpose nor economic substance.

Dana and Ingram as officers – simply to facilitate the LRT.  Charter was and is an entity primarily owned by and entirely controlled by WFC.  It had no employees in 1998, and those it has today it shares with other WFC entities.  Through the service agreement, its business of negotiating and managing leases is entirely outsourced to the same CPG employees who handled the selected leases prior to the LRT.  As for the sale of Charter's Preferred Stock to Lehman, neither Dana – an officer of Charter – nor the company's treasurer recalled being part of any negotiations regarding the sale of the Preferred Stock, nor did they believe their approval was required.  (Tr. 526; Fehlhaber Dep. 25, 33.)  As discussed further below, CPG employees often subordinated Charter's interest in the selected leases to serve those of the bank.  In short, the Court readily concludes that Charter, one of the key entities involved in the LRT, is a straw entity controlled by WFC and created for the purpose of effectuating the LRT.  Its nature undermines a finding of a "genuine multiple-party transaction . . . ."  *See Frank Lyon*, 435 U.S. at 583.[7]

The Court also finds it significant that KPMG and WFC structured the transaction to generate an enormous loss of over $400 million, all of which (as KPMG confirmed) could be offset against its $483 million in capital gains.  Dana acknowledged that he aimed for a particular target loss amount of $400 million in choosing leases for the portfolio.  He testified that his target number was an attempt to achieve economies of

---

[7] The creation of a non-bank subsidiary to conduct a particular transaction does not, in itself, suggest that only tax advantages motivated a particular transaction.  For example, WFC created Crocker to develop the Sacramento project.  As discussed below, however, the LRT is readily distinguishable from the Sacramento project.  There is compelling evidence that WFC used Crocker's structure for the non-tax business purposes for which it purported to create it.  In the case of Charter, by contrast, WFC created a straw entity and did not use it as its non-tax business purposes indicated it was intended to be used.

scale sufficient to justify the administrative cost of the transaction but small enough so that the employees managing the portfolio would retain focus on a select number of problematic properties.   Economies of scale, however, cannot fully explain the presence of numerous selected leases which do not reflect WFC's purported business purposes in executing the LRT (i.e. the portfolio included properties, such as Boise Main, not considered ORE and not identified as having any good bank customers).   As discussed further below, the "focus" justification is undermined by the fact that the same CPG lease negotiators managing the selected leases prior to the LRT continued to manage them, and by the abundance of evidence that Dana, Ingram, and the lease negotiators consistently disregarded the form of the LRT.   Both Dana and KPMG, moreover, appear to have made changes to the portfolio (such as the exclusion of Hayward Main and Stockton) and base case scenario (such as altering the leaseback rate) that simply cannot be explained in terms of achieving WFC's purported non-tax business purposes.

In addition, the Court also notes what appears to be several instances of WFC attempting to alter or recharacterize its work, sometimes in a misleading manner, to bolster its business purposes and the integrity of the form of the LRT retroactively.   For example, Dana backdated a later KPMG engagement letter which, unlike its predecessor, did not so bluntly characterize the LRT as a tax-saving device.   At trial, he characterized numerous selected leases as "at risk" of ORE designation despite having previously testified that WFC viewed them as not ORE.   The business purpose document expanded and changed significantly only after Vandermark objected that the transaction would not withstand an IRS audit.   After numerous lease amendments to the Louisiana Street

property, including at least one signed by Ingram, mistakenly identified the bank as the master tenant, Dana signed the eighth lease amendment in Charter's name after learning of the IRS' audit.  He also signed an amendment to Charter's sublease with the bank with an effective date three years before the amendment was signed.  These actions are suggestive, though not conclusive, of an entity seeking to enhance the non-tax justifications for the LRT only in anticipation of judicial scrutiny.

### ii.    Asserted Business Purpose 1: Regulatory Benefits

WFC argues that the primary, most compelling purpose of transferring twenty-one underwater leases into Charter and conducting the LRT was to shift regulatory oversight of the properties from the OCC to the Fed.  In doing so, WFC asserts, it was able to avoid the OCC's five/ten-year mandatory ORE disposition period and thus execute lease extensions to attract prospective subtenants and thereby reduce projected lease liabilities and, as in the case of Garland, generate otherwise unattainable profits.  In the Court's view, WFC has established that such regulatory shopping can lead to potential savings or profits in some circumstances.  It has failed, however, to show that the regulatory concern drove the transfer to a non-banking subsidiary of these particular selected leases, and it has entirely failed to establish that this purpose motivated the LRT as a whole.

First, regulatory concerns do not explain the issuance of the Preferred Stock and sale of the stock to Lehman.  If WFC wanted to escape OCC supervision, it could have simply transferred the leases to a non-banking subsidiary without accepting the

administrative burdens and transaction costs of creating a new class of stock and subsequently selling it.[8]

In addition, contrary to the testimony – offered many years after the fact – of Bowen and others that Dana stated he would have transferred the leases for regulatory reasons even outside the LRT structure, the record contains compelling evidence that regulatory concerns did not lead WFC to transfer the selected leases to Charter.  The OCC's regulatory restrictions were apparently a long-standing concern for CPG, but there is no evidence that Wells Fargo transferred a single property into a non-banking subsidiary for the purpose of shifting regulatory oversight to the Fed until KPMG proposed the LRT and Vandermark demanded a more robust business purpose to justify it.  While Dana's testimony regarding which of the selected leases the bank considered ORE (or "at risk" of ORE designation) shifted during the course of litigation, WFC does not dispute that many of the selected leases were not subject to ORE classification.  In his deposition, Dana identified at least ten of the twenty-one selected leases as not ORE, while an internal email from 2000 identified a mere three of the properties as having been ORE before the transfer to Charter.  Louisiana Street, for example, was nearly 100% occupied by the bank.  It appears, however, that WFC incongruously declined to include numerous underwater leases in the transaction.  Several of the selected leases had master leases expiring before the ten-year ORE disposition period, and Wells Fargo signed coterminous subleases for periods of less than forty-eight months both before and after

---

[8] The presence of Lehman and the sale of the Preferred Stock can only be justified by the "good bank customer" business purpose, which, as discussed below, the Court finds pretextual.

the LRT.  (*See, e.g.*, Px. 45 at 127 (Charles Schwab sublease), Px. 121 (City of Los Angeles sublease).)  These facts undermine WFC's contention that it sought to increase the marketability of lease tails through Fed oversight.

WFC attempts to use the conflicting testimony of its employees regarding when a property is designated ORE to argue that the ambiguity around the designation, and the potentially harsh consequences for running afoul of OCC regulations, made it all the more necessary to transfer underwater leases which might be at risk of ORE designation into a non-banking subsidiary.  Yet WFC currently has a list of properties it deems ORE, and presumably had one in 1998.  A substantial part of Cohen's job is determining which of WFC's properties may be ORE, and he testified that the bank's OCC regulator is available to offer consultation and guidance.  Remarkably, however, Dana testified that although regulatory concerns drove the transaction, he **did not consult any WFC-generated list of ORE properties** when assembling the portfolio.  While the business purpose document ultimately contained a partial list of "good bank customers" in the selected leases, WFC cited no written material quantifying those properties which were ORE or at risk of such designation.  Moreover, from 1996 to 1998, no one at Wells Fargo contacted the OCC to determine whether the selected leases WFC now characterizes as "at risk" of ORE designation were in fact at risk, or whether the bank could exercise certain lease extension options pursuant to 12 C.F.R. § 34.83(a)(3)(i), as amended in 1996.  An internal email reflects some CPG employees' impression that only three selected leases were ORE.  One would anticipate a more deliberate and thorough assessment of ORE designation of the selected leases – one that did not change from

employee to employee and from email to deposition to trial – in a multi-million dollar transaction executed for the primary purpose of regulatory change.

Indeed, it appears that the portfolio was already assembled by September 1998, with only a few minor subsequent revisions, when the idea of shifting regulatory regimes entered the discussion of a business purpose for the LRT following Vandermark's expressing his concerns with the inadequacy of the purported business purposes in October 1998. Dana's earlier drafts of the business purpose document discuss the same supposed benefits suggested in KPMG's materials; they focus on the purported benefit of consolidating problematic properties into a single entity to maintain focus and attention on their disposition and directly incentivize managers to exceed market expectations. These early drafts do not reference regulatory issues. The first written documentation of using Charter's structure to address the OCC regulatory issue in evidence is after Vandermark threatened to derail the project because of the inadequacy of a documented non-tax business purpose. An internal email from October 13, 1998 to Dana purported to answer his "question" about "possible regulatory advantages" of transferring underwater leases into a non-banking subsidiary. (Px. 38 at 26.)

WFC argues that its business purpose document was not initially intended for a broader audience but was aimed only at obtaining internal approval for the transaction. This argument fails to explain the absence of any discussion of the regulatory issue in early contemporaneous documentation of the LRT's purported business purpose. First, WFC was no doubt well aware that documenting a non-tax business purpose was an important part of the transaction, as reflected by an August 1998 email from Bowen

suggesting that KPMG re-designate the task of documenting the business purpose from the tax department to CPG.   (Dx. 110.)   Identifying a non-tax business purpose, presumably for audit purposes, was one of the first questions KPMG addressed when approaching a client with the idea for an economic liability transaction.  In addition, if regulatory concerns were truly driving the transaction and if Dana anticipated that transference to the Fed's jurisdiction would save WFC a large quantity of money, it seems logical that he would have promoted the reason for this savings internally as early as possible.

Garland was WFC's purported "poster child" for the LRT in part because it was a huge vacant space on which the bank was obliged to pay rent beyond the ORE disposition period.  In its business purpose document and at trial, WFC highlighted the example of the pre-LRT unconsummated Garland sublease with Bank of America to illustrate how the LRT and change in regulatory scheme would enable CPG to market its lease tails.  According to WFC, a potentially lucrative deal with Bank of America to sublease a substantial percentage of available space in the Garland building, including a bank vault, fell through because Bank of America demanded a long sublease term that would require the bank to exercise its master lease extension option.  Yet when Bank of America and the bank subsequently consummated the deal after the LRT, the sublease expressly disclaimed any obligation by the bank to exercise its extension option.  According to Dana, CPG did not need to include a sublease extension guarantee because Bank of America was by then desperate for vault space, empowering CPG in the negotiations.   The LRT and accompanying regulatory shift cannot account for the

lucrative Bank of America sublease, despite Dana's questionable testimony that Bank of America was partly persuaded to sign such a substantial sublease by his verbal "gentlemen's agreement" about extensions. By Dana's own account, market forces – not Charter – resulted in the consummation of the Bank of America sublease. Similarly, the Garland sublease with the City of Los Angeles, signed within the last forty-eight months of the master lease and cited by WFC as an example of the LRT's success in marketing lease tails, cannot be attributed to regulatory change; the sublease expired before the master lease.[9]

The Court agrees with WFC that transference of underwater property to a non-banking subsidiary can sometimes improve a bank's ability to market lease tails and take advantage of prospective lucrative subleasing opportunities that otherwise would not exist in ORE properties. Garland, for example, had a large profit potential due to the prospective reduction in master lease payments, but WFC could best access this potential by removing the building from OCC oversight. Indeed, a large part of Cohen's job at CPG is assessing whether bank properties might benefit from such a regulatory change by transference into Charter. In this case, however, WFC has failed to establish by a preponderance of the evidence that, on the whole, it transferred the selected leases to Charter and conducted the LRT for this purpose. Rather, the evidence compels the conclusion that WFC chose the selected leases without regard to regulatory concerns, developed the non-tax justification of regulatory benefits after Vandermark expressed

_____

[9] These subleases were of course among those counted by KPMG as attributable to the LRT. They are but two specific examples undermining the validity of KPMG's base case and subsequent improvement calculations.

concerns about an audit, conducted the LRT for tax advantages, and now can produce largely questionable evidence of how the regulatory shift directly resulted in a reduction of negative equity.

### iii.    Asserted Business Purpose 2: Good Bank Customers

WFC purports to justify this transaction in part by arguing that moving the selected leases to a non-banking subsidiary enabled WFC to cite its fiduciary duty to an outside investor in order to avoid unfavorable real estate deals with good bank customers. This non-tax business purpose is of paramount importance because WFC has used it to justify the inclusion in the portfolio of numerous properties it acknowledges were not ORE or at risk for being designated ORE, including Louisiana Street, 801 Travis, Koll-Main, Koll-Birch, and Las Vegas Tower.  In addition, the "good bank customer" business purpose is the only one that suggests the issuance of Preferred Stock and sale to Lehman were for any other reason than the recognition of the capital loss underlying the deduction at issue in this case.  Upon close inspection, however, WFC has utterly failed to establish by a preponderance of the evidence that it conducted the LRT to immunize its lease negotiators from pressure to cut unfavorable deals with good bank customers.

First, WFC has consistently and repeatedly failed to honor the form of the LRT. The Eighth Circuit has long held that

> [a] transaction will not be given effect according to its form if that form does not coincide with the economic reality and is, in effect, a sham.  The presence or absence of economic substance is determined by viewing the objective realities of the transaction, namely, whether **what was actually done is what the parties to the transaction purported to do.**

*In re Gran*, 964 F.2d 822, 825 (8th Cir. 1992) (emphasis added) (internal quotation marks and citations omitted); *see also IES*, 253 F.3d at 356.  Pursuant to the LRT, the transferring banks transferred all of the rights and obligations associated with the selected leases to Charter, an entity purporting to have fiduciary duties to outside investors.  New subleases were to bear the name of Charter, not the bank, pursuant to the service agreement, and Dana's earliest business purpose document contends that the selected leases would be segregated from the day-to-day operations of the bank.

Yet CPG employees – who continued to manage the selected leases even after the LRT – repeatedly signed subleases and other relevant documents such as lease extensions in the bank's name.  Although Dana and Ingram became officers of AMFED (later Charter) in December 1998, Dana sent an internal email on April 14, 1999, after numerous subleases in the portfolio had already been signed, requesting that he and Ingram be elected officers of Charter so that they could sign Charter subleases.  It appears that the first written notice to the lease negotiators on the effect of the transfer was on June 30, 1999, approximately six months after the LRT and after numerous subleases and other documents had already been signed.  Notably, the memorandum did not discuss how lease negotiators could or should use a fiduciary duty to Charter's outside investor to deflect attempts by good bank customers to obtain favorable terms on deals.  Pursuant to the memorandum, subtenants – presumably including numerous good bank customers – were not informed of the transfer to Charter and continued making sublease payments directly to the bank.

Even after the issuance of the memorandum, CPG employees, including vice presidents, continued to sign subleases and other documents **with entities considered good bank customers** in the name of the bank despite the transferring banks having signed away their interest to Charter.  WFC cites Dana's reprimand of a vice president who signed such a lease, but the alleged discipline occurred approximately ten years later, when Dana discovered the error as he prepared for trial.  (Tr. 417-18.)  Moreover, Dana himself signed off on an internal memorandum seeking approval of the lease modification in Seattle Tower in the bank's name, despite the fact that Charter held the leasehold and despite the fact that the building's management was considered a good bank customer.  While WFC asserts that Louisiana Street was a selected lease because of the good bank customer issue, Ingram signed lease extension options for Louisiana Street in the bank's name despite the fact that Charter has held the leasehold since the LRT was executed.  Ingram and Dana's laxness in enforcing the form of the LRT, and in particular ensuring that the lease negotiators knew how to leverage the fiduciary duty owed to outside investors, severely undermines WFC's assertion that it executed the LRT for the purpose of using Charter's name and duty to its outside investor to fend off pressure from good bank customers.

It appears to the Court that the lease negotiators were not told about the sale of the Preferred Stock, to whom the shares were sold, or how to use Charter to de-leverage good bank customers.  To the contrary, Barbara Reeve-Bailey, a CPG vice president who manages Wells Fargo's administrative facilities for southern California and non-banking states and was a key negotiator of numerous selected leases, testified that she did not

know to whom the shares were sold, or when they were sold, until just before her deposition.  (Reeve-Bailey Dep. 21.)  Moreover, negotiators seemed confused about the outside investor's position and how to leverage it in negotiations.  For example, Reeve-Bailey testified that she understood an outside investor owned 100% of Charter, and that she believed the primary benefit of an outside investor to her as a lease negotiator was removing the properties from OCC oversight.  (Reeve-Bailey Dep. 22-23.)  Only after enunciating this mistaken view of the purported value of an outside investor did she testify about the additional benefit of "[not] feel[ing] the need to be a little more politic in [her] dealings with customers of the bank."  (*Id.* at 24.)

In Dana's business purpose documents, and throughout trial, WFC attempted to analogize the LRT to the Sacramento project.  WFC claims a correlation between the Sacramento project and the LRT in support of two main premises: (a) that a fiduciary duty owed to outside investors in the Sacramento project enabled CPG to avoid unfavorable transactions relating to the joint venture with good bank customers who would otherwise have leveraged their banking relationship, and (b) that the managerial style of the Sacramento project enabled the bank to achieve efficiencies and thus superior leasing performance.  The Court concludes, however, that the Sacramento project – which does appear to have benefited CPG in the manner proponed by WFC – is readily distinguishable from the LRT.

The Sacramento project was a true joint venture.  While Wilson held a minority position in Crocker, he attended meetings, was consulted on major decisions, and offered his expertise on the project.  In terms of resisting pressure from good bank customers

eager to leverage their banking relationship to obtain favorable contracts in relation to the building, Paratte offered specific, well-documented, concrete illustrations of how he used the fiduciary duty to Wilson to deflect pressure from good bank customers. A good bank customer union picketed the project for its failure to hire nonunion subcontractors, for example, and then stopped picketing within a day of its meeting with Paratte in which he distanced Wells Fargo from the decision through reliance on Crocker's duty to its outside investor. CPG's actions reflected those of an entity for whom the presence of outside investors was truly important to convey to entities involved in the building. Both Crocker and Wilson were mentioned in materials marketing the building, for example, and Paratte had separate Crocker business cards. Unsurprisingly, there is no evidence of documentation in which the bank is mistakenly listed as the landlord of the building. The record is bereft of comparable documentation of how CPG employees employed Charter's fiduciary duty to Lehman with regard to the selected leases.

To the contrary, although Charter was supposedly paying the bank a 3% fee to manage the selected leases in its best interest, there is an abundance of evidence of CPG lease negotiators acting as if they were unaware of the transfer to Charter, offering confused testimony about the purpose of Charter's outside investor, and prioritizing the bank's (supposedly non-existent) interest over Charter's. For example, CPG lease negotiators allowed a "good, full fair market" offer (in the words of the lease negotiator) on Laguna Niguel to fall apart because of the bank's disapproval. WFC asks this Court to accept that it was able to use a fiduciary duty to Lehman to preclude the issuance of a good bank customer discount while simultaneously vetoing subtenants disagreeable to the

bank's interests in clear violation of that duty.  In another example of CPG failing to treat Charter as a legitimate and even remotely independent enterprise, Louisiana Street was fully occupied with a Charter tenant – the bank – for a full three years beyond the expiration of its sublease, and neither Ingram nor Dana know whether Charter received any rent due for that period.  Dana, a Charter officer, could not even state with any certainty whether the bank or Charter held the lease on that property today.

In place of the concrete examples of actual deals relating to the Sacramento project that were affected by the presence of outside investors, WFC relies primarily on vague testimony that Ingram and others believed transactions might possibly be influenced by Charter's duty to Lehman.  With regard to the Aetna space contraction in the Garland building, for example, Ingram testified that although he would have adopted the same negotiating position even without the LRT, it is "not inconceivable to certainly think that an accommodation would have been made" if not for the LRT.  With regard to the Globix sublease at 830 Nash, Ingram testified that he "probably . . . would have" responded to the good bank customer's request in the same way had the property not been transferred to Charter.  Dana speculated that he could have used Charter's existence "in a reactive sense" if the issue had arisen during lease modification negotiations at Seattle Tower, yet he expressed no concern about the absence of any mention of Charter in a memorandum relating to the transaction.  This highly speculative testimony fails to convince the Court that WFC entered into the LRT with the purpose of immunizing itself from deals with good bank customers or that WFC did in fact benefit from Charter's structure in this manner; the Court cannot conclude that a single transaction relating to

the transferred leases would have turned out differently if not for Charter's ability to de-leverage good bank customers.  Certainly WFC has failed to show by a preponderance of the evidence that its "good bank customers" purpose motivated the LRT.

There is no record evidence of documents relating to the Sacramento project which mistakenly referred to the bank instead of Crocker.  WFC has suggested that the numerous instances of documents relating to the selected leases mistakenly referencing the bank were mistakes of the type occurring in a large organization with many transactions, and that they constituted a small percentage of the large quantity of real estate paperwork generated after the LRT.  Failure to acknowledge the transference of the selected leases to Charter, however, occurred at levels both high and low, both immediately following the LRT and many years later, and in subleases both big and small, including those negotiated with good bank customers.  The Court does not doubt that CPG, like any other real estate management entity, makes mistakes. The scope and breadth of WFC's ignoring the form of the LRT, however, is strong evidence that WFC's purported "good bank customers" purpose in executing the transaction was a pretextual justification for a tax shelter.

The timing of the sale of the Preferred Stock also distinguishes the LRT from the Sacramento project and further undermines WFC's "good bank customers" justification. Where the Sacramento project did not commence building until its outside investment was secured, there was no outside investor in Charter until it had already been in existence for several months and signed numerous subleases and other documents. Immediately after the exchange, at the end of 1998, Wells Fargo owned 100% of

Charter's Preferred Stock as well as all of its common stock.  Internal emails between KPMG employees reflect the firm's belief that while WFC had not planned to sell the Preferred Stock immediately, it decided to do so in February 1999 in response to newly proposed federal legislation aimed at curbing corporate tax shelters.

Wilson was involved in the Sacramento project, attending meetings and consulting on issues such as identifying a contractor; the outside investors' investment into Crocker rose or fell with the success of the enterprise.  Lehman, on the other hand, is essentially a passive investor whose steady stream of dividend payments is not dependent on Charter's success.  As Hart concluded, "bringing in Lehman seemed to have no economic value of any kind, including from a regulatory point of view, and yet, increased transaction costs." (Tr. 1260-61.)  In short, the actions discussed herein with relation to the LRT are simply not those of a company that sought to use the presence of an outside investor to de-leverage good bank customers, as it did with the Sacramento project.[10]

### iv.    Asserted Business Purpose 3:  Centralization/Management Efficiencies

Dana testified that the LRT enabled him to avoid internal red tape caused by the Norwest, red tape which did not yet exist when the LRT was developed and implemented.  Dana testified that this was a less significant, "pile on reason" for the LRT,

---

[10] The government argues that the good bank customer business purpose must fail as a matter of law, because Nevada corporate law would not preclude consideration of the bank's interest when making decisions on Charter's behalf.  In the Court's view, the facts in evidence establish that WFC did not conduct the LRT with the purpose of de-leveraging good bank customers, regardless of whether its representations to such customers were or would have been legally permissible or misleading.  Accordingly, the Court finds it unnecessary to resolve this issue of Nevada corporate law.

and he acknowledged that he may not have executed the transaction if this was the only business purpose at issue.  However, it is WFC's purpose in effectuating the LRT that matters, not Dana's.  WFC has not cited precedent to support the proposition that an employee's attempt to avoid a bureaucratic structure established by the entity seeking the tax deduction can constitute a valid non-tax business purpose under the sham transaction doctrine.

Unsurprisingly, the record is bereft of evidence showing how the LRT enabled any financial benefit from the avoidance of bureaucracy and centralization or how WFC legitimately hoped it would do so.  To the contrary, WFC did not act in a manner consistent with the stated business purpose of centralization and bureaucratic avoidance.  Although Dana's business purpose document initially asserted the value of segregating the leased properties from the bank's day-to-day operations to enable focused attention on them, the same CPG managers handling the selected leases prior to the LRT continued handling them afterwards.  CPG personnel consistently acted as if they had not been told about the LRT and took steps undermining the transaction's integrity.  In addition, the chronology of events – Dana developing the portfolio for the LRT and then subsequently learning of Norwest's structure and intuiting how it might inhibit CPG's ability to dispose of underwater leases – does not support this justification for the LRT.

Dana testified that several properties in the portfolio were neither ORE nor connected to good bank customers, but selected because of the benefits of centralization and bureaucracy avoidance (Boise Main and 401-B-San Diego would appear to fit this category).  Yet the examples of how WFC intended to benefit from centralization relate

- 86 -

to properties which were purportedly included for other reasons.  These illustrations, moreover, fail to support this business purpose.  Dana testified, for example, that without the LRT he would have been required to obtain a series of signatures from various bank lines previously – but not presently – occupying FIWC before subleasing the space. However, numerous subleases and other documents relating to FIWC mistakenly identify the bank, rather than Charter, as the master tenant.  It is thus unclear that the individuals handling lease negotiations for FIWC understood that they were free from the bank's bureaucratic restrictions regarding signature collections, yet they proceeded with the transactions without an abundance of signatures.

Ingram cited First Interstate House as an exemplar of the benefits of centralization. CPG **might** have received internal pressure from other bank lines for CPG's expenditure of $1.3 million in concessions to GE Capital for taking over the lease, he testified, if not for the degree of insulation from internal scrutiny Charter provided.  This illustration shows another flaw with the centralization/bureaucracy avoidance business purpose: if WFC as a company believed that the $1.3 million was not worth more than the savings obtained from GE Capital's agreement to take the lease at First Interstate House, the Court finds it difficult to accept that WFC can proffer the benefit of this self-deception as a legitimate business purpose.  If the $1.3 million expenditure – and centralization more generally – truly benefited the company as a whole, then it could have simply removed its signature requirements and altered its internal bureaucracy to its advantage without

incurring the financial **and substantial administrative** costs of conducting the LRT.[11]  A

"roundabout means to arrive at . . . straightforward ends" can indicate that the taxpayer's

true motive was tax advantages rather than the proffered business purpose.  *Schering-*

*Plough Corp. v. United States*, 651 F. Supp. 2d 219, 270 (D.N.J. 2009).

In the same vein, Hart demonstrated how any argument for efficiency based on the

executive bonus plan is illusory as WFC could have implemented such a bonus plan with

lower administrative costs without the LRT.   Vandermark apparently agreed with this

conclusion, dismissing the incentive-based justification for the LRT as unlikely to

withstand judicial scrutiny.   Whatever efficiencies might have accrued to WFC through

centralization based on the expertise of outside investors – as in the Sacramento project –

are absent here, where Lehman contributed no particular expertise and was not

particularly incentivized to do so because, unlike Wilson, its investment did not depend

on Charter's success.

---

[11] Far from facilitating administrative efficiencies, **the LRT seems to have imposed significant administrative burdens**.  Indeed, when asked why CPG did not simply place all bank properties at risk of ORE designation into a non-banking subsidiary like Charter to avoid problems associated with the OCC disposition period, Dana testified:

> [T]here is an administrative burden that I can avoid by not doing that. . . . [I]nstead of just having one lease on a leased property, we would have two leases, one lease from the landlord to an entity like Charter and then another lease from Charter back to the bank.  It's **a higher administrative burden**, and then every month it means that cash has to be moved around and reconciled.  It's just more expensive. . . .   You would have to have a good reason to do it, . . . [to] offset[] the burden of the additional administration and the set-up costs . . . .

(Tr. 79-80 (emphasis added).)

### v.    Conclusion

If the LRT had a legitimate business purpose, the Court would not consider it a tax shelter simply because WFC took favorable tax consequences into account when entering into it.  *See Frank Lyon*, 435 U.S. at 580 ("We cannot ignore the reality that the tax laws affect the shape of nearly every business transaction.").  However, viewing the LRT as a whole, the Court concludes that WFC has failed to establish a legitimate business purpose for the transaction other than tax benefits. As in *Haberman Farms, Inc. v. United States*, 305 F.2d 787, 792 (8th Cir. 1962), in which the Eighth Circuit rejected as a sham a transaction involving a farming business' transfer of certain liabilities into a subsidiary, "an analysis of [WFC's] asserted reasons [for the LRT] in the light of the facts leaves [the Court] with the distinct impression that in actuality the reasons are thin and tenuous and that the only substantive one among them is the tax motivation."

### B.    Economic Substance

"[W]here . . . there is a genuine multiple-party transaction with economic substance which is compelled or encouraged by business or regulatory realities, . . . the Government should honor the allocation of rights and duties effectuated by the parties." *Frank Lyon*, 435 U.S. at 583-84.  The Eighth Circuit considers a transaction lacking in economic substance when "no real potential for profit exist[ed]" for the transaction outside of tax considerations.  *IES*, 253 F.3d at 353 (internal quotation marks omitted). Courts consistently conclude that the anticipated pre-tax profit of a challenged transaction must be more than the transaction costs associated with the deal; in the case of the LRT,

those costs include the $3 million fee paid to KPMG and fees paid to the lawyers who drafted the transaction documents. *See, e.g.*, *Salina P'ship LP v. C.I.R.*, T.C. Memo. 2000–352, 2000 WL 1700928, at *12 (2000) ("Generally, there must be a reasonable expectation that nontax benefits will meet or exceed transaction costs."). However, a transaction does not necessarily lack economic substance only because reasonably anticipated profits failed to materialize. Rather, "the transaction is evaluated based on the information available to a prudent investor at the time the taxpayer entered into the transaction, not what may (or may not) have happened later." *Stobie Creek*, 608 F.3d at 1375. Unlike the business purpose doctrine, which considers the taxpayer's subjective intent, courts evaluate whether a transaction was imbued with economic substance objectively. *Shriver*, 899 F.2d at 726. As discussed above, the Eighth Circuit has considered "whether what was actually done is what the parties to the transaction purported to do" in ascertaining whether a transaction has economic substance. *In re Gran*, 964 F.2d at 825 (internal quotation marks and citations omitted); *see also IES*, 253 F.3d at 356.

As a preliminary matter, the Court readily concludes that the stock sale from the transferring banks to WFC and from WFC to Lehman lacked economic substance and did not accomplish what WFC purports it to have done. *See Shell*, 2008 WL 2714252, at *37-38 (considering how "outside shareholder investors indirectly shared in the risks and potential benefits" of a subsidiary subject to an economic liability transaction). Lehman's interest was unaffected by Charter's profits; because its stock was more similar to debt than equity, the issuance of the Preferred Stock could not be predicted to enhance

WFC's ability to dispose of the underwater leases in the same way that Wilson's equity position in the Sacramento project did. As discussed above, the Sacramento project was designed (as a joint venture with a knowledgeable investor whose investment hinged on the project's success) and implemented (through marketing materials and other actions) with the goal of keeping good bank customers at bay, and there is compelling evidence that it accomplished this goal. By contrast, the record leads the Court to conclude that the LRT was designed and implemented as a tax shelter, and WFC's actions indicate an absence of any real potential – let alone success – to use Charter's fiduciary duty with an outside investor in negotiations with good bank customers. The Court agrees with Hart's conclusion that bringing in Lehman had no non-tax economic value to WFC, and yet increased transaction costs.

WFC is before this Court to claim a deduction for a loss of approximately $423 million. It claims that the sale of stock caused the company to suffer an economic loss of $423 million, although in executing the LRT it reasonably anticipated a profit. The stock sale was an integral and integrated part of the LRT's design and plan. Applicable regulations require that any deduction must be a "bona fide loss . . . actually sustained" by the taxpayer, as determined by "[s]ubstance and not mere form . . . ." 26 C.F.R. § 1.165-1(b); *see also DeMartino v. C.I.R.*, 862 F.2d 400, 406 (2d Cir. 1988) ("The basic rule of law is that taxation is based upon substance, not form."); *Shoenberg v. C.I.R.*, 77 F.2d 446, 449 (8th Cir. 1935) ("An actual loss is not sustained unless when the entire transaction is concluded the taxpayer is poorer to the extent of the loss claimed; in other words, he has that much less than before."). The Court is persuaded by the government's

assertion that if WFC actually lost $423 million through the stock sale, the calculation of anticipated pre-tax profit should include that planned, anticipated, and allegedly "actually sustained" loss.

In other words, in entering into a transaction that it knew would include a bona fide loss of $423 million, under the economic substance test WFC should have reasonably anticipated a profit in excess of that amount.   Indeed, WFC has sometimes characterized the profit potential of lease extension options (as with Garland) as an independent non-tax reason justifying the LRT.   While the parties dispute the validity of KPMG's calculations of lease improvements and the value of Garland's lease extension and purchase options, even taking as true WFC's dubious calculations in this regard, it cannot show that the LRT had the potential to generate profits anywhere near the loss it allegedly sustained in the stock sale, or over $423 million in gain.   "[M]odest profits relative to substantial tax benefits are insufficient to imbue an otherwise dubious transaction with economic substance."  *Nev. Partners Fund, LLC ex rel. Sapphire II, Inc. v. United States*, 714 F. Supp. 2d 598, 632 (S.D. Miss. 2010).

The stock sale did not, of course, generate an actual bona fide loss to WFC.   The transferring banks did not actually lose $423 million by buying the Preferred Stock and then immediately selling it to Wells Fargo, which then sold it to Lehman a few months later.   No rational company would do that.   WFC was, substantively, not $423 million poorer after the stock sale.   It had an allegedly $423 million liability (held by the transferring banks) before the LRT and an allegedly $423 liability (held by Charter) afterwards.   As in *Shoenberg*, the taxpayer "suffered no real loss, but solely a paper one

which could be shown only by considering one part of an entire plan and transaction. The entire plan was devised for the purpose of showing such loss." 77 F.2d at 449. "[T]he generated loss was designed to be entirely artificial." *Sala*, 613 F.3d at 1253. A loss "structured from the outset to be a complete fiction" is compelling evidence that the underlying transaction lacks economic substance. *Id.*

WFC concedes that "the precise form of the LRT may have been driven by tax considerations (as many business transactions are) . . . ." (Pl.'s Post-Trial Brief at 59, Docket No. 181.)  WFC essentially asks the Court to turn a blind eye to the dearth of economic substance in the stock issuance and sale.  While urging the Court to view the transaction as a whole, it nonetheless argues that "a simple recognition transaction brought about by the subsequent sale of stock should [not] be scrutinized for business purpose as part of an economic substance analysis." (*Id.* at 71 (citing *Cottage Sav. Ass'n v. C.I.R.*, 499 U.S. 554, 562 (1991).)  *Cottage Savings Association*, however, does not stand for this proposition, nor does the long line of caselaw directing courts to view a challenged transaction as a whole. *See, e.g.*, *Long Term Capital*, 330 F. Supp. 2d at 191-92.  WFC's high basis in a transferred asset does not, on its own, produce a capital loss; rather, it must engage in both a realization event and a recognition event to claim a deduction.  In this case, WFC could claim the tax benefit only when the Preferred Stock was sold to Lehman.  The absence of economic substance of that crucial step of the LRT is therefore highly relevant.

Although the Court has reason to question the precise calculation of anticipated losses, generally the Court accepts that WFC had a substantial liability on its hands in the

form of post-merger superfluous property and underwater leases.  WFC has established

the existence of large, bona fide prospective losses from the bank's master rent expenses

over the projected sublease rental income.  Yet WFC took deductions for the master lease

payments both before and after the LRT; the transferring banks took the deductions prior

to the LRT, and Charter has taken deductions since the LRT, all reflected in WFC's

consolidated tax return.   (Dx. 669 at 9.)   Those deductions are actually sustained.

Through the LRT, however, WFC is seeking a deduction for those same losses (an

amount approximating the present value of master lease payments the company

anticipated losing, **and deducting**, in the future).  This amounts to an attempted double

deduction for tax purposes (the capital loss on the stock sale in addition to the continuing

rent expense deductions taken by Charter).  The actual rent expense deductions taken by

the transferring banks and now Charter are real losses appropriately deducted as they are

incurred.  The purported $423 million loss on the stock sale is fictitious.

Moreover, based on the record evidence, the Court cannot readily conclude that

WFC had a reasonable expectation of profit absent tax considerations even excluding the

purported $423 million capital loss from the pre-tax profit analysis.  KPMG's estimates

of the savings generated from the LRT are flawed for numerous reasons.  No independent

third party evaluated the selected leases prior to the LRT; rather, KPMG relied upon the

information provided by Dana and CPG.  KPMG, the same firm that designed and

marketed the LRT as a tax shelter and was paid to implement the LRT, also performed

the improvement calculations in what would appear to be a conflict of interest.  *See*

*Canal Corp. v. C.I.R.*, 135 T.C. No. 9, 2010 WL 3064428, at *13 (2010) ("Courts have

repeatedly held that it is unreasonable for a taxpayer to rely on a tax adviser actively involved in planning the transaction and tainted by an inherent conflict of interest."). Notably, no quantification of the savings was ordered or made before Vandermark's involvement.  The base case was repeatedly tweaked in order to achieve a capital loss reserve of a certain amount, as exemplified in the case of Seattle Tower.  Two leases "in the money," for example, were re-characterized as underwater after KPMG changed certain assumptions in the base case scenario.  The base case included space already held by the bank which was subsequently leased back to the bank by Charter.  It assumed zero retention of subtenants and an inability to market a sublease for lease tails, two assumptions undercut by CPG's actual experiences in managing its properties.  While the Court agrees with WFC that it had underwater leases likely to produce losses, the quantification of those projected losses is unreliable.

As a result, and for additional independent reasons, KPMG's quantification of the projected savings from the LRT through the "what if" scenarios is also unreliable. Beyond questionable data manipulation in the base case scenario on which the improvement calculations are based, the "what if" scenarios' projected savings rely on highly speculative assumptions.  One "what if" scenario assumed that since the Sacramento project's structure enabled the bank to beat market expectations, the LRT would likewise facilitate millions of dollars in savings for the leased properties.  As discussed above, however, the LRT is easily distinguishable from the Sacramento project; in particular, the factors that generated savings with regard to that project were absent from the design and implementation of the LRT.  Another "what if" scenario

presumed savings from filling in otherwise unmarketable lease tails (due to the change in regulatory regime), but the improvement was assumed for all of the selected leases regardless of whether the bank actually considered them at risk of ORE designation. The "what if" scenario based on the avoidance of disadvantageous transactions with good bank customers, moreover, improbably assumed that all in place subtenants would agree to an immediate raising of their rents. As discussed above, the Court finds that WFC's actions are inconsistent with an actual plan to use the LRT to avoid deals with good bank customers, and the record does not reflect success in doing so. Based on the record evidence undercutting WFC's proffered "success stories" of the LRT, the Court simply cannot accept Gotthardt's conclusion that the LRT generated at least $26 million in savings for WFC.

The parties hotly dispute the value of the extension options at Garland. Notably, WFC did not attempt to quantify the fair market value of the lease extension and purchase options on Garland contemporaneously; WFC derived its value estimation from the opinion of its expert, hired in connection with this lawsuit. Also notable is the fact that the transferring banks received **nothing** from Charter in exchange for relinquishing the Garland options WFC now claims were worth $37 million in early 1999. Nonetheless, in the Court's view, WFC has established that the lease extension and purchase options on Garland did have some value in 1998, and that moving that particular property into a non-banking subsidiary outside the OCC's regulatory jurisdiction enhanced WFC's ability to maximize its profits from those options. The Court finds it unnecessary to determine the value of WFC's interest in Garland, however,

because this fact alone cannot rescue the LRT from the inevitable conclusion that it was a tax shelter devoid of economic substance.[12]  The question before the Court is not whether WFC had a reasonable expectation of profitability in transferring Garland into a non-banking subsidiary.  The question before the Court is whether the LRT – a three-step process involving twenty-one properties, the issuance of Preferred Stock, the sale of such stock from the transferring banks to WFC and from WFC to Lehman – had economic substance when viewed as a whole.  The Court concludes it did not.

The Court cannot isolate one part, or even a few parts, of one step of a large, complex transaction and find that its profit potential imbues the entire transaction with substance which is otherwise lacking.  WFC asserts that the government asks the Court to dissect the LRT and find it invalid if even one piece lacks economic substance or a non-tax business purpose.  *See Shell*, 2008 WL 2714252, at *35 (rejecting as "'slicing and dicing'" the government's "challenge only an isolated component of the overall transaction").  To the contrary, by focusing on Garland's profitability and asking the Court to disregard the stock sale to Lehman as a mere inconsequential recognition event, it is WFC that seeks to isolate a kernel of prospective profitability to justify a large, multi-step, multi-property transaction.  This the Court cannot do.  WFC has not shown

---

[12]  The Court does not agree with WFC's assertion that in *IES*, the Eighth Circuit concluded that actual profit in and of itself satisfies the "economic substance" prong of the *Rice's Toyota World* test.  *See* 253 F.3d at 354 ("Because the entire amount of the ADR dividends was income to IES, the ADR transactions resulted in a profit, an economic benefit to IES.").  Rather, the *IES* Court considered the transaction as a whole – including but not limited to the fact that "these were not transactions conducted by alter-egos of IES or straw entities created by IES simply for the purpose of conducting ADR trades" – to ascertain whether or not it was a sham.  *Id.* at 355.  The Eighth Circuit considered "all the facts and circumstances" in reaching its conclusion.  *Id.* at 356.

that the LRT, viewed as a whole, had economic substance or a real purpose other than tax

avoidance.

## ORDER

Based on the Court's Findings of Fact and Conclusions of Law, **IT IS HEREBY**

**ORDERED** that judgment be entered in favor of defendant and against plaintiff on each

of plaintiff's claims.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

DATED:  September 30, 2011                    ____s/ John R. Tunheim____
at Minneapolis, Minnesota.                           JOHN R. TUNHEIM
                                                  United States District Judge